**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WORLDWIDE DIRECTORIES, S.A. DE C.V. and IDEAS INTERACTIVAS, S.A. DE C.V., <br><br> Plaintiffs, <br><br> v. <br><br> YAHOO! INC., YAHOO DE MEXICO, S.A. DE C.V., BAKER & MCKENZIE and BAKER & MCKENZIE, S.C., <br><br> Defendants. | **Civil Action No. 14-CV-7349** <br><br> **AMENDED VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Worldwide Directories, S.A. de C.V. ("Worldwide") and Ideas Interactivas, S.A. de C.V. ("Interactivas") (collectively as "Plaintiffs"), for their Complaint against Defendants Yahoo! Inc. ("Yahoo-US"), Yahoo de Mexico, S.A. de C.V. ("Yahoo-Mexico")[1], Baker & McKenzie, LLP ("Baker"), and Baker & McKenzie, S.C. ("Baker-Mexico")[2] (collectively as "the RICO Defendants") allege for this Amended Verified Complaint with knowledge as to their own acts, and on information and belief as to all other matters, as follows:

<u>**NATURE OF THIS ACTION**</u>

1.     This is an action alleging RICO, fraud, conspiracy and other related counts against one of the largest corporations in the United States and one of the largest law firms in the world who combined to form an enterprise associated in fact for the common purpose of perverting the Mexican civil justice system and avoiding billions of dollars of liability resulting from Yahoo's attempted evasion of its valuable agreements with Plaintiffs.

---

[1] Yahoo-US and Yahoo-Mexico will be referred to individually, or collectively as the "Yahoo Defendants."
[2] Baker and Baker-Mexico will be referred to individually, or collectively as the "Baker & McKenzie Defendants."

2.      The U.S. based enterprise is comprised of several American and Mexican entities, as well as several non-parties, and involves a conspiracy hatched in the United States and executed in Mexico.  The parties comprising the U.S. based enterprise include co-conspirator RICO Defendants Yahoo-US, Yahoo-Mexico, Baker, and Baker-Mexico. These RICO Defendants together colluded, for a common purpose, to mastermind and carry out a conspiracy to avoid and/or nullify a $2.7 billion dollar judgment in favor of Plaintiffs and against Defendants Yahoo-US and Yahoo-Mexico that was entered by the Mexican courts.  The non-parties comprising the U.S. based enterprise that actively assisted with carrying out the scheme include Dr. Edgar Elias Azar ("Azar"), President of Mexico's District Federal Superior Courts, and Edgar Raul Rodriguez ("Rodriguez"), a clerk in the Mexico appellate court, and several others.  As part of this conspiracy, the RICO Defendants engaged in acts of coercion, bribery, and ghostwriting, that, as will be seen, was directed by Yahoo-US and Baker to apply pressure on Plaintiffs and avoid the judgment.  This lawsuit is necessary to recover damages and to prevent further perversion of the Mexican judicial system, and direct harm to Plaintiffs.

3.      In 2011, Plaintiffs sued Yahoo for Yahoo's failure to comply with a series of contracts related to Plaintiffs' exclusive development and distribution of an Internet and print-based yellow pages directory service for Yahoo around the World.  To ensure a successful outcome, rather than mount a legitimate legal challenge to the bona fide judgment, Plaintiffs allege that the evidence shows that the RICO Defendants conspired to unlawfully obtain a positive judgment through a series of criminal acts, including bribery, money laundering, mail fraud, and wire fraud, among others, in order to corrupt the Mexican judiciary.

4.      In 2012, at the conclusion of trial, however, despite Defendants' efforts, a Mexican court ordered Yahoo to pay $2.7 billion in damages in connection with the breach of

contract lawsuit (the "Yahoo judgment"). During the underlying litigation, Yahoo did not fully disclose to its investors the extent of the potential judgment against it. Getting the judgment overturned was imperative if Yahoo was to continue to compete in the Internet communication services industry, and not pay a substantial sum to satisfy the judgment. Accordingly, having failed to intimidate and corrupt the trial judge, the RICO Defendants set out on a course of actions to corrupt the appeals process and overturn the judgment, which still continues today.

5.      In order to accomplish this common purpose, the RICO Defendants committed repeated acts of obstruction of justice and coercion of judicial officials, directed from the United States and aimed at pressuring Plaintiffs to drop their suit or accept a settlement that is substantially less than the amount of Yahoo-US's exposure, and ultimately to illegally obtain a favorable judgment. The evidence supports a conclusion which Plaintiffs are confident discovery will confirm that this alleged criminal conduct includes, among other acts, bribery in violation of the Travel Act, extortion in violation of the Hobbs Act, mail and wire fraud, and money laundering.

6.      To execute the conspiracy through the imposition of threats and intimidation, the RICO Defendants enlisted the services of Judge Azar, who Plaintiffs have learned is known throughout Mexico for his willingness to influence the disposition of cases in exchange for money. As the ultimate supervisor of the judges involved in making these decisions, Judge Azar had substantial influence over members of the Mexican judiciary, and the ability to retaliate against judges who do not follow his corrupt directives.

7.      From the very moment that Plaintiffs initiated a lawsuit to address Yahoo's multiple contract breaches, and even before the filing of the case during the pre-claim discovery phase, the RICO Defendants conspired to corrupt the judicial process through intimidation and

3

coercion.  Specifically,  the RICO Defendants  sought  to use co-conspirator Judge Azar to intimidate  a Mexican district judge into ruling for Yahoo and then, when those efforts failed, sought  to and successfully  did corrupt the appellate  level of the Mexican judicial system, resulting  in a corrupt fraudulent  reversal of the lower district court's $2.7 billion  damages  award and a reduction  of the damages  award to $172,500.

8.     At the request of the Baker & McKenzie Defendants,  with the knowledge  and approval of Yahoo, Judge Azar improperly  injected himself  into Plaintiffs'  civil case and attempted  to intimidate  the district  court, Judge Segu, assigned  to decide  the case to rule  in favor of Yahoo despite extensive  evidence  of Yahoo's liability.

9.     In furtherance  of this conspiracy,  the evidence  shows that Defendants  Baker & McKenzie  improperly  conducted  *ex parte* meetings  with Judge Azar to discuss  the implementation  of their scheme to corrupt the Yahoo judgment.

10.     The Baker & McKenzie Defendants,  with the knowledge  and approval of Yahoo, drafted two complete  decisions  with their desired result and purported  analysis  and delivered them to Judge Segu.  The first opinion  was a self-serving  opinion  in favor of Yahoo and the second opinion  was one absolving  the Baker & McKenzie Defendants  of any wrongdoing  in connection  with that litigation.   The Baker & McKenzie Defendants  then delivered  the illegal opinions  on a memory  stick to the district court judge who had already been informed  by Judge Azar that the opinion  would be delivered  by Yahoo's lawyers. Upon delivering  the pre-drafted opinions  that completely  exonerated Yahoo and its attorneys  from any liability  for improperly filing  pleadings  and representing  Yahoo in the underlying  case, the Baker & McKenzie Defendants   pressured the district court judge to enter the opinion  as crafted by the Baker & McKenzie  Defendants.

11.     Despite Judge Azar's threats and intimidation, and contrary to instructions, Judge Segu, the district court judge, refused to enter the fraudulent decision demanded by Judge Azar. Instead, the judge decided the matter fairly by entering an unbiased judgment in favor of Plaintiffs.  As a result, Judge Segu has been severely retaliated against by Judge Azar and his corrupt cohorts.

12.     Having failed at the district court level, the RICO Defendants immediately set to corrupt and influence the appellate court which would be responsible for reviewing that decision.

13.     First, the RICO Defendants sought to have the judgment overturned by asserting that Judge Segu did not have the authority to issue the judgment in the first place.  Defendants pursued this frivolous claim although just a few days earlier the same representatives of the RICO Defendants were exhorting Judge Segu to enter a judgment, drafted by them, in their favor.  Clearly the issue of Judge Segu's authority only came into question after the RICO Defendants failed to corrupt him.

14.     Next, the RICO Defendants set out to improperly influence the Mexican appellate process.  To do so, the RICO Defendants, through the Baker & McKenzie Defendants, caused the Yahoo file to be improperly sent directly to the judges responsible for the appeal before the appellate process had even been initiated.  The RICO Defendants then instructed that the file be kept separate from all other files so they could control access to the proof of Yahoo's misconduct.

15.     In furtherance of this conspiracy of intimidation and perversion of justice, Plaintiffs have obtained evidence that Judge Azar, at the direction and instruction of the RICO Defendants, through the Baker & McKenzie Defendants, met on numerous occasions for several

hours with the Chief Judge of the Appellate Courts, intimidating her and ultimately directing her and her panel to reverse the judgment below and enter a corrupted judgment in favor of Yahoo.

16.    Indeed, when an attorney for Plaintiffs went to meet with Judge Azar about the status of the appeal before it had even been filed by Yahoo, Judge Azar explained that the other side had "got there before him" and Plaintiffs "cannot win in my court" and had "already been defeated" and there were "too many zeros involved" for his mind to be changed.

17.    Plaintiffs' allegations herein about the RICO Defendants' corruption of Judge Azar are not speculative.  Plaintiffs' evidence that this fraudulent corrupt judgment was obtained by Judge Azar's threats and intimidation comes directly from eyewitnesses who personally observed the conspiracy. These eyewitnesses include the original district court Judge Segu who has provided sworn testimony about the intimidation and corruption he suffered at the hands of Judge Azar, and threats of harm to the judge if he failed to comply, which have since manifested. These threats caused Judge Segu to temporarily flee his native country for the United States.

18.    Judge Segu has provided counsel with the original memory stick containing the illegal opinion exonerating Yahoo and an opinion finding for Yahoo on the underlying merits drafted by the Baker & McKenzie Defendants, at the direction of Yahoo. Plaintiffs have the memory stick, and a forensic analysis of this memory stick indicates that metadata shows that the documents on it were revised and possibly drafted on a computer owned by Defendant Baker & McKenzie further suggesting this scheme was tied to and originated from the United States.

19.    Moreover, former Yahoo! Inc. Chief Executive Officer, Scott Thompson, and Yahoo! Inc. General Counsel, Mike Callahan, executed powers of attorney in Mexico City, which delegated authority to a Mexican attorney to represent Yahoo! Inc. in Mexico.

20.     Plaintiffs have also obtained sworn statements from other clerks and employees of the Mexican courts who directly observed the intimidation and corruption by Judge Azar and the Baker & McKenzie Defendants alleged herein.

21.     During the course of the RICO Defendants' scheme to overturn the Yahoo judgment, Yahoo-US also sought to mislead U.S. investors, its own shareholders, and the SEC about the impact of the judgment on it earnings by making a series of misstatements and omissions.  Initially, even before the court issued a judgment, Yahoo was aware of the risk that it could be liable for substantial damages, but it did not disclose this risk to investors.  Then, following the filing of an 8-K, which attached its own press release interpreting and downplaying the judgment after it was issued, Yahoo CFO Ken Goldman told investors on a 2012 fourth-quarter earnings call that Yahoo would not be setting aside any funds to pay the judgment, assuring them that Yahoo expected to prevail on appeal (because of the acts occurring in Mexico).  However, a few months later, on February 28, 2013, Yahoo explained in its 2013 Annual Report that, while it expected to prevail on appeal, it could have to pay the judgment if, due to the unpredictability of litigation, it lost.  In that same SEC Form 10-K, Yahoo also severely downplayed the judgment, assuring investors that it would be overturned because it was entered by a clerk not a judge without authority (the very "clerk" it had encouraged to enter its favorable fraudulent opinions).

22.     In neither its fourth-quarter earnings call, nor its Annual Report, did Yahoo disclose its scheme to corrupt the Mexican judiciary and obstruct justice to obtain a favorable outcome.

23.     As a direct result of the RICO Defendants' improper corruption of the Mexican judicial system, the appellate court panel chaired by Judge Monica Venegas entered a decision

summarily reversing the carefully considered decision entered by the district court judge and reducing the $2.7 billion damage award to $172,500 and entering an approximately $3 million counterclaim judgment on Yahoo's behalf.

24.     The fraudulent conduct described herein and the evidence obtained by Plaintiffs support a conclusion that the RICO Defendants violated the Racketeer Influenced Corrupt Organization Act, 28 U.S.C. § 1962 *et seq.*, with predicate acts of extortion, bribery, mail and wire fraud, and money laundering, among others. The RICO Defendants have also committed common law fraud, and civil conspiracy through the commission of the underlying crimes and the resulting expropriation and coercion of justice.

25.     Accordingly, the RICO Defendants' fraud and RICO conspiracy directly caused Plaintiffs damage and caused the expenditure of substantial sums of money on investigators, attorneys, and the fees and costs in connection with ongoing litigation in Mexico and this lawsuit to combat this fraudulently obtained judgment and to prevent the RICO Defendants from further corruption of the Mexican judicial system.

26.     Plaintiffs, therefore, respectfully demand that this Court grant them injunctive relief and damages to remedy the unconscionable wrong caused by the RICO Defendants' improper actions.

## PARTIES

### The Plaintiffs

27.     Plaintiff Worldwide Directories, S.A. de C.V. ("WWD") is a Mexican corporation whose principal place of business is located at Guanajuato 224, Despacho 105 y 106, Col. Roma, México, DF., México. WWD was developed by Sergio Eduardo Guarneros and Carlos Alberto Bazan Canabal in 2002. WWD is a holding company for Ideas Interactivas, S.A. de C.V.

28.     Plaintiff Ideas Interactivas, S.A. de C.V. ("Interactivas") is a Mexican corporation with offices in whose principal place of business is located at Guanajuato 224, Despacho 105 y 106, Col. Roma, México, DF., México.

**The RICO Defendants**

29.     Defendant Yahoo! Inc. ("Yahoo-US") is a Delaware corporation. Yahoo-US is a multinational Internet and technology company with offices in New York. Through its United States-based website yahoo.com, Yahoo provides a variety of Internet services, including a search engine that is available internationally.

30.     Defendant Yahoo de Mexico, S.A. de C.V. ("Yahoo-Mexico") (collectively with Yahoo-US as "Yahoo Defendants") is a foreign subsidiary of Yahoo. Yahoo-Mexico provides similar or identical services as Yahoo. Yahoo-Mexico's website contains a two-letter country designation, mx.yahoo.com, and yahoo.com.mx, and content in Spanish targeted to Mexican citizens.

31.     Plaintiffs are knowledgeable and aware that the Yahoo Defendants share a document repository system, called Rover, which is accessible by all of its international offices, including those in Mexico.

32.     Defendant Baker & McKenzie, LLP ("Baker") is a US law firm with offices in New York. Baker has five offices in Mexico, including an office in Mexico City.

33.     Defendant Baker & McKenzie, S.C. ("Baker-Mexico") (collectively with Baker-US as the "Baker & McKenzie Defendants") is the Mexico City-based office of Baker.

34.     Yahoo-US, Yahoo-Mexico, Baker and Baker-Mexico (collectively as "RICO Defendants") operated as an enterprise that through intimidation, coercion, and judicial bribery caused a lawfully obtained judgment to be overturned by corrupt co-conspirators.

9

**The Non-Party Co-Conspirators**

35.     Several non-parties were central to the scheme of intimidation and fraud alleged in this Complaint.   They include:

      a.  Dr. Edgar Elias Azar is a citizen of Mexico and the President of the Federal District Superior Courts in Mexico.

      b.  Edgar Raul Rodriguez is a citizen of Mexico and an employee of the Mexican Federal District court.

      c.  Laura Pérez Ríos is a Magistrate Judge for the Third Civil Chamber of the Superior Court of Justice in the Federal District.

      d.  Mónica Venegas Hernández is a Magistrate Judge for the Third Civil Chamber of the Superior Court of Justice in the Federal District.

## JURISDICTION AND VENUE

36.     This Court is vested with subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. 1331. Plaintiffs allege that Defendants violated 18 U.S.C. §§ 1961, *et seq*.

37.     This Court has supplemental jurisdiction over Plaintiffs' remaining claims under 28 U.S.C. § 1367.

38.     This Court has personal jurisdiction over Defendants because they reside, maintain offices, or conduct substantial business in this District, and/or engaged in a substantial portion of the challenged conduct in this District.

39.     Venue is proper in this District under 28 U.S.C. § 1391 and 15 USC § 22 because the Yahoo Defendants and the Baker & McKenzie Defendants transact significant business through their offices in this district.

## ALLEGATIONS

### Yahoo-US Recruited and Hired Plaintiffs to Develop Business for Yahoo-Mexico

40.     In 1999, Yahoo-US recruited Carlos Alberto Bazan-Canabal ("Bazan") to develop Yahoo-Mexico's production and Enterprise solutions groups and to launch Yahoo-Mexico's website. At the time of his recruitment, Mr. Bazan lived in Mexico. Yahoo-US flew personnel to Mexico to conduct interviews. Mr. Bazan was then flown to California on multiple occasions to meet with Yahoo-US executives. Mr. Bazan reported directly to individuals at Yahoo-US, including Mark Inkster, Vice President of Search and Director of International Operations (California), Heather Killen, Senior Vice President, International Operations (California), Roberto Alonso, General Manager of Yahoo-Mexico and Vice President of Yahoo Americas (Miami), and Jeffrey Pedigo, Director of Sales Engineering (Atlanta). At the outset of his employment, Mr. Bazan spent 1 ½ months living in California while undergoing training at Yahoo-US. His paychecks were issued by Yahoo-US in California and Yahoo-US paid for all of his living expenses in California while Mr. Bazan was training.

41.     Mr. Bazan worked for Yahoo-Mexico from 1999 until 2003, and during that time he became familiar with Yahoo-US's and Yahoo-Mexico's operations in Latin America, Europe, and in the US.

42.     In fact, he created Yahoo!'s Enterprise Solutions division and its production group in Mexico by working closely with Yahoo-US's management team. Indeed, everything Mr. Bazan did for the company had to be sanctioned and was monitored by Yahoo-US. In fact, on two occasions, Mr. Bazan had two projects immediately shut down by Yahoo-US after Yahoo-US determined that the work was inconsistent with its own business strategy.

43.     Mr. Bazan met on many occasions with Yahoo-US's counsel regarding litigation and contractual issues.  In 1999, Yahoo-US brought a lawsuit in Mexico to prohibit a Mexican entity from using its domain name.  Before Yahoo-US could register the domain name, the Mexican entity registered the name yahoo.com.mx.  Because there was risk that Yahoo-US might not succeed in its lawsuit to regain the domain name, Yahoo-US's Vice President and Deputy General Counsel, Michael Samway, based in Coral Gables, Florida, instructed Mr. Bazan to call and inform the head of NIC Mexico, Oscar Robles, and threaten to bring criminal charges against him if he did not agree to transfer yahoo.com.mx to Yahoo.  Mr. Samway also instructed Mr. Bazan to tell Mr. Robles that Yahoo would pay his attorneys fees if Mr. Robles was sued for transferring the yahoo.com.mx domain name to Yahoo while the issue was in litigation.  Yahoo-US required that Mr. Bazan get authorization from Mr. Samway or its General Counsel Greg Wren.  On numerous occasions, Mr. Samway instructed Mr. Bazan to ignore potential criminal liability with respect to his conduct overseas involving Yahoo business dealings, and assured him that Yahoo-US would get him out of trouble if necessary.

44.     Mr. Bazan also handled Yahoo-Mexico's communications with the media which had to be consistent with Yahoo-US's message and policies in all respects.  To ensure this consistency, Yahoo-US trained Mr. Bazan on its communications strategies in the United States.

45.     In addition, between 2001-2003, Yahoo-US pressured Yahoo-Mexico to show profits and positive cash flow.  Due to Yahoo-US's pressure, Yahoo-Mexico prematurely booked a sale of a software portal to a Mexican university in 2002, which resulted in an overstatement of Yahoo's revenues.

46.     On numerous occasions, Mr. Bazan met with and was told by Yahoo-US's upper management to take certain and specific actions in Mexico for Yahoo's international lines of

business.  Mr. Bazan even met with Yahoo founders David Filo and Jerry Yang on occasion to discuss Yahoo-Mexico business strategies.  Mr. Bazan was also responsible, along with Yahoo-Mexico's marketing director, for organizing Jerry Yang's Mexico roadshows.

47.     As indicated by these and many other similar incidents, Yahoo-Mexico undertook no significant business actions without prior approval by Yahoo-US. The Mexican division of the company was under the complete control of its American parent.  Based on Mr. Bazan's experience at Yahoo-US and Yahoo-Mexico, any counsel working in Mexico would ultimately have been accountable to Yahoo-US and would have likely had meetings with executives from Yahoo-US.

48.     Indeed, Plaintiffs routinely communicated with officers, directors, and employees of Yahoo-US and Yahoo-Mexico through telephone calls, postal mail and electronic mail, and Yahoo-US regularly instructed and advised Plaintiffs on operational matters in Mexico.[3]

49.     Furthermore, Mr. Bazan was based in the Mexico City office, but also had an office in California.  For work, he made approximately two trips a month to Yahoo's offices in California and/or Texas.  Mr. Bazan reported to Fernando Ramirez, Yahoo! Mexico's General Manager based in Mexico City, and also to Mark Inkster in California.  Mr. Ramirez in turn reported to Roberto Alonso in Miami.  Over a three year period, Yahoo-US executives, including (the VP of Latin America), Inkster, Yahoo's co-founder – Jerry Yang, Hugo Beltran, Harry Neuhaush, Phil Quigley, David Duckenfield, Jorge Consuegra, Jose Rivera-Font, Kim Lynch, Jasmine Kim, and Samway, traveled to Yahoo-Mexico's office in Mexico city on approximately thirty to forty occasions.

---

[3] Yahoo-Mexico was originally a subsidiary of Yahoo-US.  All funding was provided by Yahoo-US.  Any capital calls were directed to Yahoo-US.  Yahoo-Mexico was part of Yahoo-US's profit and loss statement ("P&L").

50.      Around this same time, in 2002, Sergio Eduardo Guarneros, founded Interactivas and later on, WWD. WWD became a holding company for Interactivas, the operating company, and all other companies created by Guarneros to carry out Yahoo business around the world.

**Yahoo-US and Yahoo-Mexico Developed a Business Relationship with Plaintiffs To Develop Telephone Directories Under the Yahoo Name Throughout the World**

51.      In early 2002, Yahoo and Interactivas began preliminary discussions about collaborating on a business venture in which Interactivas would develop, manufacture and distribute telephone directories in Mexico, among other places, and provide digital directories under the Yahoo name and its international website.

52.      On or about April 25, 2002, Yahoo-Mexico and Interactivas entered into a Mutual Non-Disclosure Agreement for the purpose of developing this business relationship through the exchange of confidential and proprietary information. According to the Agreement, all notices, requests and other communications were required to be sent to Mr. Samway.

53.      Throughout 2002, discussions between Yahoo and Interactivas advanced to expanding telecommunication services outside Mexico and into other countries around the world.

54.      As evidence of the parties' ongoing and developing business relationship, they entered into multiple agreements over the course of more than two years. For example:

        a.      On or about September 10, 2002, Yahoo-Mexico and Interactivas entered into an agreement for the purpose of collaborating on building and marketing a product called "Yahoo! Paginas Utiles" (Yahoo! Useful Pages). Under this agreement, Yahoo! granted Interactivas/WWD a license to use and market its universally known trademark.

14

b.  On or about August 1, 2003, Yahoo-US and Interactivas entered into a Mutual Non-Disclosure Agreement. Fernando Ramirez, despite being Yahoo-Mexico's General Manager based in Mexico City, signed the Agreement on behalf of Yahoo-US.

c.  On or about December 29, 2003, Yahoo-Mexico and Interactivas entered into a Letter of Intent ("LOI") confirming their understanding about developing an Internet-based yellow pages directory service for distribution throughout Latin America. According to the LOI, Yahoo-Mexico and Interactivas would introduce this co-branded product, called "Yahoo! Paginas Amarillas," in Costa Rica, the Dominican Republic and Panama.

d.  On or about October 15, 2004, Yahoo-US and WWD entered into a License, Services and Promotions Agreement ("LSPA") pursuant to which WWD granted Yahoo-US a license to use, distribute and promote content from "Yahoo! Paginas Amarillas," and Yahoo-US granted WWD the right to use, distribute and promote Yahoo! Brand features.

e.  On or about November 16, 2004, Yahoo-US and WWD amended the LSPA. Jose Rivera Font, a Yahoo! Inc. General Manager, executed the amendment on behalf of Yahoo-US.

55.  During this time, Interactivas/WWD relied on Yahoo-US's promises to develop the business venture. Mr. Bazan incorporated WWD in Puerto Rico, hired numerous individuals, met with potential business parties in multiple countries to create a network of business affiliates, and spent large sums of money to evaluate the new company in order to gather funding for the joint project.

15

56.     Yahoo fully participated in Mr. Bazan's efforts to create a new company and to develop a multi-national business.  In fact, Yahoo knew that Interactivas/WWD was dedicating nearly all of its resources to the project in reliance upon Yahoo's promises of support for its development.

57.     For example, Yahoo-US was aware and encouraged Interactivas/WWD to spend hundreds of thousands of dollars to hire Lehman Brothers in 2005 to value the new company, which it estimated to be worth several hundred million dollars based on projected growth and in business, in part, due to the Yahoo venture.

58.     Throughout 2005, expansion of the relationship and the business venture continued when Yahoo and WWD modified their prior agreements and agreed to expand services beyond Latin America.

**Plaintiffs Bring A Lawsuit in Mexico for Yahoo's Systematic Breach of their Agreements**

59.     Yahoo acted in accordance with the negotiated terms of the agreements until July 2003 when it purchased a competitor company, Overture Services, Inc. ("Overture") for $1.63 billion.

60.     Like Interactivas/WWD, Overture provided local search and pay-for-performance search services.  Thus, Yahoo no longer required the services of Interactivas/WWD, and despite their agreements, Yahoo began to systematically breach the relationship by pressuring regional offices to sever established ties with Interactivas/WWD.

61.     Ultimately, Yahoo-US prevented Interactivas/WWD from entering into business relationships with *any* international Yahoo affiliate office despite its written agreements to do so, thereby destroying Interactivas/WWD's chances to maximize its potential business opportunities.

62.     On November 16, 2011, Interactivas/WWD filed suit against Yahoo de Mexico, S.A. de C.V., Yahoo, Inc., Yahoo! International Subsidiaries, Inc., and Yahoo Hispanic

Americas, LLC in the 49th Civil Court of Mexico for breach of contract, breach of promise, and lost profits.

63.     In San Diego, California, on or about January 24, 2012, Michael Callahan, General Counsel and Vice President of Yahoo, Inc. executed a general power for lawsuits and collections to the following Mexican attorneys: Salvador Fonseca González, Sergio Rodríguez Labstida, Alfonso José Antonio Curiel Valtierra and Javier Luis Navarro Treviño.

64.     On or about April 12, 2012, Scott Thompson, former President and Chief Executive Officer of Yahoo, Inc. and Michael Callahan, General Counsel and Vice President of Yahoo, Inc., of the United States executed a power of attorney in Mexico City authorizing a Mexican attorney to represent them in the matter in Mexico .

65.     The case was assigned to Judge Jorge Luis Ramirez from the filing desk.

66.     Judge Segu had been employed by the Superior Court of Justice of Mexico City for approximately nineteen years, holding various positions, and in due course became the Secretary of Agreements of the 49th Civil Court.

67.     In the Mexican court system, the Secretary of Agreements is an attorney at law, akin to a Special Master or magistrate judge, who generally takes an active role in the case and discovery, including conducting evidentiary hearings and attesting that the evidentiary hearings have been held.

68.     In accordance with the Mexican legal system, Judge Segu was the primary contact with counsel for Yahoo and WWD. He attended all meetings with counsel for the parties, and he was responsible for handling and adjudicating discovery issues.

69.     Over the course of the proceeding, over nearly a year, Judge Segu had gained intimate knowledge of the facts and issues of the WWD/Yahoo matter. In fact, because he

handled the case on a daily basis, he likely had the most knowledge of anyone within the 49th

District of the case in his capacity of Secretary of Agreements, and even more so than Judge

Sanchez.

70.     Unlike litigation in the United States, discovery in the Mexican judicial system is

handled much more actively by the courts. They help narrow the legal and factual issues, select

witnesses and gather evidence. Often Judges use their law clerks to oversee many of the

hearings and depositions in the case. Thus, Judge Segu who was the clerk responsible for

overseeing discovery in the case was in the best position to be familiar with all of the facts and to

determine a fair, well-reasoned outcome.

71.     There are similarities between the U.S. and Mexican legal systems. For instance,

both are based on a three-tier system. The district courts (Juzgados de Distrito) and jury courts

(Jurados Populares Federales) are courts of first instance. The appellate level courts (Tribunales

de Circuito) are divided into single judge courts (Tribunales Unitarios de Circuito) and collegiate

courts (Tribunales Colegiados de Circuito). The Supreme Court (Suprema Corte de Justicia de la

Nacion) has final appellate jurisdiction over all state and federal courts.

72.     District court judges and circuit court judges are appointed by the Supreme Court

to 4-year terms and may be reappointed or promoted to a higher position at the end of the term,

but they may only be dismissed for bad conduct.

73.     Mexico's legal system stems from the civil law tradition. Mexican courts look to

treatises written by prominent scholars in the same way that courts in the United States rely upon

prior case law. The doctrine of *stare decisis* does not exist in Mexico in a form similar to the

United States.

74.     On or about November 15, 2012, Judge Segu was designated by operation of law as a court judge of law for the 49th Civil Court of the Federal District of Mexico after the reassignment of Judge Jorge Luis Ramirez Sanchez, who was transferred to become a Judge of a Court of Oral Process[A1], a position in which he currently serves. Judge Segu's appointment was made in accordance with Mexican law, and, according to Article 57 of the Organic Law of the Superior Court of Justice of the Federal District, Judge Segu replaced Judge Sanchez in his absence.

**The RICO Defendants Conspire to Avoid and Conceal Liability for their Breach Through a Series of Criminal Acts**

75.     Yahoo did not oppose or question Judge Segu's appointment at that time. In fact, Yahoo continued to participate in the Mexican litigation without hesitation or any expressed concern about Judge Segu's role as the judge in the case. Indeed, neither Yahoo nor its attorneys made any affirmative statements about their desire to have the case decided by someone other than Judge Segu. Instead, Yahoo accepted the designation of Judge Segu, and began taking steps to target him for intimidation and coercion in order to obtain a favorable judgment.

76.     In the Mexican judicial system, the President of a district's Federal Superior Courts serves an administrative function. Organic Law of the Superior Court of Justice for the Federal District does not enable a district's President to meet with parties and doing so is in contravention of Federal District Penal Code Article 291, violation of which can include fines, and imprisonment.

77.     On or about November 26, 2012, Plaintiffs are informed that the representatives of Baker-Mexico, met with Judge Azar on behalf of Yahoo to elicit his aid by unlawfully injecting himself into the WWD/Yahoo judicial proceedings. At that time, Judge Azar agreed to apply pressure on the judges deciding the matter in order to obtain a favorable result for the

RICO Defendants.  The evidence and sworn statements [A2]obtained by Plaintiffs strongly suggest that Defendants offered and paid Judge Azar monetary enhancements in violation of the FCPA, to execute the scheme on their behalf.

78.     Judge Azar's willingness to compromise his integrity and the integrity of the Mexican civil judicial system was well known at the time of this meeting.  Plaintiffs had been advised by various members of the Mexican judicial system that Judge Azar was known to solicit payments to control the outcome of cases pending in "his courts".  Indeed, Judge Azar has been publicly accused of similar conduct on several occasions.

79.     For instance, a twenty-year veteran of the Mexican federal judiciary, Judge Montes de Oca[A3], spoke out against Judge Azar and accused him of pressuring judges to decide cases for his own financial benefit.  In response, Judge Azar threatened his life and ordered Judge Oca's arrest on trumped up charges and in contravention of Mexican criminal procedure.  Judge Oca was told that there was "no protection of any law in Mexico that would prevent [him] from being put in jail."  On May 15, 2012, an arrest warrant was issued against him.  Judge Oca came to find out that after illegally arresting him, Judge Azar planned to have him killed in jail.  As a result of the pervasiveness and depth of Judge Azar's corruption, Judge Oca was forced to flee to the United States to obtain political asylum.  Judge Azar also threated other judges that if they did not follow his orders, they would be similarly persecuted.  Through his approximately 20 years of service in the Mexican judiciary, from 1992 until he crossed Judge Azar, Judge Oca is aware of the pervasive corruption.  For example, there were instances where Judge Azar would convene judges or justices in order to make them commit to handling matters in a certain way.  Judge Azar would also insist on having judges report matters to him that were over a certain amount of money and he would personally review the dockets.  In addition,

litigants with access to Judge Azar could choose the courts and judges who would try their matters. On one occasion, in or around 2010, while assigned to district 77, Judge Oca was told that he needed to recuse himself from a certain matter because one of Judge Azar's "friends" did not want him to preside over that matter any longer. He was already in the process of recusing himself in that matter, and did so because it was not illegal. He is also aware that Judge Azar forbade criminal judges from either releasing people from prison or preventing them from not issuing an arrest warrant unless they first asked permission from Judge Azar. Judge Oca also knows that some people were jailed without having committed a crime. In addition, Judge Azar's corruption spreads to court operations, including the physical buildings in which the court is housed as well as the personnel who work there.

80.     On or about November 26, 2012, shortly after his meeting with the RICO Defendants, Judge Azar, at the direction of the RICO Defendants, summoned Judge Segu to his office for a meeting. Judge Azar told Judge Segu that "Yahoo could not lose" and ordered him to rule in favor of Yahoo.

81.     Judge Azar further told Judge Segu that Yahoo's attorneys would make it easy for Judge Segu by providing him with a memory stick computer drive which contained the draft of the final decision he was to enter.

82.     To ensure that Judge Segu followed his instructions, Judge Azar also instructed him to deliver a draft of the final decision to Judge Azar before entering the ruling.

83.     Troubled by Judge Azar's inappropriate, and potentially illegal instructions, Judge Segu told him that he had not yet decided the outcome of the lawsuit, to which Judge Azar stated that "Yahoo cannot lose, can you imagine the international scandal that would mean?" Judge

Azar was unquestionably in the pocket of the RICO Defendants.    As Judge Segu left Judge

Azar's office, he advised Judge Segu not to discuss their conversation with anyone.

84.     Immediately after Judge Segu left Judge Azar's office, the Baker-Mexico lawyers

representing Yahoo, who Judge Segu believes were listening to his conversation with Judge

Azar, accosted Judge Segu and told him that their paralegal would deliver a memory stick with a

draft decision the following days. Their comments confirmed that Judge Azar had been acting

under the knowledge and authority of the RICO Defendants.

85.     True to their promise, the RICO Defendants delivered a USB drive that contained

two fully drafted opinions.  The draft decisions provided by Yahoo and Baker & McKenzie not

only excused Plaintiffs of intentionally breaching the parties' agreements, it also completely

absolved Yahoo of various misconduct and procedural fraud that had occurred throughout the

litigation because Yahoo's powers of attorney were never properly constituted to represent them

in Mexico.

86.     According to Judge Segu, in his opinion, much of the opinion drafted by Baker &

McKenzie was entirely outside of the factual record. Plaintiffs have obtained this memory stick

and engaged a respected forensic expert to analyze it. This analysis appears to confirm that

metadata in the documents shows that they were revised and possibly drafted on computers

owned by Baker & McKenzie in the United States. This analysis also reveals that the names of

the attorneys representing Yahoo Inc. (a United States entity) in the case in Mexico appear

prominently in the data on more than one occasion.

87.     While it is regular practice to present arguments *ex parte* to a judge in Mexico,

any written submission becomes part of the file.  It is not regular practice to meet with judges

and present them with a fully drafted opinion to sign.  Indeed, pursuant to Code of the Federal

District Article 291, it is illegal for an individual to bias a case with any action. In this vein, Judge Oca averred that per his twenty years of experience serving in the Mexican judiciary, providing a fully drafted opinion on a USB is both highly suspicious and irregular because cases should be resolved according to law and not pursuant to threats or intimidation.

88.     Upon returning to his office, Judge Segu, troubled by Judge Azar's statements, contacted a mentor and colleague, Judge Ramirez, and explained the unlawful series of events that had unfolded in Judge Azar's chambers. Judge Segu expressed his concerns about Yahoo's and Baker's clear attempts to obstruct justice and to avoid the financial consequences of its breaches of agreements with Plaintiffs.

89.     Judge Ramirez advised Judge Segu to decide the issues in accordance with the law and based on Judge Segu's evaluation of the facts.

90.     Taking this advice, Judge Segu immediately began carefully dictating his decision. He considered all of the materials and testimony in the case, evaluated the facts and law on each side of the case, and drafted a carefully considered and reasoned opinion.

91.     Pursuant to the principle of "Economia Procesal," or "expedite justice," embodied in Mexican Constitutional Article 17, Judge Segu was required to issue an opinion quickly. Indeed, Federal District Penal Code Article 292 provides that any judge that delays a case without justification should be fined or imprisoned for up to five years.

92.     In addition, per the applicable section of the Code of Commerce, judges must issue an opinion within fifteen business days

93.     On November 29, 2012, eleven days after the conclusion of the trial, ignoring Judge Azar's direction and the demands of the RICO Defendants, Judge Segu published his own

opinion and order, based on consideration of the facts and the law, evidence, and forensic expert reports, which granted judgment in favor of WWD and awarded WWD $2.7 billion in damages.

94.     After publishing his opinion, two of Yahoo's attorneys, Alfonso Cesar Cortez Fernandez and Sergio Rodriguez Labastida, met Judge Segu and told him of their relationship with Judge Azar in order to intimidate him, implying that this close relationship with Judge Azar should have signaled to Judge Segu that it was in his professional interest to side with Yahoo in the litigation. They explicitly threatened Judge Segu for having disobeyed Judge Azar.

95.     The prophecy of Yahoo's attorneys was correct. Since disobeying Judge Azar's directive to enter the opinion and judgment drafted entirely by Yahoo's attorneys ruling in their favor, Judge Segu has been subject to extensive retaliation, similar to Judge Oca. As a result, Judge Segu has been forced to go into hiding for his safety since his return to Mexico and threatened his family.

## Plaintiffs Learn that Defendants Have Caused Judge Azar To Improperly Influence the Appeal

96.     Unaware of the conspiratorial acts being taken by the RICO Defendants, Plaintiffs prepared for the possibility of an appeal.

97.     At or around the same time that Plaintiffs were preparing for a potential appeal, and immediately after Judge Segu's decision was issued, Judge Azar and the RICO Defendants began taking calculated steps to ensure that the judgment would be reversed on appeal.

98.     The pervasive corruption of Mexico's judicial system has been well documented over the last several years, and bribery of judicial officials has become "business as usual" in the course of litigation in Mexico. The vulnerability of judges to financial incentives to effect outcomes of civil litigation is well-known, and was unquestionably known and exploited by the RICO Defendants to perpetrate a fraud on Plaintiffs and the public. Having failed to pervert the

system on their first attempt, and perhaps earlier, the RICO Defendants began colluding to coerce the judiciary to overturn Segu's judgment. Plaintiffs learned of these attempts from an attorney they asked to pursue the appeal.

99.     While executives and legal counsel from Yahoo-US and attorneys from Baker & McKenzie orchestrated the scheme to coerce, bribe, and ghostwrite, from the United States, including through mails and wires, they also traveled to and from the United States and Mexico to further the conspiracy.

100.    One of the attorneys for Interactivas/WWD contacted a lawyer specializing in appeals, Luis Jesus Bernardo Guiterrez, to develop a strategy for defending the judgment against Yahoo.

101.    Mr. Guiterrez contacted Judge Azar to set up a meeting to discuss whether the RICO Defendants would appeal the case. Mr. Guiterrez met Judge Azar on or about November 30, 2012.

102.    On or about December 4, 2012, Mr. Guiterrez told Plaintiffs and their attorneys the following summary of his conversation with Azar which contained a direct reference that Defendants had offered and paid Judge Azar money to reverse Judge Segu's judgment and obtain a judgment in their favor. Upon learning that Mr. Guiterrez intended to represent Plaintiffs, Judge Azar told him, "You've already been defeated, the other side [Yahoo] has already been here. Don't get involved … there are too many zeros involved. If you want to fight this at the Federal Level … I wish you good luck, but in my Court you are not going to win." Mr. Guiterrez further informed Plaintiffs that he had seen Yahoo's lawyers meeting with Judge Azar on December 3, 2012.

**The RICO Defendants Succeed in Causing the Reversal of Segu's Judgment**

103.    On or about December 12, 2012, Yahoo-Mexico filed an appeal, and the following day Yahoo-US filed an appeal.

104.    During this time, the RICO Defendants continued to meet with Judge Azar and continued to threaten and intimidate Judge Segu.

105.    For example, in a sworn affidavit Judge Segu stated that he was called into a meeting with Judge Tomas Cisneros Curiel, another federal judge in the 49th Federal District. Judge Curiel said that Judge Azar was "very angry" with Judge Segu's decision and for not following his instruction to enter judgment in Yahoo's favor.

106.    Additionally, a lawyer for Yahoo, Javier Quijano Baz, harassed Judge Segu about the judgment in open court. Shortly thereafter, on January 17, 2013, Yahoo filed a complaint against Judge Segu for rendering his decision, while Yahoo was fully aware that he had been granted the authority to render the judgment and it never contested his appointment until after a negative judgment had been entered. The complaint itself was unlawful and was meant solely to harass and intimidate Judge Segu, and to show Plaintiffs how Yahoo-US could wield its power in Mexico.

107.    Indeed, Yahoo's complaint that Judge Segu was not authorized to render this $2.7 billion judgment was rejected by the Third Civil Chamber of the Superior Court of Justice in the Federal District. The Judicial Council found only minor procedural flaws concerning the timing but not the substance of the final judgment relative to the date the final judgment was issued.

108.    Judge Azar's first order of business to overturn Judge Segu's judgment, under the direction of the RICO Defendants, was to obtain the case file and keep it under a watchful eye. He directed a court employee, Edgar Raul Rodriguez, to take the trial court record to his house.

109.     Once he had the case file, Judge Azar began contacting the judges who would preside over Yahoo's appeal.

110.     According to a sworn affidavit in Plaintiffs' possession, Judge Monica Venegas met Azar in April 2013 to discuss how the appellate decision should be rendered.

111.     Judge Venegas told people in her staff that Judge Azar said she had to completely invalidate the Yahoo decision rendered by Judge Segu. Judge Azar then met Judge Venegas on several occasions and pressured Judge Venegas to issue a decision reversing Judge Segu.

112.     Many other court employees also observed these meetings between Azar and Venegas.

113.     In an attempt to hide Judge Azar's and the RICO defendant's wrongdoings, on or around December 5th and 6th, 2013, an unlawful deposition of court clerks and staff took place inside the offices of the Superior Court of Justice of Mexico's Federal District in Rio de la Plata street, number 48, Mexico City. Such deposition was ordered by Judge Azar and conducted by the Mexico City office of the Attorney General. On that deposition, several sworn employees had declared that they did have knowledge of the Yahoo! case, that they knew Judge Azar and that they've seen him in Judge Venegas chambers. The employees and clerks that were deposed were Florencia del Carmen Hernandez, Maria de Jesus Barbara Hernandez, Raymundo de la Rosa, Elsa Saldivar Cruz, David Canchola Anguiano, Carmen Roque, Maria de los Angeles Alvarez, Jose Arrastio, Edgar Raul Rodriguez Amante, Joel Hidalgo Everardo, Oscar Tomas Sanchez Rodriguez, Angelica Varela Robles, and Patricia Severin Barrios. The deposed witnesses were not allowed any legal representation, nor was there any lawful reason for them to be deposed, thus violating their human and constitutional rights.

114.    The court file obtained by Edgar Raul Rodriguez was "irregularly manipulated to be restricted only for the eyes of Judge Monica Venegas and whoever she allowed." Indeed, Judge Azar was overheard to refer to the appeals tribunal as "his tribunal."

115.    In July 2013 Edgar Raul Rodriguez took his family on a European vacation that on information and belief he could not afford unless he received money from a third party, presumably Judge Azar or one of the RICO Defendants.

116.    The Third Appellate Court issued a decision that overturned Judge Segu's opinion. In stark difference to Judge Segu's opinion, the appellate court's decision had minimal legal analysis and was almost entirely comprised of a cut and paste of documents in the case, the complaint and the trial court decision. Evidence of the apparent slip-shod nature of the decision is the fact that the font constantly changes throughout the decision as if different documents have been electronically copied into the document. In addition, the Opinion did not take many of Plaintiffs' arguments into account and disregarded other issues, such as the fact that Yahoo-US was in contempt throughout the proceedings below due to improper powers of attorney. The appellate court found that Judge Segu was properly appointed.

117.    Upon receiving the decision of the Third Civil Appellate Court, Plaintiffs filed for an injunction, or Amparo in Mexico, in the 14th Federal Civil Tribunal of the First Circuit in Mexico City.

118.    Upon information and belief, a decision favorable to Plaintiffs was about to be issued. Three draft opinions were prepared, one in favor of Yahoo and the other two in favor of Plaintiffs. The decisions in favor of Plaintiffs rejected Yahoo's request for injunctive relief, or "Amparo," and the other granted Plaintiffs injunctive protection and a judgment in its favor.

119.    However, on January 14, 2015, the Federal Civil Tribunal issued a decision for the Yahoo Defendants and against Plaintiffs.  The Federal Tribunal's decision repeated a number of the factual errors that were made by the Third Appellate Court and lacked support for core legal contentions.

120.    On February 16, 2015, WWD filed an appeal through the 14th Federal Civil Tribunal to the Mexican Supreme Court to take the case in their hands.  That appeal is still pending

121.    During this time, Carlos Alberto Bazan Canabal felt forced to flee Mexico and seek safety in the United States.  The RICO Defendants' scheme has spanned several years and it became clear that, at the very least, his liberty could be in jeopardy.

122.    In sum, the RICO Defendants bribery, coercion, violation of several U.S. laws, and fraud made a sham out of the judicial system.  As a result of these predicate acts, that included extortion, money laundering, mail fraud, wire fraud, and corruption of justice, all at the direction and control of Yahoo-US in the United States by and through a United States law firm, Baker, and its Mexican counterpart, Baker-Mexico, the RICO Defendants violated civil RICO and caused substantial damage to Plaintiffs.  If the court system does not enjoin the RICO Defendants from continuing to engage in unlawful activities in the United States, their corrupt practices will continue unabated with no end in sight.

**Yahoo-US Covered Up the Bribery and its Liability To Investors**

123.    Following the initial judgment from the lower court, Yahoo-US made a series of misstatements and omissions to investors in order to disguise the extent of its liability and the commission of illegal conduct in Mexico.

124.    Initially, following the judgment, on November 30, 2012, Yahoo-US issued an SEC Form 8-K, attaching its own press release describing the outcome of the lawsuit.  Yahoo-

US did not disclose, however, that it had ineffectively attempted to improperly obtain a favorable outcome in that case through threats and intimidation and possibly offers of bribes to judicial officers.

125.   Yahoo-US then held a fourth-quarter earnings call with its Chief Financial Officer Ken Goldman on January 28, 2013, at which it downplayed the judgment again and disclosed to investors that it did not expect to pay any money as a result of the judgment and therefore, would not make any accruals for the payment of the judgment or for settlement purposes. It again did not disclose either that it had attempted to coerce the lower court judge for a favorable judgment, or that it was in the process of doing the same during the appellate process.

126.   On March 1, 2013, Yahoo-US issued its SEC Form 10-K in which it disclosed again the existence of the judgment, but continued to downplay its significance. Yahoo-US again rebuked the merits of the judgment, and insisted that it would be successful on appeal.

127.   In this Annual Report, Yahoo-US misleadingly explained to investors that the judge that decided the case did not have authority to do so. Yet, as detailed above, Yahoo-US had insisted, through its lawyers and Judge Azar, that that same judge, under his authority to enter judgments, enter a decision in its favor that they had drafted.

128.   Yahoo-US also downplayed the merits of the suit labeling their obligations under the agreements "non-binding" and stating that "no definitive agreements" existed between the parties despite acting in accordance with those agreements for several years before it breached.

129.   Finally, Yahoo-US again disclosed that it did not make any accruals for the judgment, but also that if it became apparent that it would have to pay any or part of the judgment, such an amount would be material, and it would thus make an accrual for purposes of making the payment. Yahoo-US did not disclose its improper conduct with respect to the initial

judgment, nor did it disclose its ongoing attempts to pervert the appellate process with the other RICO Defendants.

130.    As a result of the fraudulent judgment obtained through the RICO Defendants' misconduct, Plaintiffs have suffered substantial damages including but not limited to the expenses spent on investigators, attorneys and experts to uncover Defendants' fraud and on attorneys in the United States and Mexico to pursue remedies to correct the improper fraudulent judgment.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Violations of RICO (18 U.S.C. § 1962(c))
### (Against All RICO Defendants)

131.    Plaintiffs re-allege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

132.    At all relevant times, Plaintiffs and each Defendant and co-conspirator is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1962(c).

133.    The RICO Defendants and their co-conspirators are a group of persons associated together for the common purpose of carrying out the ongoing criminal enterprise described in this Complaint. This conspiracy principally involved the making of illicit payments to Judge Azar and other high-level judicial officials in exchange for ensuring that a $2.7 billion judgment would be overturned. Defendants and their co-conspirators thus constitute an association-in-fact enterprise under 18 U.S.C. § 1961(4) and § 1962(c).

134.    The RICO Defendants and their co-conspirators have been part of this enterprise and have carried out this conspiracy since before Judge Segu entered a judgment in favor of Plaintiffs in 2012 and continues to this day, which has been ample time for the enterprise to pursue its illegal purpose. Throughout this time, their conspiracy and enterprise was engaged in,

and its activities affected by, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

135.   The RICO Defendants and their co-conspirators participated in the conspiratorial conduct through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

136.   In particular, at all times material to this Complaint, Plaintiffs were engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

137.   As described in this Complaint, the RICO Defendants engaged in a wide-ranging campaign of intimidating, pressuring, threatening conduct intended to strike fear in Judge Segu and in Plaintiffs in order to obtain a favorable judgment for Yahoo and to avoid paying a judgment.

138.   As described in detail in this Complaint, the RICO Defendants conspired with Judge Azar to overturn Judge Segu's final judgment in favor of Plaintiffs. This included illicit payments to Judge Azar and possibly other Mexican judicial officials to ensure that the RICO Defendants received favorable treatment in the outcome of their appeal.

139.   At all times material to this Complaint, the RICO Defendants' conduct and their co-conspirators engaged in "racketeering activity" within the meaning of 18 U.S.C. 1961(1) by engaging in the acts set forth herein. These acts constitute two or more violations of 18 U.S.C. § 1952 (Travel Act); 18 U.S.C. § 1951 (Hobbs Act); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1341 (mail fraud). Under New York law, the acts set forth herein also constitute extortion under §§ 110.00, 115.05(2)(E) and 155.42 of the New York Penal Law which also constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

140.    The RICO Defendants violated the Travel Act through their bribery and extortionate activity as detailed herein, and as a result of their violation of the Foreign Corrupt Practices Act through their scheme to bribe Judge Azar and key Mexican judicial officials to ensure they would receive a favorable outcome in the appeal of Judge Segu's decision.

141.    The RICO Defendants violated the Hobbs Act through their bribery and extortionate activity as detailed herein, including their successful corruption of and bribing of the Mexican judicial officials and attempts to instill fear in Plaintiffs and pressure Plaintiffs to resolve the case without further litigation.

142.    The RICO Defendants carried out this illegal conduct through repeated use of regular mail, electronic mail, faxes, wire transfers, and the telephone to communicate with each other, their co-conspirators, and Mexican judicial officials.  All of these communications were part and parcel of the RICO Defendants' scheme to illicit a favorable outcome in the Mexican court system.  Indeed, they succeeded through the use of an electronic file containing the draft opinions despite, to his ultimate detriment, Judge Segu's unwillingness to be coerced.

143.    Each of the RICO Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

144.    These acts of racketeering activity constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  These acts were related by virtue of common participants, common victims, a common method of commission, and the common purpose and result of overturning Judge Segu's decision by improperly influence over the Mexican court system.

145.    As a result of the RICO Defendants' RICO Act violations, Plaintiffs have suffered the following foreseeable losses and damages:

a. the loss of a rightfully obtained judicial award;

b. the substantial costs Plaintiffs incurred in preparing a defense to the appeal in Mexico and prosecuting this action;

c. injury to Plaintiffs' business reputations; and

d. other consequential, incidental and special damages.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
### (Conspiracy to Violate RICO (18 USC 1962(d))
### (Against All RICO Defendants)

146.    Plaintiffs re-allege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

147.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

148.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

149.    As set forth herein, the RICO Defendants and their co-conspirators have since 2011 been associated with the enterprise to secure through bribery and other improper influence over the Mexican judiciary a favorable judgment for Yahoo. Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the enterprises' affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

34

150.   As a direct and proximate result of the RICO Defendants' conspiracy to violate the RICO Act, Plaintiffs have suffered the following foreseeable losses and damages:

     e.   the loss of a rightfully obtained judicial award;

     f.   the substantial costs Plaintiffs incurred in preparing a defense to the appeal in Mexico and prosecuting this action;

     g.   injury to Plaintiffs' business reputations; and

     h.   other consequential, incidental and special damages.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

### THIRD CLAIM FOR RELIEF
### Fraud
### (Against All RICO Defendants)

151.   Plaintiffs re-allege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

152.   The RICO Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before the Mexican courts, and in their communications to U.S. Government officials. Each and every RICO Defendant has personally engaged in this conduct, or knew or should have known that other Defendants were engaged in it. These false representations are detailed throughout this Complaint.

153.   The RICO Defendants made these false representations while knowing that their misrepresentations were materially false and/or that their omissions were material.

154.   The RICO Defendants further made these misrepresentations and/or omissions with the intent of obtaining favorable rulings from the Mexican courts and pressuring Mexican officials to rule against Plaintiffs.

155.   These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Plaintiffs and Mexican judicial officials.

156.     As a direct, proximate, and foreseeable result of the RICO Defendants' fraud, Plaintiffs have been injured by its loss of a rightfully obtained judicial award, and from the substantial costs they incurred in preparing a defense to the appeal in Mexico and prosecuting this action.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF
### Civil Conspiracy
### (Against All RICO Defendants)

157.     Plaintiffs re-allege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

158.     As set forth above, the RICO Defendants have committed torts against Plaintiffs, including acts of racketeering giving rise to violations of RICO and fraud.

159.     The RICO Defendants agreed to participate in a common scheme against Plaintiffs. They intentionally participated in the furtherance of a plan or purpose to obtain property from Plaintiffs, including specifically certain proprietary information and technology. In furtherance of this plan or purpose, the RICO Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.

160.     As a direct and proximate result of the RICO Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the wrongs committed against Plaintiffs, Plaintiffs have been damaged in their business and property.

161.     The RICO Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

A.      That the Court declare, adjudge, and decree that Defendants have committed the violations of federal and state law alleged herein;

B.      That the Court award general damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

C.      That the Court award prejudgment interest according to statute;

D.      That the Court award Plaintiffs' reasonable attorneys' fees and costs according to statutes 18 U.S.C. § 1964(c);

E.      That Defendants, their directors, officers, employees, agents, successors, and assigns be permanently enjoined and restrained from, in any manner, directly or indirectly, engaging in any unlawful means to secure any judgment in the Mexican court system, or elsewhere;

F.      That the Court award damages to Plaintiffs from Defendants' violations of state and federal laws in an amount to be proven at trial, plus interest; and

G.      That the Court award Plaintiffs attorneys' fees and costs of suit, and other such legal and equitable relief as the Court may deem Plaintiffs to be entitled to receive.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues in this action triable by jury.

Dated:  February 27, 2015                          Respectfully submitted,

                                                   STONE & MAGNANINI LLP


                                                   By:   s/Robert A. Magnanini
                                                    Robert A. Magnanini, Esq.
                                                   150 JFK Parkway, 4th Floor
                                                   Short Hills, NJ 07078
                                                   Tel: (973) 218-1111
                                                   rmagnanini@stonemagnalaw.com

*Attorneys for Plaintiffs Worldwide*
*Directories,  S.A. de C.V. and Ideas*
*Interactivas, S.A. de C.V.*

## **VERIFICATION**

I, CARLOS BAZAN-CANABAL, of full age, hereby verify to the Court as follows:

1.      I am a co-founder and an officer of Worldwide Directories, S.A. de C.V. and

Ideas Interactivas, S.A. de C.V., Plaintiffs in the foregoing Amended Complaint.

As such, I am fully familiar with the facts as set forth in this Verified Amended

Complaint and am authorized to make this Verification. I have read the foregoing

Verified Amended Complaint, and state the factual allegations set forth therein

are true according to my own knowledge.

2.      I certify that the foregoing statement made in the Verified Amended Complaint by

me are true, or I have been informed as to those facts not within my personal

knowledge, that they are true and correct, and that, based thereon, I believe them

to be true.

3.      I am aware that if any of the foregoing statements made by me are willfully false,

I am subject to punishment.

CARLOS BAZAN-CANABAL

Dated: February 27, 2015