**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WORLDWIDE DIRECTORIES, S.A. DE
C.V., and IDEAS INTERACTIVAS, S.A. DE
C.V.

                              Plaintiffs,

                v.

YAHOO! INC., YAHOO DE MEXICO, S.A.
DE C.V., BAKER & MCKENZIE, and
BAKER & MCKENZIE, S.C.

                              Defendants.

Civ. Action No. 14-cv-7349 (AJN)

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**BAKER & MCKENZIE LLP'S AND BAKER & MCKENZIE, S.C.'S**
**JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

Charles E. Clayman
Isabelle A. Kirshner
Wayne E. Gosnell, Jr.
Clayman & Rosenberg LLP
305 Madison Avenue, Suite 1301
New York, NY 10165
Tel.: (212) 922-1080
Fax: (212) 949-8255
clayman@clayro.com
kirshner@clayro.com
gosnell@clayro.com

*Attorneys for Defendant*
*Baker & McKenzie, S.C.*

John K. Villa (*pro hac vice* )
Ryan T. Scarborough (*pro hac vice*)
Ana C. Reyes (*pro hac vice*)
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel.: (202) 434-5000
Fax: (202) 434-5029
jvilla@wc.com
rscarborough@wc.com
areyes@wc.com

*Attorneys for Defendant*
*Baker & McKenzie LLP*

Dated:  March 31, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 4

    A.    Procedural Posture ........................................................................ 4

          1.    The Trial Court Proceedings and Decision ............................... 5
          2.    The Disciplinary Hearing Against Mr. Segu .......................... 7
          3.    The State Appellate Court Proceedings ................................. 9
          4.    The Federal Appellate Court Proceedings ............................. 11

    B.    Plaintiffs' Allegations in This Proceeding ................................ 13

          1.    Allegations Concerning Mr. Segu ......................................... 14
          2.    Allegations Concerning the State Appellate Court Proceedings ............... 14
          3.    *Ex Parte* Meetings ............................................................ 16
          4.    Judges and Judicial Officers Who Would Be Witnesses .......................... 17

STANDARD OF REVIEW ...................................................................................... 19

ARGUMENT ............................................................................................................ 19

I.    PLAINTIFFS' CLAIMS DO NOT HAVE EXTRATERRITORIAL REACH ............... 19

    A.    The Alleged Misconduct Occurred Entirely in Mexico .......................... 20

    B.    The Statutes Plaintiffs Rely Upon To Support Predicate Acts of
        Racketeering Do Not Apply to Extraterritorial Conduct ....................... 22

    C.    New York Law Presumptively Does Not Apply to Extraterritorial Conduct ........ 25

II.    PLAINTIFFS FAIL TO ALLEGE A RICO CLAIM ......................................... 26

    A.    Plaintiffs Do Not Have RICO Standing ................................................ 27

    B.    Plaintiffs Have Not Pled the Elements of a RICO Violation .................. 29

          1.    Plaintiffs Have Not Alleged a Pattern of Racketeering ........................ 30
          2.    Plaintiffs Have Not Alleged a RICO Enterprise ................................. 32

3.      Plaintiffs Have Not Alleged the Elements of a RICO Predicate Act.........33

a.      Plaintiffs Impermissibly Rely Upon Group Pleading ...................33
b.      Mail and Wire Fraud.......................................................34
c.      The Hobbs Act ...............................................................35
d.      The Travel Act................................................................36
e.      New York Law Claims ...................................................37

C.      The RICO Conspiracy Claim Should Be Dismissed Because the
Substantive RICO Claim Fails.................................................................38

III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER NEW YORK LAW.......................39

A.      Common Law Fraud ...............................................................................39

B.      Civil Conspiracy. ....................................................................................40

IV.     LEAVE TO AMEND SHOULD BE DENIED AS FUTILE. ............................................40

CONCLUSION..........................................................................................................................40

## TABLE OF AUTHORITIES

### FEDERAL CASES

*101 McMurray, LLC v. Porter*, No. 10-cv-9037 (CS), 2012 WL 997001 (S.D.N.Y. Mar. 26, 2012) ................................................................................................................32

*Agron v. Douglas W. Dunham, Esq. & Assocs.*, No. 02 Civ. 10071(LAP), 2004 WL 691682 (S.D.N.Y. Mar. 31, 2004) ...................................................................40

*Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178 (S.D.N.Y. 2000) .............................................................................40

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................................19, 35

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988) .......................................29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................19

*Boyle v. United States*, 556 U.S. 938 (2009) ................................................................32

*Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122 (2d Cir. 2008) (per curiam) ....................40

*Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008) ...........................................29

*Chanayil v. Gulati*, 169 F.3d 168 (2d Cir. 1999) .........................................................39

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999) .......................31

*Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473 (2d Cir. 2014) ............................30, 31

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) .........................................................34

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ........................................27

*Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229 (S.D.N.Y. 2011) ........................................33

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168 (2d Cir. 2004) .............................................................................................................39

*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014) ..............................20, 22, 24

*Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612 (S.D.N.Y. 2006) ..........................................31

*Filler v. Hanvit Bank*, 156 F. App'x 413 (2d Cir. 2005) .................................................39

*FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451 (S.D.N.Y.2014) ............................................................................................................36

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) .............20, 31, 39

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)...........................27, 29

*Foman v. Davis*, 371 U.S. 178 (1962) .......................................................................................40

*Freund v. Lerner*, No. 09 Civ. 7117(HB), 2010 WL 3156037 (S.D.N.Y. Aug. 10,
   2010) .....................................................................................................................................32

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463 (2d Cir. 1995) .............................30, 31

*Greenberg v. Blake*, No. 09 Civ. 4347(BMC), 2010 WL 2400064 (E.D.N.Y. June
   10, 2010) ...............................................................................................................................32

*Gross v. Waywell*, 628 F. Supp. 2d 475 (S.D.N.Y. 2009) ...........................................................31

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)....................................................................30

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) .................................................19

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)..........................................................27

*In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588
   (S.D.N.Y. 2011) .....................................................................................................................34

*In re R. M. J.*, 455 U.S. 191 (1982)............................................................................................9

*J.S. Serv. Ctr. Corp. v. Gen. Elec. Technical Servs. Co.*, 937 F. Supp. 216
   (S.D.N.Y. 1996) .....................................................................................................................25

*Knoll v Schectman*, 275 F. App'x 50 (2d Cir. 2008) .............................................................35, 38

*Kyllo v. United States*, 533 U.S. 27 (2001)..................................................................................9

*Lefkowitz v. Reissman*, No. 12 Civ. 8703(RA), 2014 WL 925410
   (S.D.N.Y. Mar. 7, 2014) ........................................................................................................20

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ............................................................33

*Lismore v. Société Générale Energy Corp.*, No. 11 Civ. 6705(AJN), 2012 WL
   3577833 (S.D.N.Y. Aug. 17, 2012) ........................................................................................19

*Makowski v. United Bhd. of Carpenters & Joiners*, No. 08 Civ. 6150(PAC), 2010
   WL 3026510 (S.D.N.Y. Aug. 2, 2010)................................................................................27, 39

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ..................................................29

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)...............................................................33

iv

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ......................................35

*Moccio v. Cablevision Sys. Corp.*, 208 F. Supp. 2d 361 (E.D.N.Y. 2002) ....................................20

*Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) .............................................23

*Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003) ......................................29

*Patrizzi v. Bourne In Time, Inc.*, No. 11 Civ. 2386(PAE), 2012 WL 4833344 (S.D.N.Y. Oct. 11, 2012) .............................................32

*Perry v. NYSARC, Inc.*, 424 F. App'x 23 (2d Cir. 2011) .............................................19

*Petroleos Mexicanos v. SK Eng'g & Constr. Co. Ltd.*, 572 F. App'x 60 (2d Cir. 2014) .............................................22, 23

*Reich v. Lopez*, 38 F. Supp. 3d 436 (S.D.N.Y. 2014) .............................................25

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629 (2d Cir. 1996) .............................................34

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178 (2d Cir. 2008) .............................................30, 31

*United States v. Carrillo*, 229 F.3d 177 (2d Cir. 2000) .............................................37

*United States v. Flores*, 289 U.S. 137 (1933) .............................................23

*United States v. Inigo*, 925 F.2d 641 (3d Cir. 1991) .............................................24

*United States v. Jackson*, 180 F.3d 55 (2d. Cir. 1999) .............................................35

*United States v. Persico*, 832 F.2d 705 (2d Cir. 1987) .............................................34

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) .............................................23

*W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629 (D.C. Cir. 2001) .............................................31

*Westgate Fin. Corp. v. Beinoni of N.Y. Inc.*, No. 10 Civ. 8102 (TPG), 2012 WL 219334 (S.D.N.Y. Jan. 25, 2012) .............................................39

*Wiwa v. Royal Dutch Petrol. Co.*, No. 96 CIV. 8386(KMW), 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) .............................................24

*World Book, Inc. v. Int'l Bus. Machs. Corp.*, 354 F. Supp. 2d 451 (S.D.N.Y. 2005) .............................................25

## STATE CASES

*Global Reinsurance Corp. – U.S. Branch v. Equitas Ltd.*, 18 N.Y. 3d 722 (2012)...............25, 26

*Goldstein v. Siegel*, 244 N.Y.S.2d 378 (App. Div. 1st Dep't 1963) ...............................40

*Hebrew Inst. For Deaf & Exceptional Children v. Kahana*, 870 N.Y.S.2d 85
  (App. Div. 2d Dep't 2008)................................................................................40

*In re Zisselman*, 768 N.Y.S.2d 8 (App. Div. 1st Dep't 2003) .......................................26

*Laura Corio, M.D., PLLC v. R. Lewin Interior Design, Inc.*, 854 N.Y.S. 2d 55
  (App. Div. 1st Dep't 2008)................................................................................40

*People v. Axentiou*, 158 Misc. 19 (N.Y. Sup. Ct. N. Y. Cnty. 1993) ...........................38

*Taub v. Altman*, 3 N.Y.3d 30 (2004).........................................................................38

## FEDERAL STATUTES

15 U.S.C. §§ 78dd-1, *et seq.* (FCPA).......................................................... *passim*

18 U.S.C. § 1341 ......................................................................................26

18 U.S.C. § 1343 ......................................................................................26

18 U.S.C. § 1512 ......................................................................................22

18 U.S.C. § 1513 ......................................................................................22

18 U.S.C. § 1951 ...........................................................................23, 24, 35

18 U.S.C. § 1952 ......................................................................................36

18 U.S.C. § 1956 ......................................................................................22

18 U.S.C. §§ 1961-68 ......................................................................... *passim*

## STATE STATUTES

N.Y. Crim. Proc. Law §§ 20.20(1)-(2) ..................................................37, 38

N.Y. Stat. Law § 149 cmt. (McKinney 2014)................................................25

N.Y. Penal Law § 115 ...............................................................................26

N.Y. Penal Law § 155.05(1) ......................................................................37

N.Y. Penal Law § 155.05(2)(a)...................................................................26

vi

N.Y. Penal Law § 155.05(2)(e)...........................................................................25, 26, 37

N.Y. Penal Law § 155.42............................................................................................26, 37

## MISCELLANEOUS AUTHORITIES

Fed. R. Civ. P. 8 & 8(a) ............................................................................... *passim*

Fed. R. Civ. P. 9(b) ......................................................................................33, 34, 35, 39

Fed. R. Civ. P. 12(b)(6)..............................................................................................18

Fed. R. Civ. P. 15(a)(2)..............................................................................................40

American Law Institute & The International Insolvency Institute, *Transnational
  Insolvency: Global Principles for Cooperation in International Insolvency
  Cases* (Mar. 30, 2012).........................................................................................16

Jay Lawrence Westbrook, *International Judicial Negotiation*, 38 Tex. Int'l L.J.
  567, 582-83 (2003)...............................................................................................16

Suprema Corte De Justicia de la Nación, *Casos Practicos de Ética Judicial* (1st
  Reprint 2013) (Legal Ethics Treatise, Ex. 7) ......................................................16

## INTRODUCTION

The Amended Complaint is a repackaged version of Plaintiffs' prior defective complaint. It is more strident, increasingly divorced from reality and suffers from the same legal infirmities as its predecessor.  Worldwide Directories, S.A. de C.V. and Ideas Interactivas, S.A. de C.V. ("Plaintiffs") continue to press this Court to conduct a review of the internal operations of Mexico's court system and overrule the decisions of numerous Mexican appellate court judges who have unanimously applied Mexican law to reject Plaintiffs' Mexican-based contract dispute. They predicate this extraordinary request by accusing a long and growing list of Mexican jurists of corruption, incompetence or other malfeasance.  Defendants Baker & McKenzie LLP ("Baker U.S.") and Baker & McKenzie, S.C. ("Baker Mexico") (together, the "Baker Defendants") move to dismiss because the complaint still has no place in an American courtroom and does not, in any event, state any cause of action.

To the extent Plaintiffs make any material changes to their complaint, those changes further underscore the flaws in their suit.  For example, Plaintiffs never informed this Court that they were pursuing an appeal to Mexico's independent *federal* appellate court challenging the same *state* appellate court rulings they claim are corrupt.  Mexico's federal court has now flatly rejected Plaintiffs' claims, confirming the conclusions reached by a host of other judges.  Rather than accept that ruling—a ruling reached by the one court Plaintiffs had *not* previously accused of corruption—Plaintiffs now ask this Court to conclude that every level of the Mexican judiciary is biased against them.  These accusations are offensive and outlandish to all jurists. The far more plausible explanation, of course, is that Plaintiffs have no case—a conclusion that must be becoming readily apparent even to them.

Plaintiffs' failure to disclose their pending federal appeal was not the only glaring omission in their prior complaint.  Plaintiffs originally asked this Court to infer wrong-doing on

1

the basis of *ex parte* contacts.  Reacting to the Baker Defendants' prior motion to dismiss, in which we showed that Mexican procedure permits *ex parte* contacts,[1] Plaintiffs have now been forced to retreat and concede what they surely knew all along, that *ex parte* contacts are both accepted and commonplace in Mexico.  *See* Verified Amended Complaint ("Am. Compl.") ¶ 87. In both instances, it is disappointing but revealing that Plaintiffs' original complaint did not inform the Court of highly pertinent facts.

If allowed to proceed, this suit will inevitably require this Court to undertake the burdensome and intrusive process of seeking testimony from dozens of judges and officials of the Mexican courts to in effect to conduct an investigation into three levels of the Mexican judiciary.  Plaintiffs do not support this astonishing request, or their desperate last-ditch effort to prosecute their meritless case here, with any facts which, if proven, would support a legitimate legal claim in a federal court.

By way of background, in 2012, a Mexican *secretario de acuerdos* (judicial secretary or clerk), Juan Francisco Garcia Segu, who became an "acting" or temporary judge during a fifteen day judicial vacancy, issued a $2.7 billion judgment in favor of Plaintiffs and against Defendants Yahoo! Inc. and Yahoo de Mexico, S.A. de C.V. (the "Yahoo Defendants").  This judgment arose out of a contract dispute in which Plaintiffs claimed that agreements to explore the feasibility of expanding their business relationship with the Yahoo Defendants into other countries were in fact agreements entitling them to billions in speculative future profits.[2]  A judicial review commission subsequently disciplined Mr. Segu for this conduct in issuing the

---

[1] *See* Memorandum of Law in Support of Baker & McKenzie LLP's and Baker & McKenzie, S.C.'s Joint Motion to Dismiss the Complaint (ECF No. 41, Jan. 21, 2015), at 11-12.

[2] The Plaintiffs and Yahoo Defendants here are the same parties as in the Mexican court proceedings.

decision.  Separately, a three-judge state appellate panel overturned Mr. Segu's judgment in a 502-page decision that found numerous independent bases for reversal.  This decision was followed by a unanimous 597–page decision of a three-judge federal *amparo* panel that affirmed the state appellate decision in its entirety.

Plaintiffs contend that the President of the Mexico City Superior Courts, Judge Elias Azar, improperly influenced one of the three state appellate court judges, and that he did so at the behest of the Yahoo Defendants and their counsel, the Baker Defendants.  They further suggest, without specific allegations, that the federal *amparo* decision was somehow obtained improperly. Plaintiffs urge that these specious allegations somehow translate into a civil claim in the United States under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and under New York common law.  They do not.  Instead, by invoking RICO and New York law, Plaintiffs invite this Court to sit in judgment over both state and federal appellate judges in Mexico based on nothing more than innuendo.  They do so even though the Mexican federal appellate court—whose jurisdiction Plaintiffs' voluntarily invoked and which Plaintiffs concede has no connection to Judge Azar—has now also rejected Plaintiffs' claims.  And they do so even though the Mexican Supreme Court has rejected Plaintiffs' first discretionary appeal.

The Court should decline Plaintiffs' improvident invitation.  First, their claims do not apply to the extraterritorial conduct alleged in this matter.  *See infra* Part I.  This defect cannot be overcome and is fatal to their claims.  Second, Plaintiffs have not alleged, and cannot allege, RICO standing, a pattern of racketeering, a RICO enterprise, or the elements of any RICO predicate act.  Their RICO claim fails for each of these reasons, any one of which requires dismissal of their case.  *See infra* Part II.  The state law causes of action should also be dismissed, both because Plaintiffs have not alleged a viable federal cause of action or diversity

and because they have not stated a claim.  *See infra* Part III.  Since this is an amended complaint, the suit should be dismissed with prejudice.

## BACKGROUND

While we address here the legal infirmities in the complaint, we must plainly state that the gravamen of Plaintiffs' accusations of misconduct against the Baker Defendants is untrue, offensive, and totally lacking in merit.  We completely reject them.  Our judicial system tolerates a great deal to assure that federal courts are open to all, but these outlandish and unsupported allegations impugning numerous jurists and professionals should never have been filed.  That said, we appreciate that the question before the Court at this stage is purely a legal one—namely, whether Plaintiffs' Amended Complaint states a claim as a matter of law—and that the Court is obligated to accept well-pleaded factual allegations.  The Court, however, is not obligated to accept conclusory allegations or shut its eyes to facts that it may properly judicially notice.[3] Plaintiffs have not alleged facts, which, if proven, would invoke federal jurisdiction.

### A.       Procedural Posture

This case began in Mexico in November 2011 when Plaintiffs filed a complaint against the Yahoo Defendants in the Superior Court of Justice for the Federal District of Mexico City.[4] *See* Am. Compl. ¶ 62.  Acting on behalf of the trial court, *Secretario* Segu, seizing upon a fifteen-day gap in the rotation of trial judges, issued a judgment in November 2012 that awarded Plaintiffs over $2.7 billion (the "Trial Court Decision").  *See* Exhibit ("Ex.") 1 at 49–53; Am.

---

[3] The Baker Defendants' accompanying Request for Judicial Notice and Notice Under Rule 44.1 sets forth the legal authority for the Court's consideration of the documents discussed herein.  All referenced exhibits are attached to the Declaration of Ana C. Reyes, filed concurrently with this motion.

[4] The Superior Court of Justice for the Federal District is equivalent to a state court in Mexico. These are not federal courts.

Compl. ¶ 93. The Yahoo Defendants appealed the Trial Court Decision to the Third Civil Chamber of Mexico City's state appellate court in December 2012. *See* Am. Compl. ¶ 103. In May 2013, that court vacated the $2.7 billion judgment, reduced Plaintiffs' award to $172,500, and awarded the Yahoo Defendants approximately $3 million in damages on their counterclaims. *See id.* ¶ 23; *see also* Ex. 2 (the "Appellate Court Decision") at 498–502. In June 2013, Plaintiffs filed a federal *amparo* challenge, essentially a collateral constitutional appeal brought under federal law, to the Appellate Court Decision. On January 28, 2015, the federal appellate court rejected Plaintiffs' *amparo* in a unanimous opinion signed by three justices of that court. *See* Ex. 6 (the "Federal *Amparo* Decision") at 593. In all, at least 12 Mexican federal and state jurists have ruled against Plaintiffs on the merits or upheld discipline upon the law clerk who entered the judgment against Yahoo.

Separately, in January 2013, the Yahoo Defendants filed a disciplinary challenge against Mr. Segu with the Council of the Judiciary of the Federal District regarding his conduct in issuing the Trial Court Decision; this body, in rulings in April and May 2013, entered sanctions against Mr. Segu. *See* Exs. 3–4 (the "*Queja* Commission Ruling" and "Board Confirmation").

These proceedings are described in greater detail below.

### 1.    The Trial Court Proceedings and Decision

As noted above, in November 2011, Plaintiffs filed a lawsuit in Mexico against the Yahoo Defendants, alleging breach of contract, breach of promise, and lost profits. *See* Am. Compl. ¶ 62. Baker Mexico represented the Yahoo Defendants in the lawsuit. *Id.* ¶ 84. Plaintiffs do not allege that Baker U.S. played any role in the litigation.[5] *Id. passim*.

---

[5] Baker U.S. and Baker Mexico are distinct legal entities; each is a member firm of Baker & McKenzie International, a Swiss Verein.

The contracts at issue in the Mexican litigation related to plans to develop, license, and promote online and print yellow page directory services in Mexico and Puerto Rico (*Yahoo! Páginas Útiles*).  Plaintiffs claimed that alleged breaches of those agreements accounted for approximately $300 million in alleged damages.  Ex. 2 at 239–42.  The bulk of Plaintiffs' claims depended on other agreements, including certain letters of intent, that contemplated feasibility studies to assess the viability of expanding the online yellow pages service to other countries. *See, e.g.*, *id.* at 306–42, 358–65, 378, 384–90, 406–09; *see also* Am. Compl. ¶¶ 54(c), 58. Plaintiffs argued, *inter alia*, that the Yahoo Defendants did not commission these feasibility studies and that the contemplated international expansion of the service never took place, thus entitling them to damages and the lost future and projected profits they would have obtained had: (1) the feasibility studies been conducted, (2) the results supported initiating formal operations in various countries around the world, (3) the Plaintiffs initiated operations in those countries, and (4) the operations in those countries been profitable to the tune of over $2.4 billion.  Ex. 2 at 192–96, 243–44.  The Yahoo Defendants argued that these feasibility study agreements never bound the parties to any expansion, as it is clear from their face and from Mexican law that they were simply agreements to assess whether further expansion was warranted.  *Id.* at 34–40, 52.[6]

The case had originally been assigned to Judge Jorge Luis Ramirez.  Am. Compl. ¶ 65. Juan Francisco Garcia Segu served as Judge Ramirez's "*secretario de acuerdos.*"  *Id.* ¶¶ 65–66. A "*secretario de acuerdos*" functions as a "law clerk" responsible for overseeing discovery in

---

[6] The Yahoo Defendants also argued that any alleged breach pertaining to Mexico and Puerto Rico had not been proven by Plaintiffs, that the agreements pertaining to the Puerto Rico project were ultimately terminated, and that the agreement governing the project in Mexico lapsed in 2009.  *See* Ex. 2 at 40–42 (Puerto Rico), 42–44 (Mexico).

the case, including by processing the admission of evidence into the record. *Id.* ¶ 70.[7]  Plaintiffs

allege that Mr. Segu was designated "by operation of law" to serve as an acting judge starting

"on or about November 15, 2012." *Id.* ¶ 74.  From November 15 to November 30, 2012, Judge

Ramirez was on a short-term leave, as Judge Ramirez was being trained for a new judicial

appointment. *Id.*; Ex. 3 at 32–33.  Due to the "complex and delicate" nature of the case, he asked

Mr. Segu to not issue a decision and to instead leave the matter for his replacement, a judge who

was to take over his duties in early December. *See* Ex. 3 at 58.  Mr. Segu, the law clerk, ignored

that instruction.  In the two-week period while Judge Ramirez was on leave, Mr. Segu entered a

judgment in favor of Plaintiffs in the amount of $2.7 billion.[8] Am. Compl. ¶ 4.  We believe this

is one of the largest judgments entered by a Mexican court, certainly by a law clerk temporarily

holding court in violation of instructions from the presiding judge.

### 2.    The Disciplinary Hearing Against Mr. Segu

In January 2013, Yahoo initiated an administrative complaint—or "*queja*

*administrativa*"—against Mr. Segu before the Commission on Judicial Discipline for the Judicial

Council of the Superior Court of Justice in Mexico City (the "Commission").  *See* Ex. 3 at 1; *see*

*also* Am. Compl. ¶¶ 106–07.

Plaintiffs characterize the Commission's decision as "reject[ing]" Yahoo's substantive

argument, and paint it as finding "only minor procedural flaws concerning the timing but not the

substance of the final judgment . . . .."  Am. Compl. ¶ 107.  This description is a departure from

---

[7] Plaintiffs originally alleged that Mr. Segu was a law clerk.  The Amended Complaint now also
alleges that this "law clerk" is "akin to a . . . magistrate judge."  Am. Compl. ¶¶ 67, 70; *cf.*
Verified Complaint (Compl.) ¶¶ 61, 64.

[8] As a point of reference, a company with $2.7 billion in annual profits would be the second-
most profitable company in Mexico.  *See Forbes Global 2000:  Mexico's Largest Companies*,
Economy Watch (July 3, 2013), *available at*
<http://www.economywatch.com/companies/forbes-list/mexico.html>.

reality.  The three members of the Commission unanimously found Mr. Segu "guilty of infringing th[e] presumption" that the decision was "passed *by a legitimate judge empowered to pass such a sentence*."  Ex. 3 at 60.  They sanctioned Mr. Segu for his actions by fining him 100 days salary and referred the matter to the Attorney General for potential criminal prosecution. *Id*. at 75.

In imposing its penalty, the Commission found that Mr. Segu committed "three serious errors."  *Id*. at 56.  First, he failed to notify the parties pursuant to Mexican law that he would serve as acting judge in the absence of Judge Ramirez, thereby depriving the Yahoo Defendants of their "due process" right to seek his recusal and to have the litigation decided by a sitting judge.  *Id.* at 44.  Second, he issued the Trial Court Decision prematurely before the new judge arrived to replace Judge Ramirez.  *See id.* at 53–54.  The Commission found this willful error in particular violated Article 220, section XIX of the Basic Law of the Superior Court of Mexico City, i.e., as stated by that law he "[d]isplay[ed] clear ineptitude, negligence, or neglect in the performance" of his functions.  *Id*. at 54.  Third, the voluminous case files were not available to Mr. Segu when he issued the decision, and therefore he issued his $2.7 billion decision without having access to all of the evidence in the case.  *Id*. at 54–55.  Mr. Segu appealed the sanctions order to the Board of the Judicial Council of Mexico City (the "Judicial Council").  The five-person Judicial Council unanimously affirmed.[9]  Ex. 4 at 22–23.

---

[9] Three members of the Judicial Council had also served on the Commission.  While Judge Azar was the Chair of the five-person Judicial Council, Plaintiffs do not allege any wrong-doing with respect to the initial decision or the affirmance of that decision.  We understand that Mr. Segu appealed the Judicial Council's decision further, but may have abandoned that appeal when he fled Mexico.

### 3.      The State Appellate Court Proceedings

In December 2012, the Yahoo Defendants appealed Mr. Segu's $2.7 billion judgment to the state appellate court.  *See* Am. Compl. ¶ 103.  Plaintiffs filed their opposition approximately one month later.  On May 15, 2013, a three-judge panel of the state appellate court issued a judgment overturning the Trial Court Decision.  Ex. 2.

Plaintiffs allege that the Appellate Court Decision "had minimal legal analysis" and was "slip-shod" in nature, citing as evidence that "the font constantly changes throughout the decision as if different documents have been electronically copied into the document."  Am. Compl. ¶ 116.  Plaintiffs' suggestion that it is improper for that court to have scanned relevant excerpts into its opinion is wrong.[10]  The panel explained that it scanned relevant pleading and contract excerpts into the opinion.  *See, e.g.*, Ex. 2 at 359 ("[I]t is appropriate to reproduce [the letter of intent] via scanner.").  Conspicuously, Plaintiffs do not address the panel's legal analysis, much less allege that the panel erred in its conclusions of law.[11]

The state appellate court gave a number of independent reasons in support of reversal. Analyzing a core issue in dispute, the panel held that the parties had entered into agreements to

---

[10] Indeed, other courts, including the United States Supreme Court, do the same.  *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 41, 52 (2001) (Stevens, J., dissenting); *In re R. M. J.*, 455 U.S. 191 (1982).

[11] To the extent that Plaintiffs' allegations address the panel's legal analysis at all, they allege that the appellate opinion "did not take many of Plaintiffs' arguments into account" and, in a new allegation, note that the court allegedly "disregarded" Plaintiffs' argument "that Yahoo-US was in contempt throughout the proceedings below due to improper powers of attorney."  Am. Compl. ¶ 116.  But Plaintiffs do not specifically identify any arguments that were not taken into account in the 502-page appellate opinion.  Even though Mr. Segu's judgment in Plaintiffs' favor did not address the power of attorney question, both the state appellate court and federal *amparo* court considered this argument regarding the Baker Defendants' alleged "lack of legal agency" and squarely rejected it.  *See* Ex. 2 at 19 (concluding that "the motion for lack of legal agency filed [against the defendants] is groundless"); Ex. 6 at 470 (concluding that "the plaintiff consented to the [first instance court's] failure to decide the motion of lack of agency" by its actions in the first instance court).

conduct feasibility studies in certain markets.  Ex. 2 at 341.  The panel held that Yahoo de Mexico breached its obligation to undertake feasibility studies in certain markets and ordered it to pay $172,500.  *Id.* at 499; Am. Compl. ¶ 7.  The panel, however, rejected the central premise of Plaintiffs' appeal, concluding that the parties were not bound to enter into subsequent licensing agreements even if the feasibility studies were positive, as that depended on "the judgment of both parties."  Ex. 2 at 341–42.  Because Plaintiffs' claims were based on these subsequent potential agreements—agreements the parties never in fact entered into—the state appellate court held that Mr. Segu erred in finding in Plaintiffs' favor.  *Id.*

The panel further held that, even if there had been an obligation to enter into subsequent licensing agreements, Mr. Segu's damages judgment contravened Mexican law in multiple ways. First, the panel noted that "[f]rom reading the complaint it is impossible to determine what it is that the plaintiffs had and no longer have.  What it is that they lost."  *Id.* at 414.  Mr. Segu's judgment did not clarify matters, as it did not contain any analysis "whatsoever" of whether Plaintiffs were in fact damaged by the alleged breaches.  *Id.*  Consequently, the Trial Court Decision was contrary to Article 2110 of the Civil Code, which requires that all damages be the result of "the immediate and direct result of" the alleged breaches.  *Id.* at 417–18.  As the panel explained:

> In the judgment appealed from[,] codefendants are ordered to pay damages and losses without any basis and without a statement of the necessary justification. There is no explanation about how it is that that breach that is attributed to the accused led to the damages and losses that they are ordered to cure. . . .  If the corresponding reasoning had been done, it would have been seen that even if it is deemed that such breach occurred, it did not cause the damages and losses that the plaintiff claims.

*Id.* at 419.

Second, the panel assigned error to Mr. Segu's imposition of "moral damages" without the requisite findings necessary to impose such damages. *Id.* at 449.

Third, the panel found that Mr. Segu erred in finding Yahoo Mexico and Yahoo! jointly and severally liable, because neither entity expressly or implicitly assumed such liability. It held Mr. Segu should have adduced their contractual obligations independently of each other and only as to the contracts they respectively executed. *See id.* at 300–02.

Fourth, the panel held that Mr. Segu violated Article 1077 of Mexico's Commercial Code by failing to address 18 of Yahoo Mexico's 19 affirmative defenses and failing to address any of the affirmative defenses filed by Yahoo!. *See id.* at 294–95.

Ultimately, the panel found no support in Mr. Segu's decision or Mexican law for the $2.7 billion judgment and accordingly reversed.[12]

### 4.    The Federal Appellate Court Proceedings

In June 2013, Plaintiffs filed a collateral challenge in Mexico's federal appellate court[13] to the panel's opinion reversing the $2.7 billion judgment—the "*amparo*" proceeding. *See* Ex. 5 (Plaintiffs' *amparo* filing); Am. Compl. ¶ 117. Because the *amparo* challenge was heard in Mexico's federal court, rather than in Mexico City's state courts, it is beyond the ambit of Judge Azar's authority as President of Mexico City's state-level courts. *See* Am. Compl. ¶¶ 2, 35(a). In their *amparo*, Plaintiffs did not make any allegation concerning improper behavior by Judge Azar or by any state court appellate judge: it only challenged the merits of the monetary award.

---

[12] One judge noted a partial dissent on a minor non-substantive point, namely, an issue relating to the return of a database that Plaintiffs had given to the Yahoo Defendants in connection with the online yellow pages projects at issue in the contracts. *See* Ex. 2 (*Voto Particular*).

[13] Plaintiffs brought their *amparo* challenge in the Fourteenth Collegiate Civil Court of the First Circuit—a federal court that has jurisdiction over such appeals.

On January 28, 2015, the federal *amparo* panel issued a unanimous opinion rejecting Plaintiffs' collateral appeal, affirming the judgment of the state appellate court. *See* Ex. 6. Like the state appellate court, the federal *amparo* panel's ruling rejected the central premise of Plaintiffs' $2.7 billion damages claim, concluding that "[t]he assertion by the parties seeking *amparo*, with respect to the international expansion, *lacks any legal basis*, as the agreements had the objective of conducting a feasibility study, i.e., there was no definitive agreement to conduct the business of international expansion." Ex. 6 at 539 (emphasis added).

In their originally-filed complaint, Plaintiffs did not allege any specific instances of misconduct in connection with the *amparo* or that any improper influence was exerted over any of the federal judges involved in the case. Nor do they do so in their Amended Complaint, which merely speculates that, "[u]pon information and belief, a decision favorable to Plaintiffs was about to be issued" just before the *amparo* panel's ruling in favor of Defendants. *See* Am. Compl. ¶ 118.[14] As with their allegations regarding the state court appellate judgment, Plaintiffs' allegations regarding the *amparo* decision do not directly address the panel's legal analysis, alleging in a conclusory fashion that "[t]he Federal Tribunal's decision repeated a number of the

---

[14] Plaintiffs suggest that the federal *amparo* panel was about to issue a favorable decision for the Plaintiffs by noting that "[t]hree draft opinions were prepared" by the panel, "one in favor of Yahoo and the other two in favor of Plaintiffs." Am. Compl. ¶ 118. Without any explanation of how they supposedly know this fact, Plaintiffs ask this court to infer that this was somehow tied to the alleged conspiracy. But, of course, judges can change their votes prior to issuance of a decision. Chief Justice Roberts is reported to have changed his vote on the first Affordable Care Act case, thereby changing the outcome. *See* Jan Crawford, *Roberts Switched Views To Uphold Health Care Law*, CBS News (July 2, 2012, 9:43 PM), http://www.cbsnews.com/news/roberts-switched-views-to-uphold-health-care-law/. There are other examples. *See, e.g.*, Michael J. Klarman, *From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equality* 293–312 (2004) (revealing the Justices' shifting votes that led to the ultimately unanimous result in *Brown v. Board of Education*, 347 U.S. 483 (1954)); Bob Woodward & Scott Armstrong, *The Brethren: Inside the Supreme Court* 162–65 (2005) (explaining how Justice Harlan changed his vote in and altered the eventual outcome of, *Clay v. United States*, 403 U.S. 698 (1971) (per curiam)).

12

factual errors that were made by the Third Appellate Court and [the decision] lacked support for core legal contentions." *Id.* ¶ 119.  In sum, Plaintiffs' allegations with regard to the federal and state courts boil down to a speculative attempt to question the credibility and integrity of both the federal and state court systems in Mexico.

Plaintiffs have further pursued their appeal in the Mexican Supreme Court, where they filed an initial petition—a *recurso de revisión* —to review the *amparo* decision on February 16, 2015.  *Id.* ¶ 120; *see also* Ex. 8.  The President of the Mexican Supreme Court rejected the petition on February 25, 2015.  *See* Ex. 9.  Now Plaintiffs have filed yet another petition— essentially a motion for reconsideration or *recurso de reclamación* —with the Mexican Supreme Court.  *See* Ex. 13.  That petition remains pending.  *See id.*  In short, Plaintiffs have developed an ever-increasing, but unsubstantiated, web of allegations of corruption, influence and incompetence that spreads to every jurist that rules against them.

### B.  Plaintiffs' Allegations in This Proceeding

Plaintiffs do not allege that Defendants directly corrupted the three state appellate court judges who overturned Mr. Segu's judgment, or the three *amparo* federal appellate court judges who affirmed that decision, or the President of the Mexican Supreme Court who rejected their petition for review.  Instead, Plaintiffs claim that Defendants sought to influence Judge Edgar Elias Azar, the President of Mexico City's Superior Courts.  He in turn, they allege, pressured Mr. Segu to enter judgment for the Yahoo Defendants.  Mr. Segu did not do so, and Judge Azar then allegedly pressured one of the three state appellate court judges to overturn Mr. Segu's decision.  According to Plaintiffs, while Judge Azar did not have sufficient pull to pressure a court clerk, he somehow did have sufficient pull to pressure state appellate court judges. Plaintiffs do not claim that Judge Azar has any authority over the federal court appellate judges

13

who have now also ruled in the Yahoo Defendants' favor, but insinuate impropriety in the issuance of that adverse decision.

### 1.    Allegations Concerning Mr. Segu

Plaintiffs claim that unidentified "representatives of the Baker & McKenzie Defendants" had an *ex parte* meeting with Judge Azar on November 26, 2012, as part of a campaign to "target [Segu] for intimidation and coercion in order to obtain a favorable judgment." Am. Compl. ¶ 75; *see id.* ¶¶ 35(a), 77.  Citing no facts, Plaintiffs allege that the evidence "strongly suggest[s] that Defendants offered and paid Judge Azar monetary enhancements . . . to execute the scheme on their behalf." *Id.* ¶ 77.[15]  Plaintiffs allege that Baker Mexico attorneys "accosted" Mr. Segu shortly thereafter, "told him that their paralegal would deliver a memory stick with a draft decision the following days," and followed through on that promise by delivering "two fully drafted opinions." *Id.* ¶¶ 84–85; *see also id.* ¶ 10.  On November 29, 2012, notwithstanding the alleged coercion, Mr. Segu granted judgment in Plaintiffs' favor for $2.7 billion. *Id.* ¶ 90.

### 2.    Allegations Concerning the State Appellate Court and Federal *Amparo* Proceedings

Plaintiffs do not make a single individualized allegation concerning Defendants and the state appellate court proceedings.  Instead, Plaintiffs allege via group pleading only that "Judge Azar and the RICO Defendants began taking calculated steps to ensure that the judgment would be reversed on appeal." Am. Compl. ¶ 97.  They also allege, via group pleading, that "the RICO

---

[15] Plaintiffs have added allegations to their complaint based on hearsay statements of former Judge Montes de Oca regarding Judge Azar's conduct in other cases.  *See* Am. Compl. ¶ 79. Judge Azar's alleged actions in other cases have no bearing on the present matter.  It bears highlighting, however, Plaintiffs' admission that a warrant issued for Judge Oca's arrest in Mexico.  Plaintiffs claim that the arrest was based on "trumped up charges." *Id.*  The vote to remove Judge Oca was based on a vote of nearly all of the judges of the Superior Court of Mexico City.  *See* Ex. 12 (redacted Superior Court Plenary Session Minutes).  We anticipate obtaining an unredacted version of these minutes, and other documents concerning Judge Oca, soon.  We will supplement the Request for Judicial Notice accordingly.

Defendants continued to meet with Azar and continued to threaten and intimidate Judge Segu," *id.* ¶ 104, and that "Judge Segu has been severely retaliated against by Judge Azar and his corrupt cohorts." *Id.* ¶ 11; *see also id.* ¶¶ 6, 21, 95.  They also allege that the Defendants engaged in "successful corruption of and bribing of the Mexican judicial officials and attempt[ed] to instill fear in Plaintiffs and pressure Plaintiffs to resolve the case without further litigation."  *Id.* ¶ 141.  They do not provide any date, location, participants, or statements of these alleged meetings between Defendants or Judge Azar; nor do they provide specific facts regarding the alleged retaliation and bribery.  Plaintiffs do not attribute any further action to any Defendant or even to the Defendants as a group with respect to the state appellate court proceedings.  Instead, the remaining allegations concern actions allegedly taken by Judge Azar.

As to the federal *amparo* proceedings, Plaintiffs have not made any allegation regarding any conduct of the Defendants or Judge Azar that may have influenced the decision in that appeal.  As noted above, they made unfounded allegations that (1) "[u]pon information and belief, a decision favorable to Plaintiffs was about to be issued" in the *amparo*; and (2) that the federal *amparo* decision in favor of the Defendants "repeated . . . factual errors that were made by the" state appellate court.  *See* Am. Compl. ¶¶ 118-19.  They assert that two draft decisions were prepared in the Plaintiffs' favor—in addition to one decision in Defendants' favor, *see id.*— to somehow suggest that the ultimate decision of the federal *amparo* panel in Yahoo's favor was fraudulently procured by the Defendants.  Yet, these allegations do not provide any specific details that would suggest that the Defendants—or even Judge Azar for that matter—had any influence whatsoever over the *federal* appellate panel; nor do they provide any specific details of the *amparo* opinion's alleged "errors."

3.      *Ex Parte* **Meetings**

Plaintiffs' complaint is premised in part on the notion that Defendants met, outside the presence of Plaintiffs' counsel, with Judge Azar.  *See, e.g.*, Am. Compl. ¶ 9.  They ask the Court to infer from these *ex parte* meetings that Defendants somehow acted improperly.  Plaintiffs' complaint, however, entirely undermines this suggestion of impropriety, as they allege that their own counsel also had *ex parte* meetings with Judge Azar.  *See id.* ¶¶ 101–02.  These meetings are not surprising.  It is a widely accepted practice in Mexico for lawyers to meet *ex parte* with judges to discuss the status of cases.

Federal appellate court Judge Walter Arellano Hobelsberger has highlighted in a 2013 ethics treatise published by the Mexican Supreme Court that one-on-one meetings with judges, "in Mexican forensic practice [have] a notable acceptance and rootedness, and even in court [they are] identified with the colloquial phrase '*alegato de oídas*' (writ of oral remarks)."  Ex. 7 (Legal Ethics Treatise) at 26.  As part of this process, he noted that "it is common that the parties arrive with a memorandum" to the one-on-one meetings with the judge.  *Id.*  Other commentators, including the American Law Institute, agree that "[i]n Mexico, communication with courts without notice to other parties (so-called 'ex parte' communications) is a common theme," and that Mexico has "very different rules governing communications with and among courts" than the United States and Canada.[16]  In response to the Baker Defendants' first motion to dismiss, Plaintiffs have now acknowledged that it is "regular practice to present arguments *ex parte* to a judge in Mexico."  Am. Compl. ¶ 87.

---

[16] *See* American Law Institute & The International Insolvency Institute, *Transnational Insolvency: Global Principles for Cooperation in International Insolvency Cases* 65 (Mar. 30, 2012); *see also* Jay Lawrence Westbrook, *International Judicial Negotiation*, 38 Tex. Int'l L.J. 567, 582–83 (2003).

In light of this astonishing admission, Plaintiffs have attempted to salvage one of the central premises of their complaint by maintaining that, while *ex parte* meetings themselves are common practice, "[i]t is not regular practice to meet with judges and present them with a fully drafted opinion to sign." *Id.* For this proposition, the Amended Complaint does not primarily rely on established legal treatises or legal provisions, but instead on the opinion of Judge Oca, who, as noted above, was removed from office for misconduct and may be a fugitive avoiding an arrest warrant. *See id.*; *see supra* p. 14 n.15. The complaint also relies on Federal District Penal Code Article 291. Am. Compl. ¶ 87. But this provision says nothing about providing draft opinions to judges; it is a general provision that prohibits a judge from "commit[ting] an act or an omission which legally damages anyone or grants such person an unlawful advantage." Ex. 10 (Federal District Penal Code Provisions).[17] Just as litigants can have *ex parte* meetings with judges in Mexico, litigants can also provide draft opinions to judges in Mexico. For example, Article 344 of Mexico's Federal Code of Civil Procedure provides that "[t]he parties . . . may submit notes of argument and even a draft of judgment prior to the conclusion of the hearing." Ex. 11. The Plaintiffs have cited to no specific provisions of Mexican law suggesting otherwise. And, of course, in many American courts, parties routinely submit proposed findings of fact and conclusions of law, or proposed orders.

### 4.    Judges and Judicial Officers Who Would Be Witnesses

Plaintiffs' complaint identifies numerous judges and officers of the Mexican courts who may be fact witnesses if this case proceeds, including several potential witnesses referenced in Plaintiffs' complaint. In the Mexico City state-level courts, these individuals include Judge

---

[17] The Amended Complaint also adds an allegation suggesting that Federal District Penal Code Article 291 "does not enable a district's President to meet with parties." Am. Compl. ¶ 76. That provision says nothing of the sort. It simply makes it a criminal offense for a civil servant to engage in certain enumerated acts of wrongdoing. *See* Ex. 10.

Edgar Elias Azar, the President of the Mexico City state-level courts; Edgar Paul Rodriguez, a Clerk in the state appellate court; Laura Perez Rios, Monica Venegas Hernandez, and Socorro Santos Ortega, the state appellate court judges who signed the Appellate Court Decision; Judges Jorge Luis Ramirez Sanchez and Tomas Curiel, the trial court judges who worked with Mr. Segu before and after he issued the Trial Court Decision, *see* Am. Compl. ¶¶ 65, 74, 88–89, 105; Maria Elena Urrutria Alvarez, another *secretario* who worked in Judge Sanchez's Trial Court, *see* Ex. 4 at 1–2; Sandra Luz Diaz Ortiz, Rafael Santa Ana Solano, Norma Raquel Lagunes Alarcon, and Hector Samuel Castillas Macedo, members of the Judicial Council and Commission who ruled on the *queja* against Mr. Segu, *see* Exs. 3–4; and at least a dozen other employees and staff members of the Mexico City state-level courts, *see* Am. Compl. ¶ 113.[18]

In Mexico's federal courts, the three judges who heard and decided Plaintiffs' *amparo* challenge are, under Plaintiffs' theories, also witnesses as to the legal propriety of the Mexico City state-level courts' actions in this case, as well as to the legal propriety of their own *amparo* ruling. *See* Am. Compl. ¶¶ 118–19. These judges include Alejandro Sanchez Lopez, Ethel Lizette Del Carmen Rodriguez Arcovedo, and Carlos Arellano Hobelsberger. *See* Ex. 6 at 593. Moreover, as noted above, the Plaintiffs appealed the federal *amparo* court's ruling to the Mexican Supreme Court via a *recurso de revisión*, *see id.* ¶ 120, and the President of the Mexican Supreme Court, Minister Luis Maria Aguilar Morales, has already dismissed that petition. *See* Ex. 9. Now that the plaintiffs have also filed a *recurso de reclamación* before the full Supreme Court, that judge, along with other Justices of that court may also be required to provide relevant testimony in this proceeding under Plaintiffs' theories.

---

[18] Additional Mexico City state-level court employees and clerks named in the complaint include Florencia del Carmen Hernandez, Maria de Jesus Barbara Hernandez, Raymundo de la Rosa, Elsa Saldivar Cruz, David Canchola Anguiano, Carmen Roque, Maria de los Angeles Alvarez, Jose Arrastio, Edgar Raul Rodriguez Amante, Joel Hidalgo Everardo, Oscar Tomas Sanchez Rodriguez, Angelica Varela Robles, and Patricia Severin Barrios. *See* Am. Compl. ¶ 113.

## STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), the Court determines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level. . . ." *Id.* Moreover, "only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (third alteration in original) (quoting Fed. Rule Civ. P. 8(a)(2)).

While the Court must generally accept as true all the factual assertions in the complaint, there is an exception to that principle: where "general allegations . . . are belied by more specific facts in the Complaint," *Lismore v. Société Générale Energy Corp.*, No. 11 Civ. 6705(AJN), 2012 WL 3577833, at *4 (S.D.N.Y. Aug. 17, 2012), or where "factual assertions . . . are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice," *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS DO NOT HAVE EXTRATERRITORIAL REACH

Plaintiffs—two Mexican companies—focus their complaint entirely on conduct that allegedly took place in Mexican courts by the Mexican defendants and Mexican judges and court officials. Their complaint fails because none of their claims have extraterritorial reach, and they

19

fail to allege any activity occurring in or in connection with the United States.

RICO was enacted "to prevent organized crime from infiltrating America's legitimate business organizations." *Moccio v. Cablevision Sys. Corp.*, 208 F. Supp. 2d 361, 371 (E.D.N.Y. 2002). Plaintiffs seek to invoke the statute even though they do not allege any connection with the United States. In *European Community v. RJR Nabisco, Inc*., 764 F.3d 129, 136 (2d Cir. 2014), the Second Circuit held that when a RICO claim depends on violations of a predicate statute that does not apply extraterritorially, RICO will not apply extraterritorially either. That decision forecloses Plaintiffs' transparent attempt "to mold their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act." *Lefkowitz v. Reissman*, No. 12 Civ. 8703(RA), 2014 WL 925410, at *4 (S.D.N.Y. Mar. 7, 2014) (internal quotation marks omitted).

Plaintiffs' New York law claims likewise do not have extraterritorial reach.[19] Accordingly, this Court should dismiss the complaint.

### A.   The Alleged Misconduct Occurred Entirely in Mexico

Plaintiffs claim in conclusory fashion that an alleged conspiracy was "hatched" in the United States, Am. Compl. ¶ 2, that the U.S. entities "orchestrated the scheme to coerce, bribe, and ghostwrite, from the United States," *id.* ¶ 99, that "they . . . traveled to and from the United States . . . to further the conspiracy," *id.*, and that the U.S. entities acted to "direct[] and control" the Mexican entities, *id.* ¶ 122. None of their allegations, however, identify with particularity any portion of the conspiracy occurring in the United States. Plaintiffs do not provide any factual detail regarding a single meeting or activity occurring in the United States concerning the

---

[19] Diversity subject matter jurisdiction does not exist to support Plaintiffs' state law claims. If the Court dismisses the RICO claims, it should also decline to exercise supplemental jurisdiction over the state law claims. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182–83 (2d Cir. 2004). This serves as an independent basis to dismiss the state law claims.

alleged scheme.[20]  To the contrary, each act alleged to have taken place in furtherance of any predicate act—the underlying litigation, the alleged threats to Mr. Segu, the alleged actions by Judge Azar, and the challenged state appellate process—are alleged to have taken place entirely in Mexico.

To be sure, Plaintiffs make allegations concerning the parties' relationship *prior* to the commencement of legal proceedings in Mexico that include actions allegedly taken by Yahoo! in the United States.  Am. Compl. ¶¶ 51–58.  And Plaintiffs allege that Yahoo! made misstatements concerning Mr. Segu's Trial Court Decision to investors in the United States, though they concede that Yahoo! disclosed the amount of the Trial Court Decision.  *Id.* ¶ 123.  These allegations are all inapposite as they do not underlie any predicate act, do not support Plaintiffs' claims as they are not predicating any claim upon shareholder status, do not include allegations of any effect on commerce in the United States, and do not concern either Baker entity.

The extraterritorial nature of Plaintiffs' complaint manifests itself starkly when one considers that Plaintiffs essentially ask the Court, based upon unsupported accusations, to sit as a foreign disciplinary authority over the Mexican judicial system.  To adjudicate the case, the Court would have to insert itself into the day-to-day-operations of the Mexican court system, interpret and evaluate Mexican judicial practice and precedent, and evaluate in particular the credibility of judges at every level of the Mexican judiciary.  The parties may be required to utilize the Hague Convention procedures—including letters rogatory—to obtain deposition

---

[20] While Plaintiffs allege that the draft opinion given to Mr. Segu was "revised and *possibly* drafted on a computer owned by Defendant Baker & McKenzie," *see* Am. Compl. ¶¶ 18, 86 (emphasis added), Plaintiffs do not allege that the proposed order was actually drafted in the United States.  They state only that the memory stick may "*suggest*[]" that the alleged scheme was tied to the United States.  *Id.* ¶ 18 (emphasis added).  Even if the stick did show such a connection, that lone allegation would not be sufficient to find a nexus to the United States, *see infra* pp. 22-25 (Part I.B).

testimony from these multiple nonparty witnesses located abroad.  If the U.S. court system can serve a supervisory role over Mexican courts based upon innuendo, and call for testimony and evidence from Mexican judges, then U.S. courts can expect similar treatment in foreign tribunals.  In neither instance would it be proper.

### B.     The Statutes Plaintiffs Rely Upon To Support Predicate Acts of Racketeering Do Not Apply to Extraterritorial Conduct

In *European Community*, the Second Circuit held that the extraterritorial application of a RICO claim is coextensive with the extraterritorial effect of the relevant predicate statutes. "[W]hen a RICO claim depends on violations of a predicate statute that does not overcome *Morrison*'s presumption against extraterritoriality, RICO will not apply extraterritorially either." *European Cmty.*, 764 F.3d at 136 (emphasis omitted).  Here, Plaintiffs allege that Defendants engaged in predicate acts that violate the following:  the Travel Act, the wire and mail fraud statutes, and the Hobbs Act.  *See* Am. Compl. ¶ 136.[21]  They also allege that the Baker Defendants violated New York state law.  *Id*.  None of the statutes Plaintiffs cite have extraterritorial effect, and thus their RICO claims fail as a matter of law.

***The Travel Act and wire and mail fraud statutes.***  The Second Circuit recently confirmed that the Travel Act and wire and mail fraud statutes do not have extraterritorial application.  *See European Cmty.*, 764 F.3d at 140–41.  This decision forecloses RICO's application to this case because Plaintiffs do not allege domestic conduct.

---

[21] Elsewhere in their complaint, but not within the RICO count itself, Plaintiffs refer to other predicate acts, including money laundering and obstruction of justice.  *See* Am. Compl. ¶¶ 3, 5. It appears that the obstruction of justice allegation has been removed. *Compare id.* ¶ 24, *with* Compl. ¶ 21.  In any event, these are not properly pled as predicate acts in the RICO count, but, even if they had been, they also do not apply to extraterritorial conduct under the circumstances alleged here.  *See* 18 U.S.C. § 1956(f) (money laundering applies to extraterritorial conduct by U.S. citizen involving more than $10,000; no money laundering of any amount alleged); 18 U.S.C. §§ 1512, 1513 (reaching extraterritorial conduct if the matters involve a U.S. court or agency; no involvement of a U.S. court or agency alleged).

*Petroleos Mexicanos v. SK Engineering & Construction Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) is instructive.  In that case, the plaintiff alleged that defendants bribed Mexican officials and that the bribes constituted wire and mail fraud predicate acts under RICO.  The Second Circuit affirmed, by summary order, dismissal of the RICO claim because the matter did not sufficiently involve domestic conduct, even though the plaintiff alleged that "the financing was obtained [in the United States], the invoices were sent to the bank for payment, and the bank issued payment."  *Id*.  As the Second Circuit noted, "[a]bsent from the pleadings are any allegations that the scheme was directed from (or to) the United States.  The activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices— took place outside of the United States."  *Id*.  Like in *Petroleos*, the activities Plaintiffs allege made up the scheme took place abroad.  Plaintiffs have not even alleged the minimal contacts with the United States—payments to and from a bank in the United States—that the Second Circuit found to be insufficient in *Petroleos*.

**The Hobbs Act.**  The Hobbs Act criminalizes "robbery or extortion" that "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce."  18 U.S.C. § 1951(a).  While neither the Supreme Court nor the Second Circuit has ruled upon the extraterritorial reach of the Hobbs Act, the Supreme Court has long recognized that criminal statutes generally do not have "extraterritorial effect."  *United States v. Flores*, 289 U.S. 137, 155 (1933).  And in *Morrison*, the Court reaffirmed the well-established presumption that federal statutes do not apply outside the United States absent a "clear indication" from Congress. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (addressing civil statutes).  The Second Circuit has similarly held that criminal statutes, absent language to the contrary or discernible legislative intent, are presumed to lack extraterritorial effect.  *See United States v.*

*Vilar*, 729 F.3d 62, 74 (2d Cir. 2013) ("[T]he general rule is that the presumption against extraterritoriality applies to criminal statutes . . . ."), *cert. denied*, 134 S. Ct. 2684 (2014).  And it has held that a statute's reference to "foreign commerce" without more, "do[es] not indicate a congressional intent that the statutes apply extraterritorially."  *European Cmty.*, 764 F.3d at 141.

Nothing in the Hobbs Act provides any indication, much less the required "clear indication," that Congress intended it to have extraterritorial reach.  The Hobbs Act has two basic components—(1) the wrongful use of fear, in this case, of economic or reputational harm (2) in order to obtain the property of another.  *See* 18 U.S.C. § 1951(a).  Neither reflects a Congressional intent that the statute be applied to extraterritorial conduct.  Some pre-*Morrison* courts had held that the Hobbs Act can apply to extraterritorial conduct, but even then only if the extortionate act "has the requisite effect on interstate commerce or commerce between the United States [and] a foreign country."  *Wiwa v. Royal Dutch Petrol. Co.*, No. 96 CIV. 8386 (KMW), 2002 WL 319887, at *24 n.32 (S.D.N.Y. Feb. 28, 2002) (citing *United States v. Inigo*, 925 F.2d 641, 648 (3d Cir. 1991)).  Here, Plaintiffs have not alleged any effect on interstate commerce or commerce between the United States and Mexico.  Indeed, since their complaint is that Defendants bribed Judge Azar in hopes that he would influence Mr. Segu or one of the state appellate court judges, they have not alleged any effect on commerce at all.

**The FCPA.**  It is unclear whether Plaintiffs rely upon the Foreign Corrupt Practices Act to support their RICO claim.[22]  If they do, such reliance is misplaced as that statute does not qualify as an independent predicate act for RICO purposes.  "With respect to the . . . FCPA violations, RICO provides an exhaustive list of qualifying predicate acts and the latter is notably

---

[22] The original complaint pleaded the FCPA in multiple locations of the complaint, including in the RICO count. *See* Compl. ¶¶ 5, 70, 139.  Although reference to FCPA was removed from some of these paragraphs, it was retained in others.  *See* Am. Compl. ¶¶ 77, 140.

absent." *Reich v. Lopez*, 38 F. Supp. 3d 436, 446 (S.D.N.Y. 2014) (citing 18 U.S.C. § 1961(1)).

Thus, "[t]he FCPA, unlike the Travel Act, is not a[n] [independent] RICO predicate." *Reich*, F.

Supp. 3d at 446 (second and third alterations in original) (internal quotation marks omitted); *see*

*also J.S. Serv. Ctr. Corp. v. Gen. Elec. Technical Servs. Co.*, 937 F. Supp. 216, 220–21

(S.D.N.Y. 1996).  To be sure, some courts have considered FCPA violations in assessing

whether a RICO claim has been properly pled, but those courts considered the FCPA violations

as a basis for independent violations of valid RICO predicates, such as the Travel Act or the mail

and wire fraud statutes.  *Reich*, 38 F. Supp. 3d at 445-46 (citing cases).  As noted above, the

Second Circuit has expressly held that the Travel Act does not have extraterritorial reach.  And

no court in the Second Circuit has held that the FCPA qualifies as a predicate act in its own right.

### C.     New York Law Presumptively Does Not Apply to Extraterritorial Conduct

It is well-settled that New York law is presumed not to apply extraterritorially.  *See*

*Global Reinsurance Corp.–U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (2012); N.Y. Stat.

Law § 149 cmt. (McKinney 2014).  New York state law claims do not overcome this

presumption "in a situation where the analogue federal claim would be barred." *Global*

*Reinsurance*, 18 N.Y.3d at 735; *see also World Book, Inc. v. Int'l Bus. Machs. Corp.*, 354 F.

Supp. 2d 451, 455 (S.D.N.Y. 2005) (noting that a state common law misappropriation claim

failed on extraterritoriality grounds because the corresponding federal Lanham Act claim

"fail[ed] to plead substantial effects on domestic commerce").  Given these principles, the state

law statutes that Plaintiffs rely upon as predicate acts for the alleged RICO violation are

inapplicable here.  Likewise, Plaintiffs' state law counts for common law fraud and civil

conspiracy also fail because they do not apply to extraterritorial conduct.

*First*, the state law grand larceny by extortion[23] predicate act alleged under New York

Penal Law Sections 155.05(2)(e)[24] and 155.42, Am. Compl. ¶ 139, fails because the federal

analogues to that statute—extortion under the Travel Act or Hobbs Act—do not apply to

extraterritorial conduct.  *See supra* pp. 22-24; *see also In re Zisselman*, 768 N.Y.S.2d 8, 9 (App.

Div. 2003) (per curiam) (noting that larceny by extortion under Section 155.05(2)(e) of New

York Penal Law is essentially identical to extortion in connection with the Travel Act).

*Second*, if Plaintiffs are proceeding on state law grand larceny allegations under a false

pretenses theory pursuant to New York Penal Law Sections 155.05(2)(a) and 155.42, Am.

Compl. ¶ 139, then such a claim essentially is equivalent to allegations under the federal wire

and mail fraud statutes,[25] which do not apply extraterritorially, *see supra* pp. 22-23.

*Third*, Plaintiffs' counts for common law fraud and civil conspiracy fail because New

York law presumptively does not apply to extraterritorial conduct.  *See Global Reinsurance*

*Corp. – U.S. Branch*, 18 N.Y.3d at 735.

## II.   PLAINTIFFS FAIL TO ALLEGE A RICO CLAIM

Because RICO does not apply to the extraterritorial predicate acts alleged by Plaintiffs,

the Court need not reach whether Plaintiffs have stated a claim under the statute.  It is clear,

---

[23] "Extortion" is not a stand-alone crime in New York.  Rather, it is one of several theories by which a defendant may commit larceny.  *See* N.Y. Penal Law § 155.05(2)(e).

[24] The Amended Complaint incorrectly cites New York Penal Law Section 115.05(2)(E) which does not exist—indeed Section 115 of the Penal Law applies to the crimes of criminal facilitation.  In all likelihood, the complaint means to refer to New York Penal Law Section 155.05(2)(e), which defines the legal theory of larceny by extortion.

[25] The federal mail fraud and wire fraud statutes involve, *inter alia*, using a scheme or artifice to defraud or obtaining property by means of false or fraudulent pretenses.  *See* 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud).  Larceny by way of false pretenses under New York state law likewise includes "obtaining property by false pretenses."  N.Y. Penal Law § 155.05(2)(a).  As discussed, even if the amended  complaint's incorrect reference to New York Penal Law Section 115.05(2)(E) actually refers to Section 155.05(2)(a), this claim nonetheless fails.

however, that Plaintiffs have not stated any such claim.  To start, Plaintiffs cannot establish

RICO standing because they fail to establish that the Baker Defendants' actions proximately

caused their alleged harm and, separately, because they have not alleged any concrete harm.  *See*

*infra* Part II.A.  Nor have Plaintiffs pled a pattern of racketeering, a RICO enterprise, or the

elements of any RICO predicate act.  *See infra* Part II.B.  Any one of these numerous

deficiencies is sufficient to dismiss their RICO claims.

### A.        Plaintiffs Do Not Have RICO Standing

Establishing standing under RICO "is a more rigorous matter than standing under Article

III."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006).  To establish RICO

standing, Plaintiffs must plead and prove "(1) a violation of section 1962; (2) injury to business

or property; and (3) causation of the injury by the violation."  *First Nationwide Bank v. Gelt*

*Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (internal quotation marks omitted).  Plaintiffs do

not allege proximate cause, and have not alleged an injury in any event.

*First*, Plaintiffs cannot demonstrate proximate cause as to the $2.7 billion judgment.

Section 1964(c) affords a private cause of action to a person injured in his business or property

"by reason of" a violation of the RICO statute.  18 U.S.C. § 1964(c).  Interpreting this language,

the Supreme Court has held that a plaintiff must show that the RICO violation was the injury's

"proximate cause," i.e., that there is some direct relation between the injury asserted and the

injurious conduct alleged.  *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265–68

(1992).  "When factors other than the defendant's RICO violation are an intervening direct cause

of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the

defendant's actions."  *Makowski v. United Bhd. of Carpenters & Joiners*, No. 08 Civ.

6150(PAC), 2010 WL 3026510, at *8 (S.D.N.Y. Aug. 2, 2010) (internal quotation marks

omitted).

Plaintiffs cannot demonstrate proximate cause in the trial court as they contend that Mr. Segu rejected Judge Azar's alleged influence. *See* Am. Compl. ¶ 11. Recognizing Mr. Segu's "unwillingness to be coerced" in the first instance court, Plaintiffs allege that Mr. Segu issued an opinion adverse to the Defendants. *Id.* ¶ 146. Despite this, Plaintiffs now illogically attempt to plead, without explanation, that the Defendants somehow "succeeded through the use of an electronic file containing the draft opinions." *Id.* But Defendants did not prevail in that court.[26]

They fare no better in alleging proximate cause in connection with the Appellate Court Decision. The state appellate court found that the Trial Court Decision was based on numerous, identifiable trial errors and violations of Mexican law. Plaintiffs do not analyze, much less allege any error with, the legal reasoning underpinning the Appellate Court Decision, with the exception of an allegation that the court "disregarded" an issue regarding Baker Mexico's allegedly providing "improper powers of attorney" in Mexico. Am. Compl. ¶ 116. However, as noted above, the Appellate Court and the federal *amparo* court each considered and rejected that argument.[27] *See supra* p. 9 n.11.

Moreover, because this Court can take judicial notice of the legal grounds provided by the Appellate Court and the *amparo* court, *see* Joint Request for Judicial Notice at 4-5, it can rely on them to hold that Plaintiffs do not—and cannot—establish proximate cause. Plaintiffs do not provide any allegations that connect the alleged conspiracy to actors within Mexico's *federal*

---

[26] Plaintiffs allege that Judge Azar retaliated against Mr. Segu. *See, e.g.*, Am. Compl. ¶ 11; *id.* ¶ 95. These conclusory allegations, even if they could be credited, are inapposite. Plaintiffs prevailed before Mr. Segu, so whatever they allege concerning Judge Azar's actions vis-à-vis Mr. Segu have no relevance to whether the $2.7 billion judgment Mr. Segu entered in their favor was properly overturned by judges at higher levels of the judiciary.

[27] Regardless, Plaintiffs do not explain how an improperly executed Power of Attorney would have had any impact on the legal or factual merits of their claim, much less how one would support re-instating a $2.7 billion judgment.

court system. Plaintiffs do not raise a legitimate challenge to the *amparo* court proceeding or allege any wrongdoing in connection with that proceeding other than to rely on speculation and innuendo.  *See supra* p. 15.  Accordingly, the *amparo* court's decision serves as an independent intervening act that prevents Plaintiffs from collecting on the initial judgment.

*Second*, Plaintiffs fail to allege that they have suffered a cognizable injury to their "business or property."  18 U.S.C. § 1964(c).  Courts require plaintiffs to show an "*actual*, quantifiable injury" such as a "concrete financial loss" in order to establish injury under RICO. *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227–28 (2d Cir. 2008) (emphasis and internal quotation marks omitted), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 659 (2008); *First Nationwide Bank*, 27 F.3d at 767–68 (requiring a showing of actual, out-of-pocket financial loss to establish RICO standing).  Here, Plaintiffs' alleged injury does not confer RICO standing because the initial judgment remains on appeal within the Mexican court system and there is no property interest in a non-final judgment.  *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988) (RICO damages potentially arising from ongoing litigation were unrecoverable pending the litigation); *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 137 (2d Cir. 2003) (per curiam) (RICO injury subject to pending arbitration not ripe because the arbitration remained "a possible influence . . . on the amount of loss").[28]

### B.  Plaintiffs Have Not Pled the Elements of a RICO Violation

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

---

[28] In their Amended Complaint, Plaintiffs have added new allegations pleading "foreseeable" "injury to Plaintiffs' business reputations" and "other consequential, incidental and special damages."  Am. Compl. ¶¶ 145, 150.  Plaintiffs still have not provided any specific detail regarding the nature of these injuries and how Defendants allegedly caused them.

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To establish a violation of Section 1962(c), a plaintiff must show that the defendant conducted, or participated in the conduct, of a RICO enterprise's affairs through a pattern of racketeering activity.  *See, e.g.*, *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014).  Plaintiffs fail on every front.

### 1.  Plaintiffs Have Not Alleged a Pattern of Racketeering

Plaintiffs cannot establish a pattern of racketeering activity sufficient to satisfy RICO.  A "'pattern of racketeering activity'" consists of, *inter alia*, "at least two acts of racketeering activity."  18 U.S.C. § 1961(5).  In order to prove such a "pattern," a civil RICO plaintiff also "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *see also Crawford*, 758 F.3d at 487.  Because "Congress was concerned in RICO with long-term criminal conduct," the statute does not concern isolated acts.  *H.J. Inc.*, 492 U.S. at 242.  Here, Plaintiffs fail adequately to allege either of the two types of RICO continuity, open-ended or close-ended.

***Open-ended continuity.***  Open-ended continuity requires a plaintiff to "show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (internal quotation marks omitted).  Open-ended continuity does not exist where the "scheme [is] inherently terminable," *GICC Capital Corp. v. Tech. Fin. Grp., Inc*., 67 F.3d 463, 466 (2d Cir. 1995) (emphasis omitted).  Here, Plaintiffs have not alleged any specific threat of continuing criminal activity—in their Amended Complaint, Plaintiffs have merely added phrases suggesting that the alleged conspiracy "continues to this day."  Am. Compl. ¶ 134.[29]  The gravamen of

---

[29] *See also* Am. Compl. ¶ 4 (adding language that the scheme "still continues today"); *id.* ¶ 122 ("If the court system does not enjoin the RICO Defendants from continuing to engage in

Plaintiffs' Amended Complaint however concerns the Appellate Court Decision reversing Mr. Segu's $2.7 billion award.  Plaintiffs do not allege a single act of racketeering activity after the issuance of the Appellate Court Decision, and even if they had, any alleged racketeering activity would necessarily end once the Mexican courts enter a final judgment.

   ***Closed-ended continuity.***  Plaintiffs fare no better in establishing a closed-ended scheme. Ascertaining whether closed-ended continuity can be established depends on "the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes."  *GICC Capital Corp.*, 67 F.3d at 467; *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006).  In the Second Circuit, any alleged scheme that lasts less than two years does not meet the statutory requirements for a close-ended scheme.  *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).[30]

   Here, the complaint alleges a single goal of overturning the Trial Court Decision with alleged acts covering a short, finite time period measured in months—denying Plaintiffs damages in a breach of contract suit.  In these circumstances, courts have held that the pattern requirement has not been met.  *See, e.g.*, *Crawford*, 758 F.3d at 488 (rejecting the argument that "[t]he existence of only one victim and one scheme suffices for a 'pattern'" (alteration in original) (internal quotation marks omitted)); *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd.*

---

unlawful activities in the United States, their corrupt practices will continue unabated with no end in sight.").

[30] *See also Spool*, 520 F.3d at 184 (16-month period insufficient for closed-end continuity especially since plaintiffs did not allege a large number of participants or victims); *Gross v. Waywell*, 628 F. Supp. 2d 475, 494, 496 (S.D.N.Y. 2009) (scheme of "over 100 instances of mail and/or wire fraud" was "essentially a single, relatively simple fraudulent scheme with a single purpose" and therefore insufficient to establish open-ended continuity).

*P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) ("[I]f a plaintiff alleges only a single scheme, a single injury, and few victims it is virtually impossible for plaintiffs to state a RICO claim." (internal quotation marks omitted)); *Patrizzi v. Bourne in Time, Inc.*, No. 11 Civ. 2386(PAE), 2012 WL 4833344, at *5 (S.D.N.Y. Oct. 11, 2012) (no closed-ended continuity where scheme to "rip off" plaintiff consisting of predicate acts over nearly three years was "too narrow, and the victims too few, to constitute a continuous pattern"). Because Plaintiffs have not alleged activity that has continued for more than two years,[31] nor anything more than a single alleged scheme with a single injury that affects only a few victims, they cannot establish the necessary pattern of racketeering activity. Plaintiffs' bare allegations that the scheme "continues" are insufficient to expand the duration of the alleged scheme. *See supra* pp. 30-31 & n.29.

### 2.      Plaintiffs Have Not Alleged a RICO Enterprise

In *Boyle v. United States*, 556 U.S. 938, 941 (2009), the Supreme Court confirmed that an alleged RICO enterprise must have some structure. Thus, a plaintiff must make allegations supporting "some overall functional unit." *Freund v. Lerner*, No. 09 CV 7117(HB), 2010 WL 3156037, at *7 (S.D.N.Y. Aug. 10, 2010) (internal quotation marks omitted). In *Greenberg v. Blake*, No. 09 Civ. 4347(BMC), 2010 WL 2400064, at *4 (E.D.N.Y. June 10, 2010), for example, the district court held that it was not sufficient for the plaintiffs to allege that the defendants acted together to commit the wrong; the plaintiffs had to allege that the defendants formed and operated a separate entity. And in *101 McMurray, LLC v. Porter*, No. 10-cv-9037 (CS), 2012 WL 997001, at *7 (S.D.N.Y. Mar. 26, 2012), the district court dismissed RICO

---

[31] While Plaintiffs suggest that the federal *amparo* panel was poised to rule in their favor and then did not do so, they do not make a single allegation tying Defendants or any conspiracy to this alleged change in the decision.

claims because the plaintiffs failed to demonstrate that the "members functioned as a unit." *Id.* Dismissal is warranted here because Plaintiffs do not allege any such structure.

Plaintiffs provide only conclusory allegations of an enterprise, *see, e.g.*, Am. Compl. ¶ 99, but never identify the enterprise's hierarchy, much less explain how the different defendants functioned as a unit or how they interacted to further a common interest. Accordingly, Plaintiffs have not pled a RICO enterprise and cannot sustain the RICO counts of the complaint. *See Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 263 (S.D.N.Y. 2011).

### 3.   Plaintiffs Have Not Alleged the Elements of a RICO Predicate Act

Plaintiffs do not plead adequately any of their alleged predicate acts.  Where the predicate acts on which a RICO claim is based sound in fraud, those acts must conform to Rule 9(b)'s heightened pleading standard—this applies to the predicate acts of mail and wire fraud alleged by Plaintiffs. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006).  Although allegations that are separate from fraud—such as those covered by the Hobbs Act—are not covered by Rule 9(b), *see, e.g.*, *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992), Plaintiffs also fail to meet the pleading standard of Rule 8(a) with respect to those claims.

### a.   Plaintiffs Impermissibly Rely Upon Group Pleading

Plaintiffs' allegations with respect to the alleged bribery of Judge Azar fail to distinguish between the Defendants, and therefore fail under both Rule 9(b) and Rule 8.  With respect to the alleged corruption of Judge Azar prior to Mr. Segu's decision, Plaintiffs assert that "[t]he evidence and sworn statements obtained by Plaintiffs strongly suggest that Defendants offered and paid Judge Azar monetary enhancements in violation of the FCPA, to execute the scheme on their behalf."  Am.  Compl. ¶ 77.  With respect to the state appellate proceedings, they allege only that, "Judge Azar and the RICO Defendants began taking calculated steps to ensure that the judgment would be reversed on appeal."  *Id.* ¶ 97; *see also id.* ¶ 104.  Nowhere do Plaintiffs

differentiate among the Defendants, much less identify which individuals at which Defendant entities carried out the alleged "monetary enhancements." *Id.* ¶ 77.

Such group pleading allegations for a RICO claim fail to plead adequately predicate acts. As another court in this district has held, a plaintiff's "failure to distinguish between [certain] Defendants mandates dismissal under both Rule 9(b) and Rule 8(a). The complaint never specifically alleges the nature of each defendant's participation in the allegedly fraudulent scheme." *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 602 (S.D.N.Y. 2011) (first alteration in original) (internal quotation marks omitted). Moreover, "[t]he requirements of section 1962(c) must be established as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987)). Plaintiffs have not done so here.

### b.  Mail and Wire Fraud

The elements of wire and mail fraud include "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996), *abrogated in part as stated in Spirit Locker, Inc. v. EVO Direct, LLC*, 695 F. Supp. 2d 296, 303 (E.D.N.Y. 2010). Plaintiffs do not state a claim for mail or wire fraud for the simple reason that they allege that Defendants carried out the alleged scheme in face-to-face meetings with Judge Azar without any reference to the use of mail or wire transfers. *See* Am. Compl. ¶ 77.[32]  Plaintiffs have failed to specify what

---

[32] Plaintiffs allege that when their counsel met *ex parte* with Judge Azar he stated, "'[Yahoo] has already been here. Don't get involved . . . there are too many zeroes involved.'" Am. Compl. ¶ 102 (alterations in original). Plaintiffs ask the Court to infer from this statement that the "too many zeroes" refers to a payment by Defendants to Judge Azar. But the equally plausible, indeed more sensible, inference is that Judge Azar was referring to the amount of the judgment, which contained eight zeroes ($2,700,000,000). One can reasonably infer that Judge Azar was

statements were made, who made them, to whom they were made, how they were misleading, and how the mails and wires were used to carry out the alleged scheme.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).

To be sure, Plaintiffs allege in conclusory fashion that "[t]he RICO Defendants carried out [] illegal conduct through repeated use of regular mail, electronic mail, faxes, wire transfers, and the telephone to communicate with each other, their co-conspirators, and Mexican judicial officials."  Am. Compl. ¶ 142.  And they allege that the Defendants "orchestrated the scheme to coerce, bribe, and ghostwrite, from the United States, including through the mails and wires." *Id.* ¶ 99.  However, such allegations are insufficient to state a predicate act of mail and wire fraud under Rule 8, much less with the particularity required by Rule 9(b).  *See Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008) (rejecting conclusory allegations of mail and wire fraud as a predicate act under RICO).

### c.      The Hobbs Act

As discussed above, the Hobbs Act prohibits "obstruct[ing], delay[ing], or affect[ing]" commerce or the movement of anything in commerce "by robbery or extortion."  18 U.S.C. § 1951(a).  This criminal offense "includes obtaining property from another through a wrongful threat of force or fear."  *United States v. Jackson*, 180 F.3d 55, 69 (2d Cir. 1999).  Plaintiffs do not allege either element.  In a conclusory fashion, Plaintiffs allege that the "Defendants violated the Hobbs Act through their bribery and extortionate activity, as detailed herein, including their successful corruption of and bribing of the Mexican judicial officials and attempts to instill fear

---

merely stating his view that the judgment would be overturned because it so plainly contravened Mexican law on damages.  He was certainly unlikely to admit to opposing counsel that he had been bribed, which is the unreasonable inference Plaintiffs ask the Court to draw.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2004) (holding that a discrimination claim was not plausible where there was an "obvious alternative explanation" for an allegedly discriminatory arrest (internal quotation marks omitted)).

in Plaintiffs and pressure Plaintiffs to resolve the case without further litigation."  Am. Compl. ¶ 141.  Plaintiffs, even if those allegations were true, still do not allege that Defendants took any property or that Defendants' alleged actions affected commerce in any fashion.  *See supra* pp. 24, 27-29.  Moreover, Plaintiffs do not allege extortionate behavior on the part of the Baker Defendants, or that the Baker Defendants used intimidation, violence, or other threats to overturn the Trial Court Decision.  Plaintiffs merely plead, in a conclusory manner, that Judge Azar engaged in "threats and intimidation" with respect to Mr. Segu and Judge Venegas of the appellate court.  Plaintiffs do not provide any specifics as to the scope or nature of the threats, or even that the Baker Defendants were aware of them.  *See* Am. Compl. ¶¶ 8, 11, 14.  The complaint is entirely silent on the nature of Judge Azar's alleged threats and intimidation of the three appellate court judges.  Thus, Plaintiffs' pleading of the Hobbs Act is insufficient to rise to a predicate act under RICO.

### d.    The Travel Act

The Travel Act makes it a crime to travel between states with the intent to commit specified crimes listed in the statute—including extortion or bribery—or to use the mail to commit those crimes.  *See* 18 U.S.C. § 1952(a), (b)(2).  Plaintiffs, once again in a conclusory manner, allege that Defendants violated the Travel Act "through their bribery and extortionate activity."  Am. Compl. ¶ 140.  Plaintiffs fail to allege with any specificity that anyone traveled between any states or that Defendants used the mails to commit any crime.  Their conclusory allegation that Defendants "traveled to and from the United States and Mexico to further the conspiracy," *id.* ¶ 99, hardly suffices to meet *Iqbal* and cannot be credited.  Their Travel Act allegation mirrors their Hobbs Act (extortion), mail fraud, and wire fraud claims addressed above, and fails for the same reasons.  *See FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 460 (S.D.N.Y. 2014).

36

###### e.        New York Law Claims

Violations of state law are RICO predicate acts if, *inter alia*, they constitute the equivalent of "extortion . . . which is chargeable under State law and [are] punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).  Larceny by extortion under New York Penal Law Sections 155.05(2)(e) and 155.42 can form the basis of a RICO predicate act.  But the Amended Complaint fails in its attempt to properly plead a RICO predicate act under those Penal Law sections.  Second Circuit law on this point is well-defined:  "If the conduct . . . d[oes] not satisfy the elements of the offense as defined by state law, [the fact finder] c[annot] find that the defendant had committed the state law offense charged as a predicate act of racketeering."  *United States v. Carrillo*, 229 F.3d 177, 183 (2d Cir. 2000).

To start, the Amended Complaint does not allege any conduct that is "chargeable under State law" because it fails to plead all of the elements of the predicate offense.  Larceny under New York state law requires proof that a defendant steals property, i.e., that he "wrongfully takes, obtains[,] or withholds" the property of another.  N.Y. Penal Law § 155.05(1).  However, Plaintiffs have not pleaded successfully that Defendants wrongfully obtained "property" from Plaintiffs, so both of these state law predicates fail on this basis alone.  *See supra* p. 29.

More fundamentally, the Amended Complaint fails to establish that New York's criminal statutes apply at all.  New York state's jurisdiction to prosecute crimes ends, as a general matter, at its borders and is invoked only if the prosecutor proves that at least one element of the offense, attempted offense, or conspiracy  to commit an offense occurred within New York.  *See* N.Y. Crim. Proc. Law § 20.20(1)(a)–(c).  The outer limit of New York's geographical jurisdiction, with a few narrowly defined exceptions not applicable here, does not apply to purely extra-state conduct.  *See id*.  On its face, the Amended Complaint fails to invoke New York's geographical jurisdiction over intra-state conduct because it does not allege that *any* conduct occurred in New

York.  Indeed, New York is only mentioned three times in the Amended Complaint when it

alleges that: Yahoo-US has an office in New York (*id.* ¶ 29), Baker & McKenzie, LLP has an

office in New York (*id.* ¶ 32), and that "Under New York law, the acts set forth herein also

constitute extortion under . . . the New York Penal Law," (*id.* ¶ 139).

New York's jurisdiction over extra-state conduct provides no refuge for Plaintiffs'

insufficient allegations.  First, larceny by extortion is not a "result" offense, and, even if it were,

the result (larceny) occurred in Mexico, not New York.  *See* N.Y. Crim. Proc. Law § 20.20(2)(a);

*People v. Axentiou*, 158 Misc. 19, 22 (N.Y. Sup. Ct. N.Y. Cnty. 1993); *see also supra* pp. 37-38

(explicating the reasons no larceny occurred).  Second, there are no allegations any larceny by

extortion was intended to have a "particular effect" in New York.  "[P]articular effect"

jurisdiction is reserved for extra-state actions that have, and are intended to have, an effect on

New York state courts or the administration of justice there.  *See Taub v. Altman*, 3 N.Y.3d 30,

36 (2004).  The Amended Complaint alleges an effect on the Mexican judicial system, not New

York's.  Third, the allegations contend that any attempted larceny by extortion occurred in

Mexico, not New York, which is insufficient to establish geographic jurisdiction in New York.

*See* N.Y. Crim. Proc. Law § 20.20(2)(c).  And finally, the Amended Complaint fails to invoke

jurisdiction because it is devoid of any allegations that an overt act in furtherance of any

conspiracy occurred in New York.  *See* N.Y. Crim. Proc. Law § 20.20(2)(d).

### C.    The RICO Conspiracy Claim Should Be Dismissed Because the Substantive RICO Claim Fails

Plaintiffs' RICO conspiracy claim should be dismissed because they have failed to state

any substantive RICO cause of action.  As the Second Circuit has succinctly stated, "[A]ny claim

under section 1962(d) based on a conspiracy to violate the other subsections of section 1962

necessarily must fail if the substantive claims are themselves deficient."  *Knoll v. Schectman*,

275 F. App'x 50, 51 (2d Cir. 2008) (internal quotation marks omitted); *Westgate Fin. Corp. v. Beinoni of N.Y. Inc.*, No. 10 Civ. 8102 (TPG), 2012 WL 219334, at *4 (S.D.N.Y. Jan. 25, 2012); *see also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004). Moreover, if a plaintiff lacks "standing to assert his substantive RICO claims," which is the case here, he "lacks standing to assert his RICO conspiracy claims." *Makowski v. United Bhd. of Carpenters*, No. 08 Civ.6150 (PAC), 2010 WL 3026510, at *9 (S.D.N.Y. Aug. 2, 2010).

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER NEW YORK LAW

If it dismisses Plaintiffs' RICO claims, the Court should decline to exercise supplemental jurisdiction over the state law claims. *See supra* p. 20 n.19. Even assuming, *arguendo*, New York state law applies to extraterritorial conduct, *but see supra* pp. 25–26, 37–38, Plaintiffs fail to state a claim under New York law and therefore Counts III and IV should be dismissed.[33]

### A.    Common Law Fraud

"To prevail on a claim of common law fraud in New York, a plaintiff must show (1) a false representation of material fact, (2) an intent to defraud, and (3) reliance." *Filler v. Hanvit Bank*, 156 F. App'x 413, 416 (2d Cir. 2005) (citing *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999)). Common law fraud in New York, like the federal mail fraud and wire fraud claims discussed above, is subject to the heightened pleading requirements of Rule 9(b). *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004). Plaintiffs fail to state such a claim. As noted above, they did not allege the statements that were made, who made them, to whom they were made, how they were misleading, or reliance. The

---

[33] Plaintiffs do not contend in their complaint that Mexican law applies to their common law fraud and civil conspiracy claims. The Baker Defendants reserve their rights to address any choice of law issues, should Plaintiffs belatedly raise them.

Second Circuit has "repeatedly held" that "conclusory allegations do not satisfy Rule 9(b)," and that is all we have here. *See id.* Accordingly, the common law fraud claim must be dismissed.

### B. Civil Conspiracy

Count Four of the complaint alleges civil conspiracy. New York, however, does not recognize a substantive tort of civil conspiracy. *See Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 187 (S.D.N.Y. 2000) (citing *Goldstein v. Siegel*, 244 N.Y.S.2d 378, 382 (App. Div. 1963)). Instead, the claim rises or falls with the underlying tort. *See Laura Corio, M.D., PLLC v. R. Lewin Interior Design, Inc.*, 854 N.Y.S.2d 55, 57 (App. Div. 2008); *Hebrew Inst. for Deaf & Exceptional Children v. Kahana*, 870 N.Y.S.2d 85, 86 (App. Div. 2008). Plaintiffs have not alleged an independent intentional tort. Therefore, the civil conspiracy claim should be dismissed. *Agron v. Douglas W. Dunham, Esq. & Assocs.*, No. 02 Civ. 10071(LAP), 2004 WL 691682, at *6 (S.D.N.Y. Mar. 31, 2004).

### IV. LEAVE TO AMEND SHOULD BE DENIED AS FUTILE

The Federal Rules of Civil Procedure provide that leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). But, when the underlying facts could never be a "proper subject of relief," the Court has discretion to deny leave to amend and dismiss with prejudice. *Foman v. Davis*, 371 U.S. 178, 182 (1962). In this case, amendment would be futile. This is particularly true now, where Plaintiffs, despite being given a second bite at the apple, have still failed to plead around the deficiencies of their complaint. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (per curiam). No matter how Plaintiffs might try to couch it, this dispute began and should end in Mexico.

### CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint in its entirety with prejudice.

Dated:  March 31, 2015                    Respectfully Submitted,


WILLIAMS & CONNOLLY LLP


By:        /s/ Ana C. Reyes_____
            John K. Villa (*pro hac vice* )
            Ryan T. Scarborough (*pro hac vice*)
            Ana C. Reyes (*pro hac vice*)

725 Twelfth Street, N.W.
Washington, DC 20005
Tel.: (202) 434-5000
Fax: (202) 434-5029
jvilla@wc.com
rscarborough@wc.com
areyes@wc.com

*Attorneys for Defendant Baker & McKenzie LLP*

CLAYMAN & ROSENBERG LLP


By:        /s/ Charles E. Clayman_____
            Charles E. Clayman
            Isabelle A. Kirshner
            Wayne E. Gosnell, Jr.

305 Madison Avenue, Suite 1301
New York, NY 10165
Tel.: (212) 922-1080
Fax: (212) 949-8255
clayman@clayro.com
kirshner@clayro.com
gosnell@clayro.com

*Attorneys for Defendant Baker & McKenzie, S.C.*