**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WORLDWIDE DIRECTORIES, S.A. DE C.V.
and IDEAS INTERACTIVAS, S.A. DE C.V.,

         Plaintiffs,

       v.

YAHOO! INC., YAHOO DE MEXICO, S.A.
DE C.V., BAKER & MCKENZIE and BAKER
& MCKENZIE S.C.,

         Defendants.

Civil Action No. 14-07349 (AJN)

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Robert A. Magnanini
David S. Stone
Amy W. Wagner
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel:  (973) 218-1111
Fax:  (908) 464-3010 or (908) 464-1020
dstone@stonemagnalaw.com
rmagnanini@stonemagnalaw.com
awagner@stonemagnalaw.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS ..........................................................................5

LEGAL STANDARD...............................................................................12

ARGUMENT ..........................................................................................14

I.   Plaintiffs Have Successfully Stated a Claim for RICO Under 18 U.S.C. § 1962(c)...... 14

   A.   Plaintiffs' Allegations Are Sufficient to Establish Domestic Liability Under RICO ................................................................................ 15

      1.  The Alleged Scheme Emanated from and is Sufficiently Connected to the United States............................................................ 15

      2.  Plaintiffs Allege Multiple Predicate Acts Which Bring Defendants' Scheme Within the Reach of RICO. ................................................ 18

         a.   RICO Defendants' Travel Act Violations Were Grounded in the United States. ................................................................... 19

         b.   Plaintiffs Allege a Hobb's Act Violation Based on Domestic Conduct. .... 22

   B.   Plaintiffs' Allegations Establish RICO Standing. .................................................. 23

      1.  Plaintiffs Sufficiently Allege Causation to Establish RICO Standing. .............. 23

      2.  Plaintiffs Suffered Injury to a Recognized Property Interest. ........................... 25

      3.  Plaintiffs Have Properly Pled Each of the Alleged Predicate Acts Constituting Racketeering Activity. .................................................. 27

         a.   The Mail and Wire Fraud Predicate Acts Have Been Sufficiently Pled. .... 27

         b.   The Predicate Act of Extortion under the Hobbs Act Has Been Properly Pled. ............................................................ 28

         c.   Plaintiffs Sufficiently Allege Extortion and Bribery in Violation of the Travel Act and the FCPA. .......................................... 30

i

C.   Plaintiffs Have Pled Sufficient Open- and Closed-Ended Continuity to
Constitute a Pattern of Racketeering Activity............................................ 31

D.   Plaintiffs Have Pled a RICO Enterprise and Conduct................................. 32

E.   Plaintiffs Have Not Engaged in Inappropriate Group Pleading. ............................ 34

II.   Plaintiffs Have Successfully Stated a Claim for RICO Conspiracy Under § 1962(d). .. 35

III.   Plaintiffs Have Successfully Stated a Claim Under New York Law. ........................... 36

A.   Plaintiffs' Allegations Establish Common Law Fraud. ........................................... 36

B.   Plaintiffs' Allegations Establish a Conspiracy. ..................................................... 38

IV.   Plaintiffs' Complaint Should Not Be Dismissed With Prejudice.................................... 39

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,*
  957 F. Supp. 1308 (S.D.N.Y. 1997) ...................................................................... 13

*Angermeir v. Cohen,*
  14 F. Supp. 3d 134 (S.D.N.Y. 2014) .................................................................... 28

*Aramony v. United Way of Am.,*
  969 F. Supp. 226 (S.D.N.Y. 1997) ....................................................................... 26

*Aschcroft v. Iqbal,*
  556 U.S. 662 (2009)............................................................................................... 13

*Asdourian v. Konstantin,*
  77 F. Supp. 2d 349 (E.D.N.Y. 1999) .................................................................... 34

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................................... 13

*Berk v. Tradewell, Inc.,*
  No. 01 CIV. 10068(MBM), 2003 WL 21664679 (S.D.N.Y. July 16, 2003).......... 13

*Cedeno v. Intech Grp., Inc.,*
  733 F. Supp. 2d 471 (S.D.N.Y. 2010) .................................................................. 18

*CGC Holding Co., LLC v. Hutchens,*
  824 F. Supp. 2d 1193 (D. Colo. 2011).................................................................. 15

*Chevron Corp. v. Donziger,*
  871 F. Supp. 2d 229 (S.D.N.Y. 2012) ........................................................... passim

*Chevron Corp. v. Donziger,*
  974 F. Supp. 2d 362 (S.D.N.Y. 2014) ............................................................ 22, 30

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
  187 F.3d 229 (2d Cir. 1999) ................................................................................. 32

*Crabhouse of Douglaston Inc. v. Newsday Inc.,*
  801 F. Supp. 2d 64 (E.D.N.Y. 2011) .................................................................... 28

iii

*DeFalco v. Bernas,*
   244 F.3d 286 (2d Cir. 2001) ...................................................................... 32

*Degulis v. LXR Biotechnology, Inc.,*
   928 F. Supp. 1301 (S.D.N.Y. 1996) ...................................................... 14, 37

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) ...................................................................... 25

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
   822 F.2d 1242 (2d Cir. 1987) .................................................................... 34

*DLJ Mortgage Capital, Inc. v. Kontogiannis,*
   726 F. Supp. 2d 225 (E.D.N.Y. 2010) ...................................................... 25

*Dornberger v. Metro. Life Ins. Co.,*
   961 F. Supp. 506 (S.D.N.Y. 1997) ............................................................ 25

*Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.,*
   No. 11 CIV. 2589 JPO HBP, 2012 WL 4474587 (S.D.N.Y. Sept. 28, 2012) ........................ 12

*Ello v. Singh,*
   531 F. Supp. 2d 552 (S.D.N.Y. 2007) ........................................................ 25

*European Cmty. v. RJR Nabisco, Inc.,*
   764 F.3d 129 (2d Cir. 2014) ........................................................ 17, 19, 21, 22

*Filler v. Hanvit Bank,*
   156 F. App'x 413 (2d Cir. 2005) ................................................................ 37

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
   385 F.3d 159 (2d Cir. 2004) .................................................................. 33, 34

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994) .................................................................. 23, 25

*First Nationwide Bank v. Gelt Funding Corp.,*
   820 F. Supp. 89 (S.D.N.Y. 1993) .............................................................. 34

*Fisk v. Letterman,*
   424 F. Supp. 2d 670 (S.D.N.Y. 2006) ........................................................ 38

*Fountain v. United States,*
   357 F.3d 250 (2d Cir. 2004) ...................................................................... 27

iv

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
   492 U.S. 229 (1989)............................................................................................................ 31, 32

*Hecht v. Commerce Clearing House, Inc.*,
   897 F.2d 21 (2d Cir. 1990) ............................................................................................... 23, 35

*Hemi Grp., LLC v. City of New York, N.Y.*,
   559 U.S. 1 (2010)................................................................................................................... 24

*In re Blech Sec. Litig.*,
   961 F. Supp. 569 (S.D.N.Y. 1997) ....................................................................................... 37

*In re Sumitomo Copper Litig.*,
   995 F. Supp. 451 (S.D.N.Y. 1998) ....................................................................................... 28

*International Motor Sports Group, Inc. v. Gordon*,
   No. 98 CIV 5611 (MBM), 1999 WL 619633 (S.D.N.Y. Aug. 16, 1999) ............................... 13

*Javier H. v. Garcia-Botello*,
   239 F.R.D. 342 (W.D.N.Y. 2006).......................................................................................... 40

*Kravetz v. Brukenfeld*,
   591 F. Supp. 1383 (S.D.N.Y. 1984) ..................................................................................... 39

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003) ................................................................................................. 24

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)............................................................................................................. 18

*Motorola Credit Corp. v. Uzan*,
   322 F.3d 130 (2d Cir. 2003) ................................................................................................. 25

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   631 F.3d 29 (2d Cir. 2010) ................................................................................................... 18

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,
   85 F. Supp. 2d 282 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001)............................ 35

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
   572 F. App'x 60 (2d Cir. 2014) ............................................................................................ 18

*Philatelic Found. v. Kaplan*,
   No. 85 CIV. 8571(RWS), 1986 WL 5629 (S.D.N.Y. May 9, 1986), *abrogated on*
   *other grounds by Aramony v. United Way of Am.*, 969 F. Supp. 226 (S.D.N.Y. 1997) ........... 26

*Reich v. Lopez,*
   38 F. Supp. 3d 436 (S.D.N.Y. 2014) ....................................................... 17, 19, 21, 22

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,*
   30 F.3d 339 (2d Cir. 1994) ................................................................................ 17

*Roeder v. General Signal Corp.,*
   901 F. Supp. 124 (W.D.N.Y. 1995) .................................................................... 14

*Salinas v. United States,*
   522 U.S. 52 (1997) ............................................................................................ 36

*Schweitzer v. Testaverde,*
   No. 86 CIV. 2498(CSH), 1990 WL 17612 (S.D.N.Y. Feb. 16, 1990) .................... 34

*Securitron Magnalock Corp. v. Schnabolk,*
   65 F.3d 256 (2d Cir. 1995) ................................................................................ 26

*SKS Constructors, Inc. v. Drinkwine,*
   458 F. Supp. 2d 68 (E.D.N.Y. 2006) .................................................................. 28

*Spira v. Nick,*
   876 F. Supp. 553 (S.D.N.Y. 1995) ..................................................................... 28

*State Farm Mut. Auto. Ins. Co. v. Cohan,*
   No. CV 09-2990 (JS) (WDW), 2009 U.S. Dist. LEXIS 125653 (E.D.N.Y. Dec. 30,
   2009) ................................................................................................................ 13

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.,*
   375 F. Supp. 2d 141 (E.D.N.Y. 2005) ........................................................... 35, 36

*Three Crown Ltd. P'ship v. Caxton Corp.,*
   817 F. Supp. 1033 (S.D.N.Y. 1993) ................................................................... 38

*Treppel v. Biovail Corp.,*
   No. 03 Civ. 3002, 2004 WL 2339759 (S.D.N.Y. Oct. 15, 2004) ........................... 38

*United States v. Anderson,*
   626 F.2d 1358 (8th Cir.1980) ............................................................................ 33

*United States v. Kozeny,*
   664 F. Supp. 2d 369 (S.D.N.Y. 2009) ................................................................ 30

*United States v. Shellef,*
   507 F.3d 82 (2d Cir. 2007) ................................................................................ 27

vi

*United States v. Turkette,*
   452 U.S. 576 (1981) ............................................................................................... 33

*United States v. Young & Rubicam, Inc.,*
   741 F. Supp. 334 (D. Conn. 1990) ...................................................................... 20

*United States v. Zichettello,*
   208 F.3d 72 (2d Cir. 2000), *cert. denied sub nom.*, 531 U.S. 1143 (2001) ............ 35

*Viacom Int'l Inc. v. Icahn,*
   747 F. Supp. 205 (S.D.N.Y. 1990), *aff'd*, 946 F.2d 998 (2d Cir. 1991) .................. 29

*Wexner v. First Manhattan Co.,*
   902 F.2d 169 (2d Cir. 1990) ................................................................................ 37

## **STATUTES**

15 U.S.C. § 78dd-1(a) ...................................................................................................... 20

15 U.S.C. § 78dd–2(a)(3) ................................................................................................. 30

18 U.S.C. § 1341 .............................................................................................................. 27

18 U.S.C. § 1343 .............................................................................................................. 27

18 U.S.C. § 1951 .............................................................................................................. 27

18 U.S.C. § 1951(a) .................................................................................................... 22, 29

18 U.S.C. § 1951(b)(2)-(3) ............................................................................................... 29

18 U.S.C. § 1952 .............................................................................................................. 27

18 U.S.C. § 1952(a) .......................................................................................................... 30

18 U.S.C. § 1961(1)(C) ..................................................................................................... 30

18 U.S.C. § 1961(4) .......................................................................................................... 33

18 U.S.C. § 1961(5) .......................................................................................................... 31

18 U.S.C. § 1962 ...................................................................................................... 23, 27, 35

18 U.S.C. § 1962(c) .......................................................................................................... 14

18 U.S.C. § 1962(d) .......................................................................................................... 35

vii

**RULES**

Fed. R. Civ. P. 8(a) ....................................................................................................... 13, 35

Fed. R. Civ. P. 8(a)(2) ......................................................................................................... 12

Fed. R. Civ. P. 9(b) ..................................................................................................... passim

Fed. R. Civ. P. 12(d) ........................................................................................................... 14

Fed. R. Civ. P. 15(a) ........................................................................................................... 40

Fed. R. Civ. P. 56(f) ........................................................................................................... 14

**OTHER AUTHORITIES**

2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 8.17[5], at 8–180 through 8–183
   (1984) .............................................................................................................................. 39

**FOREIGN CONSTITUTIONAL PROVISIONS**

Constitution of Mexico, art. 17 (Feb. 5, 1917) ............................................................... 7

**FOREIGN STATUTES**

Mexican Federal District Penal Code Article 292 .......................................................... 7

**OTHER AUTHORITIES**

2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 8.17[5], at 8–180 through 8–183
   (1984) .............................................................................................................................. 39

Plaintiffs Worldwide Directories, S.A. de C.V. and Ideas Interactivas, S.A. de C.V. ("Plaintiffs") respectfully submit this Opposition to the Motion to Dismiss by Defendant Yahoo Inc. ("Yahoo-U.S.") and Yahoo de Mexico, S.A. de C.V. ("Yahoo-Mexico") (collectively the "Yahoo Defendants") and the Motion to Dismiss by Defendant Baker & McKenzie, LLP ("Baker-U.S.") and Baker & McKenzie, S.C. ("Baker-Mexico") (collectively the "Baker Defendants").

## PRELIMINARY STATEMENT

Despite a complicated appearance, this is a simple case. Plaintiffs allege that Defendants, Yahoo-U.S. and Baker-U.S., a corporation and a law firm based in the United States, conspired with their Mexican counterparts and affiliates, Yahoo-Mexico and Baker-Mexico (collectively the "RICO Defendants"), to corrupt a judicial proceeding in order to overturn an unfavorable judgment.

Specifically, Plaintiffs sued the Yahoo Defendants in Mexico for breach of contract, breach of promise, and lost profits in connection with a business deal gone bad.  The district judge presiding over the matter was transferred and, as a result, the parties agreed that Judge Segu would take over the case.  Judge Segu was a natural choice because he had been serving in a role akin to that of a U.S. Magistrate Judge or special master throughout the litigation and he was the person most knowledgeable about the case, as he was familiar with the documents, had been present at depositions and interviews and meetings with the parties, and had conducted evidentiary hearings.

Shortly thereafter, the President of the Federal District Superior Courts in Mexico, Judge Elias Azar, for the first time ever invited Judge Segu to his office and attempted to intimidate him into ruling in favor of the Yahoo Defendants, instead of allowing Judge Segu to apply the facts in evidence to the law.  Judge Azar informed Judge Segu  that the Baker Defendants would

1

deliver a memory stick with the Opinions that Segu should sign and enter.  He also instructed

Judge Segu to obtain his approval before entering any Opinion or judgment.  As Judge Azar

promised, representatives of the Baker Defendants delivered a memory stick to Judge Segu,

which contained two fully drafted, complete Opinions with the result that the RICO Defendants

sought to achieve: absolving the Yahoo Defendants of any wrongdoing and finding in their favor

on liability.

Ultimately, Judge Segu refused to be corrupted and entered a $2.7 billion judgment

against the Yahoo Defendants on the merits.  It should be noted that the damages entered by

Judge Segu were based upon a report that was authored by an independent expert that both

parties had agreed upon, after the Yahoo Defendants' and Plaintiffs' experts were found to be in

disagreement.  Interestingly enough, although the RICO Defendants are now loudly criticizing

Judge Segu's qualifications and authority to issue an opinion in this case, they only raise these

issues after Judge Segu refused to be improperly swayed and failed to rule for them.  It is only

when Judge Segu did not enter the opinion they drafted and provided to him through the Baker

Defendants, and instead ruled against the Yahoo Defendants that they and their lawyers, for the

first time, took the position that Judge Segu had no authority to the enter the decision.  It is hard

to believe Defendants' contentions that this scheme did not emanate from the offices of Yahoo's

General Counsel.

In addition, after Judge Segu issued the judgment, the Baker Defendants intimidated and

threatened him for disobeying Judge Azar, and even went so far as to harass him about the

judgment in open court.  The RICO Defendants also brought disciplinary proceedings and,

through Judge Azar, had warrants for Judge Segu's arrest issued on trumped up charges.

Plaintiffs have obtained sworn testimony from Judge Segu detailing the threats and intimidation

that he suffered, which ultimately caused him to flee the country.  It is also hard to believe that the Baker-Mexico lawyers did all of this on their own, without the knowledge and approval of the other Defendants, when the appeal involved the reversal of a $2.75 billion judgment, and a cursory review of Yahoo's 10-K Annual Reports filed with the SEC highlight four litigations, only one of which — this "Mexican" case — is material to the Company.

The RICO Defendants appealed Judge Segu's decision and set out to corrupt the appellate process through their agent, Judge Azar.  Avoiding the $2.7 billion judgment by any means was particularly important to the RICO Defendants because of mischaracterizations by Yahoo-U.S. about their potential liability and the Mexican litigation in its United States Securities and Exchange Commission filings.  Plaintiffs retained a lawyer specializing in appellate matters to meet with Judge Azar before the judgment was reversed and asked him to remain neutral. Judge Azar told the lawyer that there are "too many zeroes on this one," that he was "too late," and that "[his] client would never win in [Judge Azar's] court."

Judge Azar was known to refer to the Third Appellate Court as "his tribunal" and his illegal meddling did not stop at the district court level.  Jude Azar repeatedly met with and pressured Judge Monica Venegas, the presiding judge of the Third Appellate Court, which reversed Judge Segu's decision.  In addition, shortly after assisting in the process to secure an Opinion in favor of Yahoo, the clerk of the Appellate Court, who was known to be of little means, went on an expensive vacation.

These facts support a conclusion for purposes of a pleading at the motion to dismiss stage that two U.S.-based defendants, Yahoo and Baker, conspired with their Mexican counterparts to violate the law by influencing a Mexican government official to act improperly and unlawfully for their benefit to first obtain a corrupt judgment in their favor, and then, when that did not

occur, to reverse the $2.7 billion judgment against them.  That is the only case before the Court, and because the Verified Amended Complaint ("Complaint") in this case alleges proper causes of action, the RICO Defendants' motions to dismiss should be denied in their entirety.

Indeed, the RICO Defendants do not even assert that these allegations, if true, fail to establish liability against them. Instead, they attempt to shift the Court's focus by impugning the various witnesses who have provided evidence establishing these facts. These witnesses include the trial judge in the case and employees of the appellate courts who have personal knowledge of the actions taken by Judge Azar, the Baker Defendants, and Yahoo Defendants in furtherance of their scheme.

The RICO Defendants would like to obfuscate matters by introducing extraneous facts and facts not alleged in the Complaint, but this case is not about whether or not Yahoo breached an agreement with Plaintiffs, or even whether or not Yahoo owes Plaintiffs $2.7 billion. Instead, the core allegations in the Complaint, which the Court must assume to be true for the purposes of this motion, establish liability under the RICO statute and New York State law.  Specifically, the Complaint establishes that the Yahoo Defendants and Baker Defendants conspired to unlawfully induce Judge Azar, President of the Mexican Federal Courts, to interject himself into the Mexican lawsuit to influence judges under his supervision and at the appellate level to rule in Yahoo's favor.  Plaintiffs have suffered significant damage and the companies' principals have endured serious threats to their life and liberty as a result of the RICO Defendants' illegal activities.  Already one United States federal agency has reviewed the allegations in the Complaint, and used it, *inter alia*, to grant leave to one of the principals seeking asylum in the United States.  As new facts come to light and the Mexican case continues on appeal at the

Mexican Supreme Court, the need for injunctive relief to prevent the RICO Defendants from illegally influencing the process is increasingly clear.

## STATEMENT OF FACTS

As alleged in the Complaint, this action stems from RICO Defendants' perversion of the Mexican judicial system in conjunction with their Mexican counterparts to avoid a judgment obtained against them by Plaintiffs Worldwide Directories, S.A. de C.V. and Ideas Interactivas, S.A. de C.V.  (Complaint ("Compl.") ¶ 1).  Specifically, the RICO Defendants obtained the corrupt and extrajudicial influence of non-party co-conspirators, namely the President of Mexico's District Federal Superior Courts, Dr. Edgar Elias Azar, as well as a clerk in the Mexican appellate court, Edgar Raul Rodriguez, and other government and judicial employees, in order to nullify a $2.7 billion dollar judgment in favor of Plaintiffs against Defendants Yahoo and Yahoo-Mexico.  (Compl. ¶¶ 2, 35).  While Judge Azar and Rodriguez are not parties to this action, they, along with the RICO Defendants, engaged  in a systematic scheme to ensure that the judgment would be vacated, that the RICO Defendants would be absolved of any wrongdoing, and that any person who did not fall in line would be discredited, unemployed, and forced to flee from the country or killed.  (Compl. ¶ 6).  Indeed, Judge Azar's expansive, corrupt reach is clear from the experience of Judge Oca, a twenty year veteran of the Mexican federal judiciary who dared to disagree with Judge Azar and had his life threatened, arrest warrants issued on trumped up charges, and ultimately was forced to flee Mexico and seek asylum in the United States as a result. (Compl. ¶ 79).  Judge Azar's corruption, influence, and willingness to compromise his integrity and that of the Mexican judicial system tainted outcomes, court operations, and the personnel who worked there.  (Compl. ¶¶ 6, 78-79).

Carlos Alberto Bazan-Canabal, one of the founders of Plaintiffs, is a former employee of Yahoo-Mexico who used to maintain an office and report to superiors in both Mexico City and

the United States and would routinely travel back and forth. (Compl. ¶ 49). As a result, he is intimately familiar with the interconnectedness of Yahoo-U.S. and its Mexican subsidiary and that "Yahoo-Mexico undertook no significant business actions without prior Yahoo-U.S. approval." (Compl. ¶ 47). While there, everything Mr. Bazan-Canabal did for Yahoo-Mexico was sanctioned and monitored by Yahoo-U.S. to ensure harmony and consistency regarding litigation and contractual issues, as well as with project strategy, public relations, and policy. (Compl. ¶¶ 40-47). Moreover, the Vice President and Deputy General Counsel of Yahoo-U.S. based in Florida, instructed Mr. Bazan-Canabal "to ignore potential criminal liability with respect to conduct overseas involving Yahoo business dealings, and assured him that Yahoo-U.S. would get him out of trouble if necessary" on numerous occasions. (Compl. ¶ 43).

Plaintiffs sued Yahoo and its Mexican counterpart in 2011 in Mexico due to their failure to comply with contracts entered into with Plaintiffs for their exclusive development and distribution of an Internet and print-based yellow pages directory for Yahoo around the world. (Compl. ¶¶ 3, 51-52). Throughout the litigation, Yahoo's General Counsel, Michael Callahan, and Chief Executive Officer, Scott Thompson, delegated authority to a Baker-Mexico attorney to represent Yahoo-US in Mexico. (Compl. ¶¶ 19, 63-64).

Judge Segu was assigned as a Secretary of Agreements, a judicial position similar to that of a United States Magistrate Judge in the federal system, or a Special Master. (Compl. ¶¶ 66-67). By virtue of that role, Judge Segu was heavily involved in the case and intimately familiar with the facts, as he was responsible for handling and adjudicating all discovery issues. (Compl. ¶¶ 67-70). When the presiding Judge Ramirez-Sanchez was transferred to another position, Judge Segu was designated by operation of law as a court judge of law for the 49th Civil Court of the Federal District of Mexico. (Compl. ¶ 74). Naturally, having previously presided over the

entire matter, Judge Segu issued an Opinion in accordance with applicable Mexican law, which requires that judges issue opinions expeditiously.  (Compl. ¶ 91).[1]  Tellingly, neither the Yahoo Defendants nor the Baker Defendants opposed or questioned Judge Segu's authority or appointment at that time.  (Compl. ¶ 75).

Unbeknownst to Plaintiffs, however, the RICO Defendants had hatched a conspiracy in the United States, which was executed in Mexico, to mastermind and carry out a series of acts in order to avoid liability. (Compl. ¶¶ 2, 7).  Before Judge Segu decided the matter, the RICO Defendants approached Judge Azar to obtain his corrupt influence via improper means, involving "many zeros".  (Compl. ¶¶ 8-9, 76-78).  Shortly thereafter, on or about November 26, 2012, Judge Azar called Judge Segu to his offices at the RICO Defendants' direction. (Compl. ¶ 80).  During that meeting, Judge Segu's first ever with Judge Azar, Judge Azar told Judge Segu that "Yahoo could not lose" and ordered Judge Segu to rule in favor of the Yahoo Defendants. (Compl. ¶ 80).  In addition, Judge Azar told Judge Segu that the Baker Defendants would provide a memory stick with the final decisions that Judge Segu was to enter.  (Compl. ¶ 81).  To ensure Segu's compliance, Judge Azar instructed Judge Segu to deliver a draft of the final decision to Judge Azar for his review.  (Compl. ¶ 82).

Judge Segu found this highly troubling, and informed Judge Azar that he had not yet decided the outcome, to which Judge Azar responded: "Yahoo cannot lose, can you imagine the international scandal that would mean?"  (Compl. ¶ 83).  Judge Segu believes that Baker-Mexico lawyers were listening the whole time, because when Judge Segu left the meeting with Judge

---

[1] Indeed, the principle of "Economia Procesal," or "expedite justice," is embodied in Article 17 of the Mexican Constitution requires judges to issue opinions quickly.  (Compl. ¶ 91).  Moreover, Mexican Federal District Penal Code Article 292 provides for fines and possible imprisonment for any judge that delays a case without justification. (*Id.*)  The RICO Defendants' contrary suggestions that another Judge instructed Judge Segu to wait to issue an Opinion is belied by Plaintiffs' allegations and, in any event, should not be considered on a motion to dismiss since it is a contrary allegation outside of the Complaint.

Azar, they accosted Judge Segu in the hall and told him that a paralegal would deliver the decisions to be entered in the coming days.  (Compl. ¶ 84).

With the knowledge and approval of their clients the Yahoo Defendants, the Baker Defendants drafted two entire decisions, complete with legal analysis, factual findings, and their desired result, a far cry from a simple proposed order or findings of facts and conclusions of law, and outside normal practice in the Mexican judicial system.  (Compl. ¶¶ 10, 85, 87).  The first was a self-serving Opinion in favor of the Yahoo entities, while the second Opinion cleared the Baker Defendants of any wrongdoing in connection with that litigation.  (Compl. ¶¶ 10, 85).  In order to achieve that improper result, the Opinions had to rely on information outside the factual record.  (Compl. ¶ 86).  As Judge Azar indicated they would, the Baker Defendants promptly delivered a memory stick with those two Opinions to Judge Segu and pressured him to enter the opinions crafted by them.  (Compl. ¶¶ 10, 85).  Plaintiffs subsequently obtained the memory stick and conducted a forensic analysis of the metadata, which indicates that "the documents on it were revised and possibly drafted on a computer owned by Defendant Baker & McKenzie further suggesting that this scheme was tied to and originated from the United States."  (Compl. ¶¶ 17, 86).  In other words, at a minimum, the United States entities revised the Opinions and, based on a preliminary forensic analysis, they may have drafted them entirely.

Ultimately, Judge Segu refused to be corrupted and submit to the RICO Defendants' intimidation and, instead, issued an Opinion based on the law as well as his evaluation of the facts in the case.  (Compl. ¶¶ 10, 88-90, 93).  For example, in arriving at this result, Judge Segu adopted the findings of a neutral or "third" expert, central to the Mexican judicial system, who evaluated the claims of both experts.  Having been intimately involved in the case throughout discovery and the merits, then-presiding Judge Segu issued an Opinion quickly, as required by

Mexican law, and ordered the Yahoo Defendants to pay $2.7 billion in damages.  (Compl. ¶¶ 91-93).  Shortly thereafter, two of the Yahoo Defendants' attorneys from Baker-Mexico, Alfonso Cesar Cortez Fernandez and Sergio Rodriguez Labastida met with Judge Segu to intimidate him and threaten him for having disobeyed Judge Azar.  (Compl. ¶¶ 94, 104).  The Yahoo Defendants' attorneys were so brazen in this regard that one, Javier Quijano Baz, went so far as to harass Judge Segu about the judgment in open court.  (Compl. ¶ 106).

Since disobeying Judge Azar's directive to enter judgment in favor of Yahoo, Judge Segu has also been subjected to extensive retaliation by the RICO Defendants as well as by Judge Azar and those within his influence.  (Compl. ¶ 97).  Indeed, Plaintiffs have obtained an affidavit with Judge Segu's sworn testimony regarding the intimidation and corruption, as well as the threats of  harm if he failed to comply.  (Compl. ¶¶ 17, 105).  As events subsequently unfolded, it has become clear that these were not idle threats but have indeed manifested, forcing Judge Segu to initially flee Mexico and remain in hiding.  (Compl. ¶ 17).  However, since the filing of the Amended Verified Complaint, Judge Segu has had an Amparo issued on his behalf, and the Court invalidated the charges against him.

At the behest of the RICO Defendants, Judge Azar and other judicial officers then conspired to overturn the judgment secured by Plaintiffs and discredit and punish those who did not fall in line. (Compl. ¶¶ 11-13, 97-98).  In order to accomplish this goal, executives and legal counsel from Yahoo-U.S. and attorneys from Baker-U.S. orchestrated the scheme to coerce, bribe, and ghostwrite, from the United States, including through mails and wires, to travel to and from the United States and Mexico to further the conspiracy.  (Compl. ¶ 99).  Moreover, the RICO Defendants sought to have the judgment overturned by claiming that Judge Segu did not have authority to issue his Opinion, a contention belied by the fact that the RICO Defendants

agreed that Judge Segu had the authority to issue an opinion until after he refused to be corrupted by them.  (Compl. ¶ 13).  In addition, the RICO conspirators also initiated disciplinary and other proceedings in retaliation and in order to discredit Judge Segu as part of the strategy to fraudulently avoid the judgment.  (Compl. ¶¶ 13, 106).

While systematically discrediting Judge Segu, the RICO Defendants simultaneously mounted an appeal on or about December, 2012, and set out to corrupt the appellate process. (Compl. ¶¶ 14, 103).  Prevailing on appeal, by any means necessary, was particularly important to the RICO Defendants in light of mischaracterizations of the Mexican litigation and judgment in Yahoo's United States Securities and Exchange Commission filings.  (Compl. ¶¶ 21-22, 123-129). This is evidenced through Yahoo-U.S.'s 10-K filings, which are required to include information about significant pending lawsuits or other legal proceedings. Beginning with their 10-K filing for 2012 and continuing until the present, Yahoo-U.S. lists or includes information about the status of Plaintiffs' lawsuit as a factor that could result in an adverse outcome, causing Yahoo-U.S.'s financial results to materially differ from current expectations. Moreover, this case was just one of a small number considered important enough to be included in their 10-K filing, and as one of their most-important ongoing cases it is inconceivable that Yahoo-U.S. and Baker &McKenzie-U.S. would not have been intimately involved in the management and oversight of the case.

Before the appeal was filed, however, Plaintiffs engaged an appellate specialist, Luis Jesus Bernardo Gutierrez, who met with Judge Azar about Plaintiffs' case.  (Compl. ¶¶ 16, 100-101).  During that meeting, Judge Azar unequivocally indicated that he had been improperly influenced, explaining the "other side had 'got there before him' and 'Plaintiffs cannot win in my

court' and had 'already been defeated' and there were 'too many zeros involved' for his mind to be changed."  (Compl. ¶¶ 16, 102).

With Judge Azar — who had been known to call the Third Appellate Court "his tribunal" — in their pocket, the Baker Defendants manipulated the protocol and appellate procedures by having the case file sent directly to the presiding appellate judges before even initiating the appeal.  (Compl. ¶¶ 14, 104, 108, 114).  The RICO Defendants also instructed that the files be kept separately so they could control access to the information.  (Compl. ¶¶ 14, 114).  Curiously, in July 2013, the clerk who facilitated that, Edgar Raul Rodriguez, "took his family on a European vacation that on information and belief he could not afford unless he received money from a third party, presumably Judge Azar or one of the RICO Defendants."  (Compl. ¶ 115).  Per the RICO Defendants' instructions, through the Baker Defendants, Judge Azar also repeatedly met with the Chief of the Appellate Courts, Monica Venegas, for multiple hours, intimidating her and ultimately directing that the appellate panel reverse the judgment below and deliver the result sought by the Baker Defendants on behalf of the Yahoo Defendants.  (Compl. ¶¶ 15, 109-111).  Indeed, many court employees observed these meetings between Judges Azar and Venegas.  (Compl. ¶¶ 112-113).  As a direct result of Judge Azar's corrupt influence, the appellate panel for the Third Appellate Court, chaired by Judge Venegas, entered a decision which achieved the result that the RICO Defendants desired: reducing the $2.7 billion damage award for the Plaintiffs to $172,500 and entering an counterclaim judgment of approximately $3 million on Yahoo's behalf.  (Compl. ¶¶ 23, 116).  Plaintiffs have obtained affidavits from eyewitnesses who personally observed the conspiracy confirming these facts as well as an affidavit from Judge Oca, who also found himself the victim of similar corrupt acts by Azar. (Compl. ¶¶ 17, 20).

11

To try to combat this flagrant corruption, Plaintiffs sought an Amparo, or injunction in the 14th Federal Civil Tribunal of the First Circuit in Mexico, but the decision issued on January 14, 2015, denied the injunction and repeated many of the factual errors and lack of legal support from the prior decision. (Compl. ¶¶ 117-119).  This is curious, as Plaintiffs believed a decision favorable to them was about to be issued when the decision came down.  (Compl. ¶ 119).  An appeal of this decision is still pending in the Mexican Supreme Court.  (Compl. ¶ 120).

Plaintiffs do not seek collateral review of these decisions by United States courts, but set forth the specific facts to illustrate the breadth of Judge Azar's reach as well as the depths to which the RICO Defendants went in order to effectuate their scheme.  Indeed, one of the principals of Plaintiffs, Mr. Bazan-Canabal, "felt forced to flee Mexico and seek safety in the United States" as a result of threats to him in light of the reach and influence of the RICO Defendants and those engaged by them to carry out their scheme and has been allowed to remain in the United States while his pending asylum application is being considered.  (Compl. ¶ 121). As a further result of Defendants' RICO scheme, "Plaintiffs have suffered substantial damages, including but not limited to the expenses spent on investigators, attorneys and experts to uncover Defendants' fraud and on attorneys in the United States and Mexico to pursue remedies to correct the improper fraudulent judgment."  (Compl. ¶ 130).

## LEGAL STANDARD

Rule 8(a)(2) requires that a pleading contain a "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  While "a plaintiff cannot satisfy this burden by proffering 'naked assertion[s]' devoid of 'further factual enhancements' . . . this does not mean that a claim must contain 'detailed factual allegations' to survive a Rule 12(b)(6) motion to dismiss." *Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*, No. 11 CIV. 2589 JPO HBP, 2012 WL 4474587, at *4 (S.D.N.Y. Sept. 28, 2012) (quoting *Aschcroft v. Iqbal*, 556 U.S. 662,

678 (2009)).  As the Supreme Court explained in *Twombly*, plaintiffs need to allege "only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"Where a RICO violation is predicated on fraud, Rule 9(b) of the Federal Rules of Civil Procedure must also be satisfied."  *State Farm Mut. Auto. Ins. Co. v. Cohan*, No. CV 09-2990 (JS) (WDW), 2009 U.S. Dist. LEXIS 125653, at *18 (E.D.N.Y. Dec. 30, 2009).  However, "'a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.'"  *Berk v. Tradewell, Inc.*, No. 01 CIV. 10068 (MBM), 2003 WL 21664679, at *12 (S.D.N.Y. July 16, 2003) (quoting *International Motor Sports Group, Inc. v. Gordon*, No. 98 CIV 5611 (MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999)).  "Indeed, in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed. R. Civ. P. 8(a), which requires only a 'short and plain statement' of the claims for relief, and Fed. R. Civ. P. 8(f), which provides that 'all pleadings shall be so construed as to do substantial justice.'"  *Gordon*, 1999 WL 619633, at *3.

"The Second Circuit and courts in this district frequently have found that exclusive possession of the relevant information by the defendant is a ground for reading Rule 9(b)'s requirements permissively."  *Berk*, 2003 WL 21664679, at *13 (citing several cases and explaining the permissive 9(b) standard in the context of a RICO claim).  Moreover, "[i]t is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant."  *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F.

Supp. 1308, 1327 (S.D.N.Y. 1997); *accord Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp.

1301, 1311 (S.D.N.Y. 1996) (explaining that "in cases of corporate fraud, the requirements of

Rule 9(b) are relaxed as to matters particularly within the opposing party's knowledge," and

noting that this is particularly the case in situations where discovery has not yet begun).

## ARGUMENT

### I.  Plaintiffs Have Successfully Stated a Claim for RICO Under 18 U.S.C. § 1962(c)

Plaintiffs' Complaint asserts that the Yahoo Defendants and Baker Defendants conspired

and entered into a criminal enterprise for the purpose of using unlawful means in order to secure

a favorable judgment and reverse the unbiased judgment entered against them on the merits. As

alleged in the Complaint, this enterprise began in and was directed from the United States, but

largely carried out in Mexico.

In stating a claim for the predicate acts of mail and wire fraud, extortion, bribery, and

violations of the FCPA, the Plaintiffs have specifically alleged sufficient facts and allegations to

satisfy the requirements of the Federal Rules of Civil Procedure, which requires that a court

consider all well-pled allegations as true and not rely on extraneous allegations or materials.[2]

The RICO Defendants seek to convert Plaintiffs' well-pled RICO claims into a collateral review

of the decisions issued by the Mexican judiciary while distorting Plaintiffs' core allegations.

That approach mischaracterizes Plaintiffs' claims and is impermissible. *Roeder v. General Signal

Corp.*, 901 F. Supp. 124, 126 (W.D.N.Y. 1995) ("Defendants mischaracterize the contents of

---

[2] Plaintiffs do not take issue with the Court considering portions of the Record from the case in Mexico, but submit that those documents are not relevant to the inquiry before the Court.  In addition, Plaintiffs note that per Federal Rule of Civil Procedure 12(d), if matters outside the pleadings are presented and considered by the court, the motion must be treated as one for summary judgment and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  Plaintiffs are in possession of documents which they will submit to the Court upon request.  However, as alleged in detail in the Complaint, the RICO Defendants possess exclusive knowledge of the contours of much of the wrongdoing alleged in the Complaint and it would be highly prejudicial to dismiss Plaintiffs' claims without the benefit of discovery or allowing the submission of an affidavit pursuant to Federal Rule of Civil Procedure 56(f).

[plaintiff's] complaint…The present case…is in the early stages of litigation and [plaintiff] should be given the opportunity to engage in discovery to explore the issue of defendants' intent.")

     **A.**    **Plaintiffs' Allegations Are Sufficient to Establish Domestic Liability Under RICO**

          **1.**  **The Alleged Scheme Emanated from and is Sufficiently Connected to the United States.**

The Second Circuit has never required plaintiffs to plead a RICO enterprise that is wholly contained within the borders of the United States. Instead, courts must examine the entire "pattern of racketeering activity and its consequences." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012) (citing *CGC Holding Co., LLC v. Hutchens*, 824 F. Supp. 2d 1193, 1198 (D. Colo. 2011)).  To determine whether a domestic pattern of racketeering activity is extraterritorial, a court should consider the following: (1) where the alleged scheme was conceived and operated from, (2) whether it involved citizens or corporations from the United States as plaintiffs or defendants, and (3) whether acts in furtherance of the alleged scheme were committed within the United States. *Chevron*, 871 F. Supp. 2d at 245-46.

Here, the scheme was conceived and operated from the United States. As detailed above, executives and legal counsel from Yahoo-U.S. and attorneys from Baker-U.S. orchestrated the scheme from the United States, including through mails and wires, to travel to and from the United States and Mexico to further the conspiracy.  (Compl. ¶¶ 19, 99). The scheme was then carried out in conjunction with their Mexican counterparts, which involved bribery, ghostwriting, threats, intimidation, and coercion, in order to use corruption instead of mounting a legitimate legal challenge to avoid an unbiased judgment entered against them. (Compl. ¶¶ 2-3).  Indeed, prevailing by any means was particularly important to the RICO Defendants in light of

mischaracterizations of the Mexican litigation and judgment that Yahoo admits is "material" in its United States SEC filings.  (Compl. ¶¶ 21-22, 123-129).

To be clear, the allegations in the Complaint establish that the United States RICO Defendants were not tangentially involved; rather, the inference is that they were involved, especially once a material $2.75 billion judgment was entered against them, and that they even went so far as to edit and possibly draft the illegal Opinions that the other members of the enterprise pressured and intimidated Judge Segu to enter.  (Compl. ¶¶ 17, 86).  Not so mysteriously, the Third Appellate Court's decision reached the exact same result as the complete Opinions contained on the memory stick obtained by Plaintiffs.  (Compl. ¶ 23).

Moreover, the personal experience of one of Plaintiffs' principals, Mr. Bazan-Canabal, illustrates the interconnectedness of Yahoo-U.S. and its Mexican subsidiary on business and legal decisions and that the Mexican division of the company was under complete control of the parent.  (Compl. ¶¶ 41-49).  This carried over to avoiding potential criminal liability as well, as while working at Yahoo-Mexico, Mr. Bazan-Canabal confirmed that Yahoo-U.S. directed Yahoo-Mexico employees "to ignore potential criminal liability with respect to . . . conduct overseas involving Yahoo business dealings," as Yahoo-US would take care of any trouble, if necessary.  (Compl. ¶ 43).  Accordingly, the RICO Defendants' arguments based upon a claim that some of their conduct occurred outside of the United States are misplaced, where, as here, the scheme alleged was conceived and carried out by two major United States entities for the purpose of eliminating a judgment against one of them.  Accordingly, a cause of action has been properly alleged.  *See Chevron*, 871 F. Supp. 2d at 241 (RICO applies where the scheme was conceived and orchestrated by United States entities even though some of the predicate acts occurred in Ecuador).

The fact that the target of the wrongful acts was in Mexico is irrelevant to the question of whether or not this was a domestic or foreign RICO violation.  Indeed, the Second Circuit has specifically "*not* held that the alleged enterprise *itself* must be domestic in nature." *Reich v. Lopez*, 38 F. Supp. 3d 436, 447 (S.D.N.Y. 2014) (emphasis in original) (citing *European Cmty. v. RJR Nabisco, Inc.,* 764 F.3d at 135–36). Despite the RICO Defendants' frequent recitation of the fact that Plaintiffs are Mexican and Defendants are from the United States, they fail to address the actual issue: that the RICO Defendants' alleged actions are sufficiently domestic to create liability under RICO. *Reich v. Lopez*, 38 F. Supp. 3d at 447.

There is no requirement that every part of a racketeering enterprise occur within the territorial borders of the United States in order to remain liable under  RICO. *Chevron*, 871 F. Supp. 2d at 243; *see Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) (holding that RICO defendants and the RICO enterprise must be distinct). Indeed, as both criminal enterprises and corporations have expanded due to globalization, RICO schemes increasingly involve multinational or cross-border enterprises.  As the Second Circuit explained:

> [S]uppose that officials of two corporations—one incorporated in Delaware and the other in Bermuda, but both doing substantial business in the United States— conducted the respective affairs of those entities, each entity independent of the other, through patterns of mail and wire fraud or other predicate acts in the United States to the great injury of members of the American public. The idea that the officials of the Delaware corporation could be prosecuted criminally and sued civilly under RICO because their enterprise was a domestic corporation while their counterparts with the Bermudan corporation would be immune solely because the Bermudan corporation was foreign would be risible.

*Chevron*, 871 F. Supp. 2d at 243.

Accordingly, by arguing that RICO does not apply to wholly extraterritorial conduct, the RICO Defendants miss the mark and, as a result, the cases relied upon by the RICO Defendants are entirely distinguishable.  In contrast to the facts alleged in the Complaint, those cases

primarily involve disputes between foreign nationals with only tangential connections, at best, to the United States. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ("no securities listed on a domestic exchange, and all aspects of the purchases complained of…occurred outside the United States."); *Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010) ("[T]he connections to the United States may be too peripheral or problematic to support a RICO lawsuit brought here."); *see also Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) (Canadian plaintiff's allegations of racketeering against Russian defendants using Russian companies to take control of another Russian company in which plaintiff was a minority shareholder was insufficient to support extraterritorial application); *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (suit between two foreign parties from Mexico where "[t]he scheme alleged by Pemex possesses three minimal contacts with the United States: the financing was obtained here, the invoices were sent to the bank for payment, and the bank issued payment. Absent from the pleadings are any allegations that the scheme was directed from (or to) the United States.").

To the contrary, in this case, the allegations in the Complaint establish that the alleged scheme was orchestrated, directed, and participated in by United States companies seeking to avoid liability under a foreign judgment. This constitutes a domestic pattern of racketeering which falls within the ambit of RICO. *Chevron*, 871 F. Supp. 2d at 245-46.

### 2. Plaintiffs Allege Multiple Predicate Acts Which Bring Defendants' Scheme Within the Reach of RICO.

Regardless of whether or not the alleged enterprise focused on extraterritorial conduct, the Second Circuit has definitively held that "RICO applies extraterritorially if, and only if, liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate. Thus, when a RICO claim depends on violations of a predicate statute that manifests an unmistakable

congressional intent to apply extraterritorially, RICO will apply to extraterritorial conduct, too."
*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014). Here, Plaintiffs allege
predicate acts with extraterritorial effect.

        a.      <u>RICO Defendants' Travel Act Violations Were Grounded in the United States</u>.

The Second Circuit has unequivocally held that Travel Act violations may constitute
predicate acts that come within the ambit of RICO if they are sufficiently connected to the
United States. *European Cmty.*, 764 F.3d at 139 ("[B]ecause Plaintiffs have alleged that all
elements of the wire fraud, money fraud, and Travel Act violations were completed in the United
States or while crossing U.S. borders, we conclude that the Complaint states domestic RICO
claims based on violations of those predicates.").  Thus, the RICO Defendants misconstrue
*European Community* when they claim that the Travel act and wire and mail fraud statutes do not
have extraterritorial reach. (Baker & McKenzie Mot. at 22; Yahoo Mot. at 17).

The RICO Defendants' FCPA violations underlie Travel Act violations based on
domestic conduct.  Plaintiffs allege in their Amended Verified Complaint that the RICO
Defendants "violated the Travel Act through their bribery and extortionate activity…and as a
result of their violation of the Foreign Corrupt Practices Act through their scheme to bribe Judge
Azar and key Mexican judicial officials to ensure they would receive a favorable outcome in the
appeal of Judge Segu's decision." (Compl. ¶ 140). The RICO Defendants attempt to parry these
allegations by claiming that an FCPA cannot be used as a RICO predicate, despite the fact that
the FCPA may be used as the basis for a Travel Act violation, which is a RICO predicate. (Baker
& McKenzie Mot. at 24-25; Yahoo Mot. at 29). However, contrary to the RICO Defendants'
assertions, *Reich* holds that "FCPA violations [can serve] as a basis for Travel Act violations,
which, in turn, are alleged as predicates for the RICO offense charged." *Reich v. Lopez*, 38 F.

Supp. 3d at 446 (quoting *United States v. Young & Rubicam, Inc.,* 741 F. Supp. 334, 338 (D.

Conn. 1990)).

Plaintiffs allege that the RICO Defendants violated the FCPA by bribing a foreign

official in order to obtain a favorable court judgment.  (Compl. ¶ 102); 15 U.S.C. § 78dd-1(a).  It

has long been established that although the FCPA is not a predicate act for RICO, the FCPA may

be used as the basis for a Travel Act violation, which, in turn, may be used as a predicate act

under RICO.  *United States v. Young & Rubicam,* 741 F. Supp. at 338-39.  Accordingly, the

FCPA violation underlies a Travel Act violation.

Plaintiffs further allege that the United States Defendants violated the Travel Act and the

wire and money fraud statutes by taking actions that crossed the U.S. border into Mexico.

(Compl. ¶¶ 5, 140). Yahoo-Mexico was directly operated and supervised by Yahoo-U.S., making

it impossible for Yahoo-Mexico to have taken any substantial action without the knowledge and

direction of Yahoo-U.S. (Compl. ¶ 47).  Even at this early stage of the litigation, Plaintiffs have

already discovered evidence linking the RICO Defendants' United States offices with the

racketeering scheme, as forensic analysis of the memory stick given to Judge Segu provided

metadata that could be traced back to Baker-US.  Specifically, "[t]he analysis [of the memory

stick with the draft Opinion] appears to confirm that metadata in the documents shows that they

were revised and possibly drafted on computers owned by Baker & McKenzie in the United

States. This analysis also reveals the names of the attorneys representing Yahoo Inc. (a United

States entity) in the case in Mexico appear prominently in the data on more than one occasion.").

(Compl. ¶ 86).  It also reveals that, at a minimum, the content was edited at Baker-U.S. and

possibly even drafted there. Finally, after Judge Segu refused to be corrupted by the RICO

Defendants, they violated the Travel Act and the FCPA by bribing Judge Azar and using him as

an agent to extort other members of the Mexican judiciary. (Compl. ¶ 140).  These domestic activities were central to the RICO Defendants' scheme.

Accordingly, there is no extraterritorial concern given that the RICO Defendants entered into and operated their racketeering efforts from the United States for the benefit of corporations within the United States. *European Cmty.*, 764 F.3d at 141 (holding that the complaint "alleges sufficient domestic conduct for the claims involving mail fraud, wire fraud, and Travel Act violations to sustain the application of RICO, notwithstanding that these predicates do not apply extraterritorially"). Thus, although the Second Circuit has yet to draw a line distinguishing between domestic and extraterritorial applications of the wire fraud, mail fraud, and Travel Act, Plaintiffs have clearly alleged coordination and control of the scheme from the United States, which constitutes a domestic enterprise in violation of RICO. (Compl. ¶¶ 2, 5, 47); *European Cmty.*, 764 F.3d at 142.

Plaintiffs, in their Complaint, have fully alleged domestic violations of RICO. As *European Community* clearly held, RICO allegations will not be found extraterritorial unless the claims are entirely without substantial domestic connections. *Reich v. Lopez*, 38 F. Supp. 3d at 448 ("As long as enough domestic conduct exists to fulfill the requirements of both the Travel Act and wire fraud, it is irrelevant that those statutes are further violated by conduct that is extraterritorial in nature."). Furthermore, it is not the place of the court to evaluate the truth or falsity of Plaintiffs' allegations at the motion to dismiss stage. Nor should the court be concerned that some of Plaintiffs' claims deal with activities which took place in Mexico, as Plaintiffs have not yet had the benefit of discovery to uncover the depths of the RICO Defendants' conduct, and knowledge of its contours is within their exclusive possession. *European Community* already resolved this issue, holding that  should the "pattern of conduct of certain Defendants or certain

schemes prove to be extraterritorial, the district court may need to narrow the scope of this action accordingly, through either motions for (partial) summary judgment or through carefully tailored jury instructions." *European Cmty.*, 764 F.3d at 143; *see also Reich v. Lopez*, 38 F. Supp. 3d at 448 ("Extraterritoriality concerns do not bar the alleged RICO claim at [the motion to dismiss] stage.").

      b.    <u>Plaintiffs Allege a Hobb's Act Violation Based on Domestic Conduct</u>.

Plaintiffs also allege that the RICO Defendants have committed domestic actions in violation of the Hobbs Act. The Hobbs Act criminalizes "robbery or extortion or attempts or conspires so to do" that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C.A. § 1951(a). Once again, *Chevron* proves instructive, holding that a scheme to extort money via the corrupt court system of Ecuador was in violation of the Hobbs Act, and this violation of the Hobbs Act was a domestic—not extraterritorial—offense because the enterprise was initiated by and developed for the benefit of domestic Defendants. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 587-88 (S.D.N.Y. 2014) ("While Donziger's activities in Ecuador were important, they in many respects were merely tools. Regardless of where the conduct creating the threat took place, the plan was hatched and run from the United States.").

As discussed above, the Court should respectfully give little weight to the fact that a substantial amount of the RICO Defendants' alleged activities took place in Mexico. Despite its international reach, this enterprise was organized and operated from within the United States, making it, for all intents and purposes, a domestic violation of the Hobbs Act, under which the discussion of extraterritoriality is wholly irrelevant. *Chevron*, 974 F. Supp. 2d at 587-88. Similar to *Chevron*, the RICO Defendants' enterprise resulted in the corruption of the Mexican judicial

system, it was entered into, organized, and operated from the United States for the benefit of those in the United States.

  **B.**  <u>**Plaintiffs' Allegations Establish RICO Standing**</u>**.**

  To establish standing under RICO, Plaintiffs must show "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990). Plaintiffs have appropriately alleged a violation of § 1962, by which the RICO Defendants were the proximate cause of Plaintiffs' actual injuries.

   **1.** **Plaintiffs Sufficiently Allege Causation to Establish RICO Standing.**

  Plaintiffs allege, and have demonstrated through their pleadings, that the RICO Defendants were the proximate cause as to the loss of their civil judgment and resulting injuries. Proximate cause is found if the RICO Defendants were (1) a substantial factor in the sequence of responsible causation, and (2) Plaintiffs' injury was reasonably foreseeable. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994). Under this standard, the RICO Defendants are clearly the proximate cause behind Plaintiffs' injuries.

  The RICO Defendants consistently misconstrue Plaintiffs' allegations in claiming that there is no proximate cause because Judge Segu's decision was overturned by the Mexican state appellate court. (Baker & McKenzie Mot. at 28; Yahoo Mot. at 23-24). Plaintiffs' allegations do not end with Judge Azar's attempted extortion of Judge Segu. Rather, Plaintiffs go on to fully allege that Judge Azar, on behalf of the RICO Defendants, continued to improperly influence the appellate decision and intimidate and threaten all those who posed additional roadblocks. (Compl. ¶¶ 96-122). This was discovered by one of Plaintiffs' attorneys, who was told directly by Judge Azar that the case had already been decided, and further corroborated by credible reports and sworn testimony that Judge Azar pressured and otherwise exerted his influence to

force Judge Venegas, and the appellate panel which she oversaw, to rule in favor of the RICO Defendants in order to absolve them of all wrongdoing. (Compl. ¶ 102) ("[Judge Azar:] You've already been defeated, the other side [Yahoo] has already been here…there are too many zeros involved…in my Court you are not going to win."); (Compl. ¶ 111) ("Judge Venegas told people in her staff that Judge Azar said she had to completely invalidate the Yahoo decision rendered by Judge Segu.").

Accordingly, the reasoning and purported analysis in the Appellate Court Opinion is irrelevant because Plaintiffs have strong evidence that the decision was obtained via means of fraud, bribery, and threats of harm. In other words, the issued appellate Opinion was merely a vehicle to achieve a corrupt end: permit the Yahoo Defendants to avoid the judgment and clear them of any wrongdoing.  The point of Plaintiffs' allegations is that, regardless of how the appellate court attempted to justify its written opinion, the decision was a foregone conclusion due to the RICO Defendants' illegal acts. This reality is the clear, definitive link that is required under RICO. *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010).

When determining if proximate cause exists, the key factor to consider is the direct relationship between the RICO Defendants' alleged actions and the harm Plaintiffs suffered. *Hemi Grp. v. City of New York,* 559 U.S. at 12. A simple recitation of the allegations also demonstrates that Plaintiffs meet the standard required for proximate cause: (1) Defendants bribe Judge Azar, (2) Judge Azar coerces the judges on the Court of Appeals, and (3) the Court of Appeals rules in Yahoo's favor. (Compl. ¶¶ 103-122); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003).

Proximate cause, when applied correctly, narrows the field of possible plaintiffs to only those who were reasonably or foreseeably harmed by defendants actions, and when defendants

actions were a substantial factor in causing that harm. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d at 769. By unjustly influencing the judicial process, the RICO Defendants are the clear, proximate cause, as the appellate decision and other intimidation and threats were the direct result of the RICO Defendants' actions and agents.

### 2. Plaintiffs Suffered Injury to a Recognized Property Interest.

Plaintiffs have alleged that, due to the RICO Defendants actions, their $2.7 billion damages award was fraudulently overturned and that Plaintiffs suffered injury to their business reputation, as well as the substantial costs involved with investigating, appealing, and prosecuting this action, both in Mexico and in their efforts in the United States to obtain a level playing field and compensation for the associated costs. (Compl. ¶¶ 7, 25, 130, 145). There is nothing speculative or unclear about these injuries; a definite sum totaling the damages was reached by a mutually agreed upon expert witness, and that amount was awarded to Plaintiffs by a judge. Furthermore, Plaintiffs' principals have faced very serious challenges to their finances and personal safety, which has resulted in very specific harm. (Compl. ¶ 121).

The Second Circuit has generally recognized that "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Ello v. Singh*, 531 F. Supp. 2d 552, 574-75 (S.D.N.Y. 2007) (quoting *Motorola Credit Corp. v. Uzan,* 322 F.3d 130, 135 (2d Cir. 2003)); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). In contrast, a "clear and definite injury" doesn't exist when there are other remedies available, or when a ruling has not yet been reached. *DLJ Mortgage Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 239 (E.D.N.Y. 2010). Injuries are most likely to be found unclear or indefinite when there are alternatives, untried remedies, or when the actual event has yet to occur. *See Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 522 (S.D.N.Y. 1997) ("Plaintiff does not

allege that MetLife refused to honor her policies. Hence, Plaintiff's actual loss was speculative in this respect.").

Here, the RICO Defendants violated RICO after Judge Segu entered his judgment, preventing Plaintiffs from obtaining their judgment through any alternative means. Absent the extraordinary and illegal measures undertaken by the RICO Enterprise, Yahoo would have been liable for the total judgment issued by Judge Segu. Anticipating that the scheme would successfully unwind this judgment, Yahoo-U.S. downplayed the judgment to investors and represented that it would not have to pay the judgment before Yahoo had even filed an appeal. (Compl. ¶¶ 124-129).

Plaintiffs have also suffered a serious calculable injury due to the costs associated with investigating the RICO Enterprise, as well as appealing a series of appellate decisions obtained through bribery and extortion. (Compl. ¶¶ 25, 130, 145). These legal expenditures may be considered a "RICO injury where defendant's underlying wrongful acts contemplate the victim responding in court." *Aramony v. United Way of Am.*, 969 F. Supp. 226, 232 (S.D.N.Y. 1997).

Finally, as a result of the RICO Defendants' illegal activities, Plaintiffs' business reputations have been damaged, causing them to lose potential profits and opportunities. Although not as easily calculated as the loss of their rightfully obtained judicial award and subsequent legal and investigative expenses, these types of damages are recognized as appropriate RICO damages. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262 (2d Cir. 1995) (upholding a $100,000 jury award to a RICO plaintiff for "injury to reputation and/or loss of goodwill"); *Philatelic Found. v. Kaplan*, No. 85 CIV. 8571 (RWS), 1986 WL 5629, at *11 (S.D.N.Y. May 9, 1986), *abrogated on other grounds by Aramony v. United Way of Am.*, 969 F. Supp. 226 (S.D.N.Y. 1997) ("Pecuniary damage to business reputation also appears to raise

difficult problems of proof, but this type of damage has been included within the 'injury to his business' requirement of § 1964(c).").

### 3. Plaintiffs Have Properly Pled Each of the Alleged Predicate Acts Constituting Racketeering Activity.

Plaintiffs' Complaint successfully alleges the RICO Defendants' liability for the predicate acts under 18 U.S.C. § 1962.  The Complaint sufficiently pleads that the RICO Defendants' racketeering activity consisted of two or more violations of the Travel Act, 18 U.S.C. § 1952 the Hobbs Act, 18 U.S.C. § 1951, wire fraud, 18 U.S.C. § 1343, and mail fraud, 18 U.S.C. § 1341.

### a. The Mail and Wire Fraud Predicate Acts Have Been Sufficiently Pled.

Plaintiffs have alleged that the RICO Defendants utilized mail and telecommunication services in furtherance of their RICO scheme. The "essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (quoting *Fountain v. United States,* 357 F.3d 250, 255 (2d Cir. 2004)). Specifically, the RICO Defendants repeatedly used regular mail, electronic mail, faxes, wire transfers, and the telephone to communicate with each other, their co-conspirators, and Mexican judicial officials as part of their unlawful scheme to overturn Judge Segu's judgment. (Compl. ¶¶ 99, 142). These communications were integral to their scheme to elicit a favorable outcome in the Mexican court system. (Compl. ¶ 142). In fact, their initial success was through the use of an electronic file containing the draft opinions. (*Id.*). Indeed, the draft opinions, which were drafted by the Baker Defendants at the direction of the Yahoo Defendants and revised and possibly drafted on a computer owned by Defendant Baker-U.S., were provided to Judge Segu on a memory stick. (Compl. ¶ 18).

27

The Second Circuit has held that in "complex civil RICO actions involving multiple defendants…Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998); *Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995). Instead, plaintiffs are only required to "delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *In re Sumitomo Copper Litig.*, 995 F. Supp. at 456. Finally, mailings or communications in furtherance of a fraud are not held to Rule 9(b)'s heightened pleading standard. *Spira*, 876 F. Supp. at 559 ("[W]e do not regard mailings in furtherance of the scheme, but which are not themselves false or misleading, as "averments of fraud" within the language of Rule 9(b).").

Plaintiffs allege that the mail and wire fraud statutes were violated by the conspiracy to bribe Judge Azar, and attempt to control Judge Segu, through the use of technology. As Plaintiffs have alleged the entire scheme with the requisite particularity, it is premature and unnecessary for Plaintiffs to provide the actual electronic transmissions at the pleading stage. *See Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 88 (E.D.N.Y. 2011); *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 76 (E.D.N.Y. 2006); *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 146 (S.D.N.Y. 2014).

b.  <u>The Predicate Act of Extortion under the Hobbs Act Has Been Properly Pled</u>.

The Complaint alleges that "[t]he RICO Defendants violated the Hobbs Act through their bribery and extortionate activity as detailed [in the Complaint], including their successful corruption of and bribing of the Mexican judicial officials and attempts to instill fear in Plaintiffs and pressure Plaintiffs to resolve the case without further litigation." (Compl. ¶ 141). A

defendant is liable under the Hobbs Act if they, "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do."  18 U.S.C. § 1951(a). Extortion is further defined in the act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right," whereas commerce is defined as "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof." 18 U.S.C. § 1951(b)(2)-(3).

Plaintiffs' allegation that the RICO Defendants violated the Hobbs Act through the bribery of Judge Azar and other judicial officials in order to overturn Judge Segu's decision is sufficient to meet the criteria required by the Second Circuit: wrongful means and wrongful objectives. *Viacom Int'l Inc. v. Icahn*, 747 F. Supp. 205, 210 (S.D.N.Y. 1990), *aff'd*, 946 F.2d 998 (2d Cir. 1991). To simplify, "both elements of extortion occur whenever one exploits fear to obtain property to which one has no lawful claim." *Id.* at 210.

Plaintiffs' evidence that this fraudulent corrupt judgment was obtained through the use of threats and intimidation comes directly from eyewitnesses who personally observed the conspiracy. These eyewitnesses include the original district court judge, Judge Segu, clerks, and other employees of the Mexican courts. (Compl. ¶¶ 17, 20). Judge Segu has prepared sworn testimony about the threats of harm, intimidation and corruption he suffered at the hands of Judge Azar as a result of this scheme. (Compl. ¶ 17). As a result of these threats of harm, Judge Segu was forced to flee his native country for the United States and is currently in hiding. (Compl. ¶ 17).

As discussed *supra*, Plaintiffs had a property interest in Judge Segu's judgment, which was lost due to the RICO Defendants' use of bribery to obtain a favorable judgment. However,

29

the RICO Defendants were only able to terminate Plaintiffs' property interest through the use

fear of retaliation or other forms of recrimination by their agent, Judge Azar. Plaintiffs will

demonstrate, through evidence, depositions, and testimony that Judge Azar was rightly feared for

the lengths he was willing to go to obtain a verdict once he was paid, as is alleged in the

Complaint. (Compl. ¶ 102). This fear is clearly a form of extortion prohibited by the Hobbs Act.

c.  Plaintiffs Sufficiently Allege Extortion and Bribery in Violation of
the Travel Act and the FCPA.

Plaintiffs allege that the RICO Defendants violated the Travel Act through the use of

interstate and foreign commerce to violate the anti-bribery provisions of the FCPA by bribing

Judge Azar and key Mexican judicial officials to secure the reversal of Judge Segu's decision.

(Compl. ¶ 140).

The Travel Act is an enumerated RICO predicate, 18 U.S.C. § 1961(1)(C), and it

prohibits the use of  "any facility in interstate or foreign commerce" with the intent to "(1)

distribute the proceeds of any unlawful activity…or (3) otherwise promote, manage, establish,

carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful

activity," 18 U.S.C. § 1952(a).

Plaintiffs allege sufficient facts throughout the Complaint demonstrating that the RICO

Defendants violated all of the elements of the FCPA's anti-bribery provisions as (1) Defendants,

who are U.S. residents and who utilized Mexican agents, (2) used instrumentalities of interstate

commerce to (3) corruptly (4) pay Judge Azar, a foreign official, (5) knowing that Judge Azar

would unlawfully interfere (6) with the Mexican judicial system. *See* 15 U.S.C. § 78dd–2(a)(3).

This textbook violation of the FCPA serves as the basis for a violation of the Travel Act, upon

which a RICO claim may be brought.  *Chevron*, 974 F. Supp. at 596; *see also United States v.*

30

*Kozeny*, 664 F. Supp. 2d 369 (S.D.N.Y. 2009) (upholding a conviction for conspiracy to violate the FCPA and Travel Act in furtherance of FCPA violation).

> **C.** **Plaintiffs Have Pled Sufficient Open- and Closed-Ended Continuity to Constitute a Pattern of Racketeering Activity.**

Plaintiffs' Complaint alleges the necessary continuity to establish a pattern of racketeering activity, which meets the pleading requirements of RICO. Under RICO, Plaintiffs must establish a "pattern of racketeering activity" requiring "at least two acts of racketeering activity" committed in a 10–year period. 18 U.S.C. § 1961(5). Plaintiffs are only required to prove that the RICO Defendants' predicate acts of racketeering were "related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989). However, a pattern of continued criminal activity can be either "closed-ended continuity," or "open-ended continuity." *See Id.,* 492 U.S. at 239, 241. Plaintiffs' allegations of the RICO Defendants' racketeering activity successfully establishes both closed- and open-ended continuity.

The RICO Defendants' racketeering activities began prior to Judge Segu's decision, when the RICO Defendants first conspired to attempt to use bribery and extortion to achieve a favorable ruling. (Compl. ¶¶ 8-9, 76-78, 80-85, 94, 104, 106). When Judge Segu rebuffed the RICO Defendants' agents, the pattern of racketeering continued with the further bribery of Judge Azar. (Compl. ¶¶ 10-13, 88-90, 93, 97-98). Judge Azar, then acting as the RICO Defendants' agent, continued the pattern of intimidation against the appellate judges. (Compl. ¶¶ 14-15, 103, 109-111, 113). Thus, the period in which the RICO Defendants were engaged in racketeering activities began no later than 2012 and are still continuing through to this day, a period of at least three years. (Compl. ¶ 4). Several witnesses for the Plaintiffs claim that they still fear retaliation from Judge Azar or other of the RICO Defendants' agents because the racketeering activity is

ongoing, as well as the fact that this behavior is pervasive in the Mexican court system. (Compl. ¶¶ 17, 20, 78-79, 95, 98, 112, 121).

Close-ended continuity can be shown by the RICO Defendants' predicate acts that extend "over a substantial period of time…[or] the predicates establish a *threat* of long-term racketeering activity." *H.J. Inc.,* 492 U.S. at 230-31. Courts have held that long-term racketeering activity will not be considered for the purpose of close-ended continuity if it does not continue for a minimum of two years. *DeFalco v. Bernas*, 244 F.3d 286, 322 (2d Cir. 2001). Plaintiffs have identified several instances of racketeering, such as the initial meeting of Judge Azur and Judge Segu, the conversations with Baker-Mexico lawyers, the delivery of the Opinions on a memory stick, and the continued threats against members of the Mexican judiciary, which has now existed for a period far longer than the requisite two years.

Open-ended continuity does not require Plaintiffs to "show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242-43 (2d Cir. 1999). Plaintiffs also allege that the RICO Defendants entered into a racketeering enterprise, which continues to this day, for the purposes of continued manipulation of the Mexican judicial system. (Compl. ¶ 134). Having accomplished their first goal, the racketeering scheme set in motion by the RICO Defendants continues, prepared to bribe or extort anyone who they might encounter in connection with their current Mexican litigation to ensure their desired results.

### D.    Plaintiffs Have Pled a RICO Enterprise and Conduct.

Plaintiffs have sufficiently alleged a RICO enterprise that was an association-in-fact with a shared purpose of corruptly obtaining a favorable verdict and depriving Plaintiffs' of their legitimately obtained judgment. RICO defines "enterprise" broadly, so as to include "any

individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *United States v. Turkette*, 452 U.S. 576, 576 (1981) (quoting 18 U.S.C. § 1961(4)). This has been further clarified by the Supreme Court, which held that, for the purposes of RICO, an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct…[proven] by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583.

This enterprise requirement is "most easily satisfied when the enterprise is a formal legal entity…[or] where there is simply a 'discrete economic association existing separately from the racketeering activity.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173-74 (2d Cir. 2004) (quoting *United States v. Anderson,* 626 F.2d 1358, 1372 (8th Cir.1980)). It is a matter of fact that all of the RICO Defendants are legal entities with an attorney-client relationship in connection with the Mexican litigation at issue in this case.  (Compl. ¶¶ 2, 34, 133). The Complaint also alleges that certain non-parties actively assisted the RICO enterprise. (Compl. ¶¶ 2, 6, 35, 134).

Plaintiffs allege that the RICO Defendants worked together for the common purpose of obtaining a favorable ruling from Judge Segu. (Compl. ¶¶ 2, 6). When that failed, the RICO Defendants then used Judge Azar to obtain a favorable verdict from the Appellate Court through the use of bribery, extortion, and intimidation. (Compl. ¶¶ 15, 97, 102, 105-114). This meets the second requirement set forth by the Second Circuit, which requires allegations that a "nexus exist between the enterprise and the racketeering activity that is being conducted…and '[f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such

purposes.'" *First Capital Asset Mgmt., Inc.*, 385 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 820 F. Supp. 89, 98 (S.D.N.Y. 1993)).  Plaintiffs have thus more than sufficiently pled the elements of a RICO enterprise.

      **E.**      **Plaintiffs Have Not Engaged in Inappropriate Group Pleading.**

Plaintiffs are not engaged in group pleading because they have set forth specific factual allegations as to how and why each RICO Defendant violated RICO. Group pleading is considered fatal to a complaint when "no single defendant is sufficiently advised of which fraudulent act he is alleged to have committed, where, when, by what means, and its specific form and content: oral, written, and whether the fraud consists of misrepresentation or omission." *Schweitzer v. Testaverde*, No. 86 CIV. 2498 (CSH), 1990 WL 17612, at *1 (S.D.N.Y. Feb. 16, 1990). Plaintiffs have provided the RICO Defendants with sufficient notice throughout their Complaint as to the specific factual allegations supporting the RICO charge. The clear nature of Plaintiffs' allegations provide the RICO Defendants with sufficient facts to identify the alleged violations.

Furthermore, when defendants are "insiders," the "connection between the fraudulent representations and the specific defendants is not necessary." *Asdourian v. Konstantin*, 77 F. Supp. 2d 349, 356 (E.D.N.Y. 1999). While allegations of fraud must meet the standards set forth by Rule 9(b), there is a "recognized exception…that fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  Here, Plaintiffs have served the RICO Defendants with a verified complaint setting forth factual details obtained from witnesses, which details the fraudulent scheme in sufficient detail to put the RICO Defendants on notice of the allegations against them.

**II.** **Plaintiffs Have Successfully Stated a Claim for RICO Conspiracy Under § 1962(d).**

As set forth above, Plaintiffs have more than adequately alleged that the RICO

Defendants conspired to enter into an agreement to violate RICO that withstands the liberal

pleading standard of Rule 8(a). While Plaintiffs' allegations that the RICO Defendants

committed substantive violations of RICO must meet the more exacting standards of 9(b),

conspiracy allegations need only meet the more-liberal standard of Rule 8(a). *State Farm Mut.*

*Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 152-53 (E.D.N.Y. 2005).

Section 1962(d) states that it "shall be unlawful for any person to conspire to violate" any

of the RICO subsections. 18 U.S.C. § 1962(d). However, to adequately state a claim under §

1962(d), plaintiffs must allege "(1) an agreement to join the conspiracy; (2) the acts of each co-

conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in

the same." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282,

303 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001) (citations omitted).  The Second

Circuit has held that for a RICO conspiracy claim, the Court must limit its focus to "whether an

alleged conspirator knew what the other conspirators were up to or whether the situation would

logically lead an alleged conspirator to suspect he was part of a larger enterprise." *United States*

*v. Zichettello,* 208 F.3d 72, 99 (2d Cir. 2000), *cert. denied sub nom.,* 531 U.S. 1143 (2001)

(citations omitted).

As discussed herein, Plaintiffs have sufficiently pled a substantive violation of RICO.

*Hecht*, 897 F.2d at 25 ("Because a conspiracy—an agreement to commit predicate acts—cannot

by itself cause any injury, we think that Congress presupposed injury-causing overt acts as the

basis of civil standing to recover for RICO conspiracy violations."). By alleging a substantive

violation, Plaintiffs have necessarily alleged a conspiracy to violate RICO, as every substantive

violation must be preceded by a conspiracy. However, even if Plaintiffs' substantive violations

of RICO were to be dismissed, this would not force the dismissal of Plaintiffs' conspiracy allegations. Instead, Plaintiffs must only allege that the RICO Defendants agreed to commit the predicate acts, not that the acts were committed. *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.*, 375 F. Supp. 2d at 150-51. So long as the RICO Defendants planned to commit a RICO violation and offered some support for these violations, they may be found guilty, regardless of who committed the actual RICO violation or if the RICO violation was actually carried out. *Salinas v. United States*, 522 U.S. 52, 63 (1997).

Based upon the facts alleged in the Complaint, the RICO Defendants have been put on sufficient notice of Plaintiffs' RICO conspiracy claim.  Accordingly, the RICO Defendants' motions to dismiss the RICO conspiracy claim should respectfully be denied.

### III.  Plaintiffs Have Successfully Stated a Claim Under New York Law.

In addition to the RICO violations, Plaintiffs allege that the RICO Defendants are liable for common law fraud and conspiracy in New York. The Complaint states that the RICO Defendants, by directing an enterprise dedicated to bribery and extortion through Judge Azar, exploited the Mexican legal system's vulnerability to corruption and perpetrated a fraud on Plaintiffs. (Compl. ¶ 98). What began as a scheme to defraud Plaintiffs became a larger conspiracy due to the RICO Defendants' attempts to hide the lawsuit from their own shareholders, necessitating later disclosures to investors about Yahoo's potential liability. (Compl. ¶ 21). It is evident that, for the purposes of a motion to dismiss, Plaintiffs have successfully pled their allegations of common law fraud and conspiracy.

#### A.  Plaintiffs' Allegations Establish Common Law Fraud.

Plaintiffs have stated a claim for fraud, as the Complaint contains sufficient allegations to show that the RICO Defendants perpetrated their actions through fraudulent means. Under New York law, common law fraud occurs when a defendant engages in (1) a false representation of

material fact, (2) with the intent to defraud, and that (3) plaintiff relies upon that representation. *Filler v. Hanvit Bank*, 156 F. App'x 413, 416 (2d Cir. 2005). Plaintiffs believed that they could rely upon the judicial system in Mexico, only to later discover that the appellate process had been a sham, as the RICO Defendants had already purchased their desired verdict with the intent to deprive Plaintiffs of a fair trial. (Compl. ¶¶ 14-15). Furthermore, Plaintiffs' reliance on the courts to maintain their judicial integrity and return an impartial verdict satisfies the reliance element. *In re Blech Sec. Litig.*, 961 F. Supp. 569, 587 (S.D.N.Y. 1997) (holding that reliance on the integrity of the market satisfies the reliance element of common law fraud).

Although allegations of fraud must meet the heightened standards of Rule 9(b), this standard is met so long as the alleged fraud is stated with particularity. *Degulis*, 928 F. Supp. at 1310. Therefore, Plaintiffs are only required to allege "specific facts supporting a strong inference of fraud." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). As Plaintiffs have thoroughly identified the scheme, the parties involved, the timeframe within which the alleged actions occurred, and the purpose of the alleged actions, the RICO Defendants have been presented "with notice of the charges leveled against them." *Degulis*, 928 F. Supp. at 1311.

The RICO Defendants wrongly claim that Plaintiffs' claims must be dismissed because they fail to identify specific fraudulent statements or actors. (Baker & McKenzie Mot. at 39; Yahoo Mot. at 36). This attempt to dismiss Plaintiffs' claims fails for two reasons. First, Plaintiffs have clearly alleged that the RICO Defendants manipulated the Mexican court system through Judge Azar; Plaintiffs are not claiming that the RICO Defendants committed fraud through misrepresentation. (Compl. ¶ 16). Thus, Plaintiffs are not required to identify misrepresentations, because they have not alleged misrepresentations. Second, courts must be

especially mindful that, when ruling on a motion to dismiss involving allegations concerning

manipulation as opposed to affirmative misrepresentations, "some or all of the facts will be in the

control of the defendants and inaccessible to the plaintiffs without discovery.'" *Three Crown Ltd.*

*P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993). Although Plaintiffs anticipate

finding stronger evidence once discovery commences, the allegations of common law fraud in

the Complaint are more than sufficient at the motion to dismiss stage.

### B.      Plaintiffs' Allegations Establish a Conspiracy.

New York recognizes actions for conspiracy so long as the allegations are connected to a

separate, underlying tort. *Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006).

Therefore, to "establish a claim of civil conspiracy, plaintiff must demonstrate the underlying

tort, plus the following four elements: (1) an agreement between two or more parties; (2) an

overt act in furtherance of the agreement; (3) the parties' intentional participation in the

furtherance of a plan or purpose; and (4) resulting damage or injury." *Fisk v. Letterman*, 424 F.

Supp. 2d at 677 (quoting *Treppel v. Biovail Corp.*, No. 03 Civ. 3002, 2004 WL 2339759, at *19

(S.D.N.Y. Oct. 15, 2004)).

As discussed above, Plaintiffs have alleged through their Complaint that the RICO

Defendants conspired to violate multiple RICO predicates and committed common law fraud

through the use of bribery and intimidation to overturn a judicial verdict. The Complaint contains

sufficient evidence which, if accepted as true, along with the underlying RICO and common law

fraud claims, satisfies the required elements for conspiracy. Plaintiffs' allegations of conspiracy

are also required to meet Rule 9(b)'s standard, which requires that:

> [w]here possible, there should be some details of time and place and the alleged
> effect of the conspiracy. This is not to say that the pleader must plead his
> evidence; further details may be secured by means of discovery, and related
> devices. Moreover, great leeway should be allowed the pleader, since by the

nature of the conspiracy, the details may not be readily known at the time of the pleading.

*Kravetz v. Brukenfeld*, 591 F. Supp. 1383, 1387-88 (S.D.N.Y. 1984) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 8.17[5], at 8–180 through 8–183 (1984)).

Plaintiffs have provided all of the information in their possession possible regarding the RICO Defendants' conspiracy, which is more than adequate to put the RICO Defendants on notice. Plaintiffs expect that during discovery more information will quickly come to light regarding the depths and nature of the RICO Defendants' conspiracy.

**IV.     Plaintiffs' Complaint Should Not Be Dismissed With Prejudice.**

Plaintiffs, at great financial cost and personal risk, have continued to seek justice despite the RICO Defendants' efforts to corrupt the judicial system for their own benefit. Plaintiffs have amassed the best information available without the benefit of discovery, which demonstrates that the RICO Defendants conspired to and engaged in an enterprise designed to bribe and intimidate any judge who refused to provide them with their desired ruling. Plaintiffs have met the standard set forth by Rule 9(b) by alleging, with specificity, who, how, when, and why the RICO Defendants violated RICO and the predicate statutes. In response, the RICO Defendants have simply denied responsibility and now attempt to bury the matter by claiming that actions orchestrated from within the United States should be exempt from the laws of the United States.

However, if the Court finds this Complaint to lack the requisite specificity, Plaintiffs would then ask for leave to amend should any aspect of the RICO Defendants' motion to dismiss be granted, as new facts and evidence continue to come to light. For example, since the filing of the Complaint, Mr. Bazan-Canabal, one of Plaintiff  companies' founders has sought asylum in the United States and has been granted temporary status in large part due to the events detailed in the Complaint.  Similarly, a Mexican appellate court partially granted injunctive relief through

39

an Amparo proceeding to vacate the arrest warrant for Judge Segu, recognizing the frivolity of

the charges. In addition, the Mexican Supreme Court has agreed to consider the matter.  Under

Rule 15(a), "leave to amend shall be freely given when justice so requires," whereas leave to

amend should only be denied unless "unless the party seeking leave has acted in bad faith, there

has been an undue delay in seeking leave, there will be unfair prejudice to the opposing party if

leave is granted, or the proposed amendment would be futile." *Javier H. v. Garcia-Botello*, 239

F.R.D. 342, 345 (W.D.N.Y. 2006).

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that this Court deny the

RICO Defendants' motions to dismiss in their entirety.


Dated:  May 8, 2015                                  Respectfully Submitted,

                                                     By:      s/ Robert A. Magnanini
                                                            Robert A. Magnanini
                                                            David S. Stone
                                                            Amy W. Wagner
                                                     STONE & MAGNANINI LLP
                                                     100 Connell Drive, Suite 2200
                                                     Berkeley Heights, NJ 07922
                                                     Tel:    (973) 218-1111
                                                     Fax:    (908) 464-3010 or
                                                            (908) 464-1020
                                                     rmagnanini@stonemagnalaw.com
                                                     dstone@stonemagnalaw.com
                                                     awagner@stonemagnalaw.com
                                                     *Attorneys for Plaintiffs*